No. 25-5431

In the

# United States Court of Appeals
### For the District of Columbia Circuit

JAMES FARMER, *et al.*,
*Plaintiffs-Appellants,*

v.

ENVIRONMENTAL PROTECTION AGENCY, *et al.*,
*Defendants-Appellees.*

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
*Intervenors below*

On Appeal from the United States District Court for the District of Columbia

**BRIEF OF PLAINFIELD TOWNSHIP, PENNSYLVANIA; TOWN OF THURSTON, NEW YORK; AND TOWN OF CAMERON, NEW YORK AS AMICI CURIAE IN SUPPORT OF APPELLANTS AND REVERSAL**

*/s/ Michael Youhana*
Michael Youhana
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
T: 212- 284-8033
E: myouhana@earthjustice.org

*Counsel for Amici Curiae*

<u>**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES,**
**AND RULE 26.1 DISCLOSURE**</u>

Pursuant to D.C. Circuit Rule 28(a)(1) and Federal Rule of Appellate Procedure 26.1, counsel for Amici Curiae Earthjustice certify as follows:

**(A)** **Parties and Amici.** Except for the following, all parties, intervenors, and amici appearing in proceedings before this Court are, to the best of my knowledge, listed in the Certificate as to Parties, Rulings and Related Cases filed by counsel for Intervenor National Association of Clean Water Agencies, on January 5, 2026:

- Earthjustice attorney Michael Youhana is counsel to Amici Curiae, Plainfield Township, Pennsylvania; the Town of Thurston, New York; and the Town of Cameron, New York in support of Plaintiffs-Appellants in No. 25-5431.

- Erica Kyzmir-Mckeon, Nora Bosworth, and Erica A. Fuller are counsel for Amici Curiae, Truckers Movement for Justice, Robert Bierschenk, James Buckle, Egide Dostie II, Jason Grostic, Robert O'Neal, and Allison Jumper in support of Plaintiffs-Appellants in No. 25-5431.

- Ashley Wilmes and Tom Fitzgerald are counsel for Amici Curiae Organic Trade Association, Sierra Club, Delaware Riverkeeper, Kentucky Resources Council, Kentucky Waterways Alliance, Save Plainfield Township Inc., and Center for Food Safety, in support of Plaintiffs-Appellants in No. 25-5431.

**(B)** **Rulings Under Review.** Plaintiffs-Appellants seek review of a final order

and memorandum opinion entered by the United States District Court for the District of Columbia (Honorable Dabney L. Friedrich) on September 29, 2025, in civil case number 24-1654, granting defendants' motion to dismiss all of the claims by Plaintiffs-Appellants in the case.

**(C) Related Cases.** The case now pending before this Court was not previously before this Court, and counsel is not aware of any other pending or related cases.

**(D) Rule 26.1 Disclosure.** Amici Plainfield Township, Pennsylvania, Town of Thurston, New York, and Town of Cameron, New York are municipalities. They are not publicly held corporations, do not issue stock, and do not have any parent corporation.

Dated: March 24, 2026

*/s/ Michael Youhana*
Michael Youhana
Earthjustice
48 Wall Street, 15th Floor
New York, NY 10005
myouhana@earthjustice.org
212- 284-8033

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. iv

GLOSSARY.................................................................................................... vi

CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING................................................................................. vii

STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE .................1

SUMMARY OF ARGUMENT ..............................................................................4

ARGUMENT ..........................................................................................................6

    I.   Land spreading PFAS-contaminated sewage sludge presents grave risks.......6

      a.   PFAS are a large class of toxic pollutants that present risks to human health................................................................................................................6

      b.   PFAS are often present in sewage sludge, which is spread on farmland across the country as a fertilizer. ..................................................................7

      c.   The land application of PFAS-contaminated sewage sludge presents risks to human health, requires costly remediation, and destroys farmland. ...............9

    II.   Local governments across the country are unable to regulate the land application of PFAS-contaminated sewage sludge within their boundaries and would therefore benefit from federal standards.................................................13

      a.   Very few states have stepped in to fill the gap left by EPA's failure to regulate PFAS in land applied sewage sludge...................................................14

      b.   Local governments seeking to protect their residents from the land application of PFAS-contaminated sewage sludge face significant obstacles..17

    III.   Section 405(d)(2)(C) of the CWA imposes a non-discretionary biennial duty to regulate newly identified PFAS in sewage-sludge.................................23

CONCLUSION ....................................................................................................28

CERTIFICATE OF COMPLIANCE....................................................................29

CERTIFICATE OF SERVICE .............................................................................30

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Application of Town of Wheatfield v. Ball*,
  No. 903925-17, 2018 WL 4916171 (N.Y. Sup. Ct. July 31, 2018)....................22

*Collins v. Yellen*,
  594 U.S. 220 (2021)..............................................................................................27

*Commonwealth v. East Brunswick Township*,
  980 A.2d 720 (Pa. Commw. Ct. 2009) ............................................................21

*Farmer v. EPA*,
  No. 24-1654 (D.D.C. Sep. 29, 2025) ................................................................24

*Kingdomware Techs., Inc. v. United States*,
  579 U.S. 162 (2016)............................................................................................24

*Pharm. Rsch. & Mfrs. of Am. v. Thompson*,
  251 F.3d 219 (D.C. Cir. 2001) .........................................................................25

*Rudisill v. McDonough*,
  601 U.S. 294 (2024)............................................................................................25

*Wash. Dep't of Ecology v. Wahkiakum County*,
  337 P.3d 364 (Wash. Ct. App. 2014)...............................................................21

*Waterkeeper All. v. U.S. Env't Prot. Agency*,
  140 F.4th 1193 (9th Cir. 2025) ............................................................26, 27, 28

**Statutes**

33 U.S.C. § 1311(d) ..............................................................................................26

33 U.S.C. § 1314(b) ..............................................................................................26

33 U.S.C. § 1314(g) ..............................................................................................26

33 U.S.C. § 1317(b) ..............................................................................................27

33 U.S.C. § 1345(d)(2)....................................................................................24, 25

33 U.S.C. § 1345(d)(2)(A) ...................................................................................24

33 U.S.C. § 1345(d)(2)(B) ...................................................................................24

33 U.S.C. § 1345(d)(2)(C) .............................................................................23, 25

33 U.S.C. § 1345(d)(2)(D) ...................................................................................24

3 Pa. Stat. and Cons. Stat. § 312 (West 2025) ...............................................22, 23

3 Pa. Stat. and Cons. Stat. § 313 (West 2025) ...............................................22, 23

Conn. Gen. Stat. § 22a-903c (2025) .....................................................................15

Me. Stat. tit. 38, § 1306(7) (2025) ........................................................................15

N.Y. Agric. & Mkts. Law § 305-a (McKinney 2026) ...........................................22

**Other Authorities**

132 Cong. Rec. 32383 (1986) ..........................................................................25, 26

# **GLOSSARY**

| | |
|---|---|
| ACRE | Agriculture, Communities and Rural Environment Act |
| Cameron | Amicus curiae the Town of Cameron |
| CWA | Clean Water Act |
| EPA | United States Environmental Protection Agency |
| EWG | Environmental Working Group |
| ICMA | International City/County Management Association |
| Thurston | Amicus curiae the Town of Thurston |
| PFAS | Per- and polyfluoroalkyl substances |
| PFOA | Perfluorooctanoic acid |
| PFOS | Perfluorooctane sulfonic acid |
| Plainfield | Amicus curiae Plainfield Township |
| ppb | part per billion |
| Risk Assessment | EPA's Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) CASRN 335-67-1 and Perfluorooctane Sulfonic Acid (PFOS) CASRN 1763-23-1 |
| RTF | Right to Farm |

# CERTIFICATE OF COUNSEL REGARDING AUTHORITY TO FILE AND SEPARATE BRIEFING

Pursuant to Federal Rule of Appellate Procedure 29(a)(2) and D.C. Circuit Rule 29(b) may file an amicus brief with consent of the parties, and undersigned counsel for amici curiae represents that counsel for all parties have consented. Amici Plainfield Township, Pennsylvania, the Town of Thurston, New York, and the Town of Cameron, New York (collectively "Amici") further represent that, as local governments, they are "governmental entities" for the purposes of D.C. Circuit Rule 29(d), if the term "governmental entity" carries its ordinary meaning within this provision. However, if Amici are not considered "governmental entities," counsel certifies pursuant to D.C. Circuit Rule 29(d) that filing a separate brief from other amici curiae is necessary and appropriate to ensure that the unique interests of Amici are adequately represented in this proceeding. While Amici share the ultimate position of others supporting Plaintiffs-Appellants in their appeal, the reasons for Amici's opposition are distinct and unique to the experiences of local governments struggling to regulate PFAS-contaminated sewage sludge through local laws.

Dated: March 24, 2026        */s/ Michael Youhana*
                                      Michael Youhana

<u>**STATEMENT OF IDENTITY AND INTEREST OF AMICI CURIAE**</u>

The Amici Curiae are local governments concerned about the environmental and public health impacts associated with the spreading of sewage sludge (sometime called "biosolids") contaminated by per- and polyfluoroalkyl substances ("PFAS"). The efforts of Amici to enact regulations to control PFAS in sewage sludge have been hindered by a variety of administrative and legal obstacles. Amici support Plaintiffs-Appellants' appeal seeking reversal of the district court decision, which misconstrues Section 405(d)(2)(C) of the Clean Water Act ("CWA"), and, in so doing, leaves local governments without protection from PFAS contamination that would otherwise be afforded by federal regulations. Amici submit this brief to underscore the risks presented by PFAS in sewage sludge fertilizers, the difficulties faced by local governments seeking to manage those risks, and the resulting need for the promulgation of U.S. Environmental Protection Agency's ("EPA") regulations, as mandated by CWA Section 405(d)(2)(C).

**Plainfield Township** ("Plainfield") is a political subdivision and township of the Commonwealth of Pennsylvania. In September 2024, Plainfield adopted a municipal ordinance to regulate PFAS in sewage sludge that is land applied within its municipal boundaries. The ordinance fills a gap in Pennsylvania state law, which does not regulate PFAS in sewage sludge. To develop the ordinance

1

Plainfield retained a scientific consultant with expertise in PFAS. The consultant reviewed nearly 50 studies and determined that land application of contaminated sludge would create risks by contaminating soil within the township. Despite Plainfield's best efforts to mitigate public health risks presented by PFAS through science-based regulation, the ordinance may not survive. The Pennsylvania Office of Attorney General has launched a review of the legality of the ordinance that continues to this day. In addition, since July 17, 2025, Plainfield has been mired in a Pennsylvania Commonwealth Court lawsuit filed by a proponent of sewage sludge spreading, which asserts that the ordinance is preempted by state law. Plainfield has an interest in the adoption of federal regulations that would protect its residents from PFAS in sewage sludge and thereby obviate the need for local regulation.

**The Town of Thurston** ("Thurston") is located in the State of New York. Dangerously high levels of PFAS have been detected in several private drinking water wells sampled near sites of sewage sludge land application within Thurston. New York State has failed to enact regulations that provide the town with adequate protections from PFAS in sewage sludge. Thurston has responded by enacting a local law to regulate the land application of PFAS-contaminated sewage sludge within the town. To comply with New York State law, Thurston conducted an extensive scientific review of the likely environmental impacts of the local law;

2

consulting with several technical experts on the health effects on PFAS and the chemical behavior of contaminants in agricultural soils. Nonetheless, in March 2024, at the request of a farmer using sludge as a fertilizer, the New York State Department of Agriculture and Markets initiated a legal review of Thurston's local law, under the state's Agriculture and Markets Law. This review, which to the Town's knowledge is ongoing, may result in the invalidation of Thurston's local law, after a protracted administrative proceeding. As a result of New York's uncertain legal climate, Thurston has an interest in the outcome of this case. EPA's issuance of regulations to address the land application of PFAS-contaminated sludge would help provide the town's drinking water with a modicum of protection from PFAS even if the local law is invalidated.

**The Town of Cameron** ("Cameron") neighbors Thurston in the State of New York. Cameron adopted a local law to regulate PFAS in sewage sludge modeled on Thurston's because water samples taken in the town revealed PFAS contamination near sites of sewage sludge land application. The law was also adopted because the U.S. Department of Agriculture has rated approximately 97% of the Town's land as having "very limited" suitability for municipal sewage sludge application; meaning that town's topology creates a heightened risk that sludge will runoff and thereby spread contaminants over a larger area. Much like Thurston, Cameron has an interest in this litigation because federal sewage sludge

regulations can provide protections to residents from PFAS even if the New York State Department of Agriculture and Markets invalidates the town's local law.

## SUMMARY OF ARGUMENT

This case concerns EPA's years-long failure to comply with a mandatory duty to promulgate regulations to protect public health and the environment from toxic PFAS in sewage sludge, a failure that is resulting in severe consequences for local governments across the country. The district court's determination that EPA is not obligated to promulgate regulations should be reversed for the following reasons:

**I.** PFAS are highly toxic pollutants. Scientific literature shows that PFAS are commonly present in sewage sludge. A vast and growing body of scientific literature also shows that PFAS-contaminated sludge presents risks to public health and the environment when applied to land as a fertilizer. Billions of pounds of sewage sludge, likely contaminated with PFAS, have been used on millions of acres of farmland across the country. Once applied to land, PFAS accumulate in soil and water, crops, farm animals, and eventually human bodies, leading to the development of a host of illnesses. Thereafter, without exceedingly costly remediation efforts PFAS contaminates soil and water indefinitely.

**II.** Local governments are on the frontlines of this crisis. In the absence of federal rules governing the use and disposal of PFAS-contaminated sludge, these

counties and municipalities are left with little protection. In most of the country states have not issued regulations that protect the public from PFAS-contaminated sludge. Rather, state policy often promotes the land application of contaminated sludge. Many local governments are unable to step in to fill this regulatory gap because fiscal, technical, and legal obstacles make enacting local ordinances to deal with the problem exceedingly difficult. In the absence of federal action, the environmental and human toll in the communities these governments represent is likely to compound over time.

**III.** CWA Section 405(d)(2)(C) requires EPA to biennially review and update federal sewage sludge regulations. The provision was adopted to protect the public from any new toxic pollutants in sludge identified by EPA during or before the provision's two-year review period. Although EPA has identified PFAS as pollutants commonly present in sewage sludge, the agency's Section 405(d)(2)(C) regulations entirely fail to address PFAS in sewage sludge. The district court erred in finding that Section 405(d)(2)(C) of the CWA does not establish a mandatory timetable for EPA to periodically update its sewage sludge regulations to address PFAS. The court's view that the provision only requires a passive biennial review of existing sewage sludge without a corresponding requirement to update those regulations runs counter to the relevant statutory context and legislative history,

not to mention common sense. EPA's failure to act shifts the burden to regulate onto municipalities that lack the regulatory capacity of the federal government.

## ARGUMENT

Notwithstanding the district court's determination, EPA has failed to comply with its obligations under CWA Section 405(d)(2)(C) to promulgate any regulations to protect the public from PFAS in sewage sludge. The agency's failure to issue federal regulations exposes communities across the country to these toxic pollutants. Many local governments are unable to fill the regulatory gap despite their best efforts.

**I. Land spreading PFAS-contaminated sewage sludge presents grave risks.**

An enormous amount of unregulated, PFAS-contaminated sewage sludge is applied to agricultural land across the country, putting public health at risk.

**a. PFAS are a large class of toxic pollutants that present risks to human health.**

PFAS are a large class of human-made chemical compounds,[1] used in a wide range of products, such as paper and cardboard packaging, carpet, cookware, clothing, and firefighting foam.[2] Aptly called "forever chemicals," PFAS can

---

[1] Carol F. Kwiatkowski et al., *Scientific Basis for Managing PFAS as a Chemical Class*, 7 Env't. Sci. & Tech. Letters 532 (2020).
[2] *See* U.S. Dep't of Health & Hum. Servs., *Toxicological Profile for Perfluoroalkyls* 2 (2021), https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

persist for decades in the human body and environment.[3] Because PFAS

accumulate in blood and body tissue, repeated exposures to even low PFAS levels

can build up and cause serious harm.[4] Exposure to PFAS has been linked to many

serious health harms, including increased risk of certain cancers.[5] PFAS-related

diseases cost Americans up to $63 billion each year.[6]

### b. PFAS are often present in sewage sludge, which is spread on farmland across the country as a fertilizer.

**1.** PFAS end up in sewage sludge when contaminated wastewater is

discharged from industrial facilities and residences into wastewater treatment

plants.[7] EPA has acknowledged that two PFAS, perfluorooctanoic acid ("PFOA")

and perfluorooctane sulfonic acid ("PFOS"), are routinely found in sewage sludge.[8]

---

[3] *See*, *e.g.*, *id.* at 5 tbl. 1-1; Mark L. Brusseau, R. Hunter Anderson & Bo Guo, *PFAS Concentrations in Soils: Background Levels Versus Contaminated Sites*, 740 Sci. Total Env't 1, 7–8 (2020).

[4] *See* Emiliano Panieri et al., *PFAS Molecules: A Major Concern for the Human Health and the Environment*, 10 Toxics 1, 16 (2022).

[5] U.S. Dep't of Health & Hum. Servs., *supra* note 2, at 6.

[6] *Daily Exposure to 'Forever Chemicals' Costs United States Billions in Health Costs*, NYU Langone Health (July 26, 2022), https://nyulangone.org/news/daily-exposure-forever-chemicals-costs-united-states-billions-health-costs.

[7] Jared Hayes, *'Forever Chemicals' in Sludge May Taint Nearly 70 Million Farmland Acres*, Env't Working Grp. (Jan. 14, 2025), https://www.ewg.org/news-insights/news/2025/01/forever-chemicals-sludge-may-taint-nearly-70-million-farmland-acres.

[8] EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) CASRN 335-67-1 and Perfluorooctane Sulfonic Acid (PFOS) CASRN 1763-23-1*, at iv (2025), https://www.epa.gov/system/files/documents/2025-01/draft-sewage-sludge-risk-assessment-pfoa-pfos.pdf ("Risk Assessment"); *see also* Arjun K.

Recent studies also document the presence of PFAS other than PFOA and PFOS in sludge, sludge-impacted soil, surface water, groundwater, and vegetables,[9] often at higher concentrations than PFOA and PFOS.[10]

**2.** A large amount of sewage sludge is land applied as a fertilizer in agricultural operations,[11] often at the encouragement of state governments.[12] The Environmental Working Group ("EWG") estimates, based on state reports to EPA, that from 2016 to 2022, persons applied 19.1 billion pounds of sewage sludge to farmland across the nation.[13] In 2025, EWG also estimated that PFAS-

---

Venkatesan & Rolf U. Halden, *National Inventory of Perfluoroalkyl Substances in Archives U.S. Biosolids from the 2001 EPA National Sewage Sludge Survey*, 252 J. Hazardous Materials 413 (2013).

[9] Gwynn R. Johnson, *PFAS in Soil and Groundwater Following Historical Land Application of Biosolids*, 211 Water Rsch. 1, 5 (2022) ; Justin Caniglia et al., *Extraction, Analysis, and Occurrence of Per- and Polyfluoroalkyl Substances (PFAS) in Wastewater and After Municipal Biosolids Land Application to Determine Agricultural Loading*, 4 Frontiers Water 1, 8 tbl. 3 (2022); Nanthi Bolan et al., *Distribution, Behaviour, Bioavailability and Remediation of Poly- and Per-fluoroalkyl Substances (PFAS) in Solid Biowastes and Biowaste-Treated Soil*, 155 Env't Int'l 1, 9 tbl. 2 (2021).

[10] Garrett W. Link et al., *Per- and Polyfluoroalkyl Substances (PFAS) in Final Treated Solids (Biosolids) from 190 Michigan Wastewater Treatment Plants*, 463 J. Hazardous Materials 1 (2024).

[11] Colin M. Pohlman, *"Toxic Terroir"? PFAS in Agricultural Biosolids*, 39 Nat. Res. & Env't 19, 19 (2024).

[12] *See*, *e.g.*, *Land Application of Wastewater and Wastewater Treatment Residuals*, Mo. Dep't of Nat. Res., https://dnr.mo.gov/water/business-industry-other-entities/technical-assistance-guidance/land-application-wastewater (last visited Mar. 17, 2026); *Domestic Wastewater Biosolids*, Fla. Dep't of Env't Prot., https://floridadep.gov/water/domestic-wastewater/content/domestic-wastewater-biosolids (last modified Dec. 13, 2024).

[13] Pohlman, *supra* note 11, at 20.

contaminated sewage sludge was being applied to up to 18% of U.S. agricultural lands, which is nearly 70 million acres.[14]

### c. The land application of PFAS-contaminated sewage sludge presents risks to human health, requires costly remediation, and destroys farmland.

**1.** EPA and other scientific authorities have acknowledged that land application of sewage sludge creates multiple pathways for human exposure to PFAS.[15] For example, after sewage sludge is land applied, PFAS in the sludge enter soil, where the chemicals can persist long-term or be taken up by crops.[16] PFAS can also become airborne,[17] leach into groundwater, and run off into surface water, contaminating water supplies.[18] Livestock, fish, and wildlife that ingest

---

[14] Hayes, *supra* note 7 (referencing National Biosolids Project industry survey data on acres affected by sewage sludge spreading).

[15] *See*, *e.g.*, EPA, *EPA Biosolids PFOA & PFOS Problem Formulation Meeting Summary* 14 (2020), https://www.epa.gov/sites/default/files/2021-02/documents/biosolids-pfoa-pfos-meeting-summary-nov-2020.pdf.

[16] *See* M. Christina Schilling Costello & Linda S. Lee, *Sources, Fate, and Plant Uptake in Agricultural Systems of Per- and Polyfluoroalkyl Substances*, 10 Current Pollution Reps. 799, 803, 805–11 (2024); Johnson, *supra* note 9; Bei Wen et al., *Field Study on the Uptake and Translocation of Perfluoroalkyl Acids (PFAAs) by Wheat (Triticum aestivum L.) Grown in Biosolids-Amended Soils*, 184 Env't Pollution 547 (2014).

[17] *See* Annesh Borthakur et al., *Inhalation Risks of Wind-Blown Dust from Biosolid-Applied Agricultural Lands: Are They Enriched with Microplastics and PFAS?*, 25 Current Op. Env't Sci. & Health 1, 1 (2022).

[18] *See* Andrew B. Lindstrom et al., *Application of WWTP Biosolids and Resulting Perfluorinated Compound Contamination of Surface and Well Water in Decatur, Alabama, USA*, 45 Env't Sci. & Tech. 8015, 8020 (2011); Aurélia Marcelline Michaud et al., *In Situ Occurrence and Mobility of Per and Polyfluoroalkyl*

PFAS in soil, plants, air, and water can become contaminated with accumulating amounts of the chemicals.[19] Thus, through sewage sludge land application, food, air, water become pathways for human exposure to PFAS.

EPA acknowledges the health risks presented by human exposure to PFAS in sewage sludge. The agency has characterized PFOA and PFOS as "highly toxic to human beings,"[20] and noted that land application of sewage sludge containing PFOA or PFOS at very small amounts – just one part per billion ("ppb") – can result in exceedances of EPA's acceptable thresholds for cancer and non-cancer risks by several orders of magnitude.[21] For example, children who consume milk that has been contaminated with PFOA as a result of sludge application may experience a lifetime cancer risk thousands of times above the level that EPA

---

*Substances in Soils Amended with Organic Waste Products,* 984 Sci. Total Env't 1, 13 (2025); Michael Holly et al., *Evaluation of Per- and Polyfluoroalkyl Substances Leaching from Biosolids and Mitigation Potential of Biochar Through Undisturbed Soil Column*, 4 ACS ES&T Water 413, 420 (2024); Johnson, *supra* note 9.

[19] *See* Clare Death et al., *Per- and Polyfluoroalkyl Substances (PFAS) in Livestock and Game Species: A Review*, 774 Sci. Total Env't 1, 1 (2021); Sara J. Lupton et al., *Distribution and Excretion of Perfluorooctane Sulfonate (PFOS) in Beef Cattle (Bos taurus),* 62 J. Agric. & Food Chemistry 1167 (2014); Janine Kowalczyk et al., *Absorption, Distribution, and Milk Secretion of the Perfluoroalkyl Acids PFBS, PFHxS, PFOS, and PFOA by Dairy Cows Fed Naturally Contaminated Feed,* 61 J. Agric. & Food Chemistry 2903 (2013).

[20] Risk Assessment at iv; *see also* 40 C.F.R. §§ 141.2, 141.50(a)(24), (25) (indicating that any amount of PFOA and PFOS in drinking water may present risks to health).

[21] Risk Assessment at vi.

deems acceptable.[22] Unacceptable cancer risks exist even if the land-applied sludge contains PFOA at levels too small to be quantified.[23] Moreover, these risks are not limited to PFOA and PFOS. EPA determined that low-level exposures to several other kinds of PFAS linked to sludge can also cause serious harm to human health,[24] and EPA admits that exposure to multiple PFAS, in combination with exposure to sludge-related PFOA and PFOS, would result in greater risks.[25]

The amount of PFAS in sludge often exceeds the low thresholds that present health risks. For example, more than 98% of sludge samples collected in Colorado in 2023 exceeded 1 ppb for PFOS.[26] Similarly, researchers detected PFOS in 95% of sludge samples collected between 2018 and 2022, from 190 wastewater

---

[22] *Id.* at 102, 105.

[23] *Id.* at 106 ("The modeling suggests that even when modeled concentrations are below currently available method detection limits (MDLs), estimated cancer risks associated with PFOA can exceed acceptable thresholds.").

[24] *Human Health Toxicity Assessments for GenX Chemicals*, EPA, https://www.epa.gov/chemical-research/human-health-toxicity-assessments-genx-chemicals (last updated Nov. 12, 2025); *Perfluorobutanoic Acid (PFBA)*, EPA, https://iris.epa.gov/ChemicalLanding/&substance_nmbr=701 (last visited Mar. 17, 2026); *Perfluorohexanoic Acid (PFHxA)*, EPA, https://iris.epa.gov/ChemicalLanding/&substance_nmbr=704 (last visited Mar. 17, 2026).

[25] Risk Assessment at vi–vii (acknowledging that "risk estimates that account for . . . exposure to other PFAS would be greater than those presented in [the Risk Assessment]").

[26] Sammy Herdman, *More 'Forever Chemical' Protections Needed for Colorado Farmlands and Food*, Colo. Newsline (Jan. 23, 2025), https://coloradonewsline.com/2025/01/23/forever-chemical-colorado-farmlands.

treatment plants in Michigan; the average PFOS concentration in those samples was 40 ppb.[27]

**2.** When PFAS gets into water it is costly to remediate, and local governments may end up bearing the costs. For example, the city of Anaheim, California expects to spend $200 million on the filtration of PFAS from drinking water.[28] Once soil is contaminated by PFAS, cleaning up the toxic pollutants is similarly exceedingly costly.[29] Several instances of extreme contamination underscore the urgency of the problem. In Michigan, officials shut down a cattle farm after its beef was found to contain unsafe levels of PFAS traced to sludge application on fields.[30] The state has permanently prohibited the farm from being used for agriculture,[31] pushing the owner toward bankruptcy.[32] In Texas, cattle

---

[27] Link et al., *supra* note 10.

[28] Pien Huang, *How a California County Got PFAS out of Its Drinking Water*, NPR (Sep. 12, 2024), https://www.npr.org/sections/shots-health-news/2024/09/12/g-s1-22291/pfas-drinking-water-filter.

[29] *See*, *e.g.*, Jitendra A. Kewalramani et al., *Coupled High and Low-Frequency Ultrasound Remediation of PFAS-Contaminated Soils*, 88 Ultrasonics Sonochemistry 1, 1–2 (2022); Hafiz N. Hussain et al., *Advances in the Removal of Polyfluoroalkyl Substances (PFAS) from Water Using Destructive and Non-Destructive Methods*, 12 Green Analytical Chemistry 100225 (2025).

[30] Teresa Homsi, *This Farmer's Livelihood Was Ruined by PFAS-Contaminated Fertilizer that Few Midwest States Test for*, Neb. Pub. Media (Mar. 11, 2024), https://nebraskapublicmedia.org/en/news/news-articles/this-farmers-livelihood-was-ruined-by-pfas-contaminated-fertilizer-that-few-midwest-states-test-for/.

[31] Hiroko Tabuchi, *Something's Poisoning America's Land. Farmers Fear 'Forever' Chemicals.*, N.Y. Times (Aug. 31, 2024), https://www.nytimes.com/2024/08/31/climate/pfas-fertilizer-sludge-farm.html.

[32] Homsi, *supra* note 30.

ranchers discovered that a stillborn calf had high levels of PFAS in its liver, which they attributed to sludge application on neighboring land; the ranchers subsequently stopped sending all of their cattle to market.[33] And in Maine, more than 100 farms that are licensed sludge land application sites have suffered PFAS contamination of their soil or groundwater, driving at least six farms to close and three farms to downsize.[34]

Thus, the land application of PFAS-contaminated sewage sludge presents a growing public health threat across the country, and the need for regulations to control its use and disposal is tremendous.

II. **Local governments across the country are unable to regulate the land application of PFAS-contaminated sewage sludge within their boundaries and would therefore benefit from federal standards.**

A very small number of states have set limits on the amount of PFAS allowed in land applied sewage sludge, leaving concerned local governments to fend for themselves. Unfortunately, local governments that aim to fill federal and state gaps in the regulation of PFAS in sludge through the adoption of local laws often face administrative burdens, technical hurdles, and litigation.

---

[33] Tabuchi, *supra* note 31.

[34] *See* Me. Dep't of Agric., Conservation & Forestry, *Maine PFAS Response Program Updates & What's Next* 5 (Jan. 15, 2026), https://www1.maine.gov/dacf/ag/pfas/docs/pfas-response-ats-2026.pdf.

> **a. Very few states have stepped in to fill the gap left by EPA's failure to regulate PFAS in land applied sewage sludge.**

**1.** In the absence of EPA regulations on PFAS in sewage sludge, just a small minority of states have stepped in to fill the regulatory gap. In many instances, state lawmakers and regulators have been reactive: establishing rules to address PFAS in sludge only after a high profile or extreme instance of contamination comes to light.[35] Recent reviews of the regulatory landscape indicate that just around a dozen states have enacted regulatory requirements related to PFAS in sewage sludge.[36] Moreover, a 2023 survey by the Environmental Council of the States found that 27 out of 38 state-respondents did not even have *proposed* legislation on PFAS in sewage sludge.[37]

**2.** Even in the minority of states that *have* acted to address PFAS-contaminated sludge, legal requirements are often weak. Only two of the

---

[35] Brook Duer, *FAQ: Why Aren't PFAS Compounds in Land-Applied Biosolids Regulated by EPA?*, PennState Extension (Aug. 25, 2025), https://extension.psu.edu/faq-why-arent-pfas-compounds-in-land-applied-biosolids-regulated-by-epa.

[36] *See* MOST Pol'y Initiative, *PFAS Land Application Regulations* 1 (2025), https://mostpolicyinitiative.org/wp-content/uploads/2025/01/PFAS-Land-APPLICATION.pdf (identifying "[s]tates that actively regulate PFAS on land application"); Emma L. Lautanen, Jeff B. Kray & James A. Tupper, *Wastewater, Biosolids Come Under PFAS Regulation*, Marten Law (Sep. 10, 2024), https://martenlaw.com/news/wastewater-biosolids-come-under-pfas-regulation (identifying states "actively regulating" PFAS in biosolids; and states requiring "monitoring/sampling"); Kayla Nuschke, *PFAS: State-by-State Regulatory Update (March 2025 Revision)*, ALL4 (Mar. 13, 2025), https://www.all4inc.com/4-the-

14

approximately one dozen states that regulate PFAS in sludge, Connecticut and Maine, have banned the sale or land application of PFAS-contaminated sludge.[38] Regulators in the other states often only require monitoring of PFAS concentrations, or target just one or two types of PFAS among the myriad known to be present in sewage sludge.

For example, Colorado's "Biosolids-PFAS Interim Strategy" primarily requires entities that generate or prepare sewage sludge for use (e.g., wastewater treatment plants) to periodically sample for PFAS.[39] No further action is required by the regulated party unless the sampling results show that concentrations of one type of PFAS in the sewage sludge, PFOS, meet or exceed an astronomically high

---

record-articles/state-pfas-regulations-march-2025/ (identifying states with rules related to PFAS in sewage sludge); *Safer States: Bill Tracker*, Safer States, https://www.saferstates.org/bill-tracker/?year=2002:2026&issue_sectors=Biosolids/Sludge&toxic_chemicals=PFAS (last visited Mar. 17, 2026) (identifying states that have adopted legislation requiring monitoring or management of PFAS in sewage sludge).

[37] *See* Sarah Grace Hughes, Env't Council of States, *PFAS in Biosolids: A Review of State Efforts & Opportunities for Action* (2023), https://www.ecos.org/wp-content/uploads/2023/01/PFAS-in-Biosolids-A-Review-of-State-Efforts-and-Opportunities-for-Action.pdf; *see also* Molly Carey, *Fatal Fertilizer: Pfas Contamination of Farmland from Biosolids and Potential Federal Solutions*, 40 Pace Env't L. Rev. 282, 300–02 (2023).

[38] Conn. Gen. Stat. § 22a-903c (2025); Me. Stat. tit. 38, § 1306(7) (2025).

[39] Colo. Dep't of Pub. Health & Env't, *Colorado Biosolids-PFAS Interim Strategy* 1–2 (2025), https://drive.google.com/file/d/1yrkB2ZXpPwvVXppJYHMcTQ0bUolIIxU8/view.

threshold of 50 ppb.[40] As noted above, sludge contaminated with just 1 ppb presents health risks.[41] If the 50 ppb is threshold is met, then the regulated party must investigate why PFOS levels in the sludge are so high, and afterward the regulator might require implementation of a plan to reduce concentrations of PFOS in the sludge.[42]

New York's sewage sludge policy likewise only targets two PFAS: PFOS and PFOA.[43] The policy requires land application facilities to sample sewage sludge they receive and test for PFAS.[44] As with Colorado's policy, regulatory action is only triggered if the tests show that the sewage sludge is contaminated with very high PFOS or PFOA concentrations.[45] If PFAS other than PFOS and PFOA are present in the sludge at high concentrations, no regulatory action is required.

---

[40] *Id.* at 4.

[41] *See supra* Section I.c.

[42] Colo. Dep't of Pub. Health & Env't, *supra* note 39, at 3–4.

[43] N.Y. State Dep't of Env't Conservation, *DMM- 7/ Biosolids Recycling in New York State – Interim Strategy for the Control of PFAS Compounds* 4 (2023), https://extapps.dec.ny.gov/docs/materials_minerals_pdf/dmm7.pdf.

[44] *Id.* at 3.

[45] *Id.* at 4 (noting that land application is prohibited at concentrations above 50 ppb; and will be "restrict[ed]" if levels remain above 20 ppb for more than one year).

### b. Local governments seeking to protect their residents from the land application of PFAS-contaminated sewage sludge face significant obstacles.

In the absence of federal and state regulation, local governments across the country have tried to regulate the land application of PFAS-contaminated sewage sludge by passing local laws.[46] Unfortunately, local governments seeking to protect their residents from PFAS in sludge face significant hurdles. These hurdles include a lack of regulatory capacity, a lack of fiscal resources to develop local sewage sludge regulations, and, when local laws are enacted, costly preemption litigation.

**1.** Many local governments around the country lack the administrative and technical capacity to draft and enact complex regulations to control the land-application of PFAS in sewage sludge. Locally regulating PFAS in land-applied sludge requires significant technical and legal expertise. For example, to demonstrate to state and local stakeholders that the enactment of a local ordinance establishing ceiling concentrations on PFAS in land-applied sewage sludge was necessary to protect public health, Amicus Plainfield needed to retain a team of

---

[46] *See* Lela Nargi, *New York's Sludge Wars Are Personal*, Offrange (Apr. 13, 2024), https://ambrook.com/offrange/environment/sludge-biosolids-farmland-New-York-PFAS; Bill Rethlake, *Biosolids Ordinance Passes Second Reading*, Greensburg Daily News (Dec. 24, 2024), https://www.greensburgdailynews.com/news/local_news/biosolids-ordinance-passes-second-reading/article_83345564-bf01-11ef-9719-6b30010fade8.html; Town of Groton, Mass., Moratorium Prohibiting the Use or Storage of "Biosolids" or Compost Derived from Sewage Sludge (May 9, 2024), https://ecode360.com/GR1188/document/753055347.pdf.

environmental lawyers, consider nearly 50 studies and reports detailing harms from PFAS, and consult with an environmental toxicologist with expertise in PFAS fate and transport.[47]

Several surveys and reports suggest that many municipalities across the country do not have the expert staff or support that was available to Plainfield. In a 2015 survey of U.S. cities and counties conducted by the International City/County Management Association ("ICMA"), a significant share of respondents indicated that there was a lack of staff dedicated to environmental protection in many local governments.[48] Other data gathered in recent years indicate that local governments face challenges recruiting qualified staff across a range of departments.[49]

---

[47] Letter from the Township of Plainfield to Robert A. Willig, Pa. Att'y Gen., at 1, Ex. 1 (Nov. 18, 2024), https://www.attorneygeneral.gov/wp-content/uploads/2024/10/Plainfield-Township-Redacted-Township-Response.pdf.

[48] *Nearly a Third of Local Governments Have Adopted Sustainability Plans*, ICMA (Mar. 21, 2016), https://icma.org/articles/article/nearly-third-local-governments-have-adopted-sustainability-plans.

[49] One state and local government 2025 survey, in which 79% of respondents were local governments, found that 34% of respondents had an insufficient number of qualified applicants necessitating a reopening of recruitment "very frequently" or "somewhat frequently" over the past year. MissionSquare Rsch. Inst., *2025 State and Local Government Workforce Survey Results* 4, 16 (2025), https://research.missionsq.org/content/media/document/2025/5/2025_State_Local_Workforce_Report.pdf; *see also* OpenGov, *The State of Local Government Survey 2023*, at 3 (2023), https://go.opengov.com/rs/884-HTB-905/images/State%20of%20Local%20Government%20Survey%202023.pdf (finding 61% of respondents view hiring challenges as an obstacle); Eloise Wyatt, Northeast-Midwest Inst., *Local Government Capacity in Legacy Cities* 4 (2025),

Problems of regulatory capacity are especially acute for small communities, as an EPA Local Government Advisory subcommittee representing small communities of as few as 2,500 persons has acknowledged.[50] Such small communities, like Amici Thurston and Cameron, are often located in the rural areas subject to the land application of sludge.[51]

**2.** Similarly, many local governments likely lack the fiscal space to enact complex environmental laws. The aforementioned ICMA survey found that although a plurality of 47% of local governments identified environmental protection as a priority, only 19% had dedicated budgets for sustainability or environmental protection.[52] The National League of Cities' more recent 2025 City Fiscal Conditions Report also raises doubts that municipalities will have the resources to develop complex, new environmental regulations targeting PFAS in

https://www.nemw.org/wp-content/uploads/2025/11/Policy-Report-Local-Governance-1-1.pdf.

[50] *See* EPA, *Small Communities: The Front Line of Environmental Protection* 7–9 (2008), https://19january2021snapshot.epa.gov/sites/static/files/2013-09/documents/2009_0414_lgac_small_communities.pdf; *see also* Small Cmty. Advisory Subcomm., EPA, *SCAS Transitional Letter - Small Community Priorities Look Ahead* 1 (2024), https://www.epa.gov/ocir/small-community-advisory-subcommittee-scas (noting that small communities may lack "resources needed to address complex environmental challenges like pollution control").

[51] *See*, *e.g.*, Joshua A. Bickel & Sean Murphy, *Residue from Human Waste Has Long Wound up as Farm Fertilizer. Some Neighbors Hate It*, Associated Press (Mar. 26, 2025), https://apnews.com/article/oklahoma-biosolids-sewage-sludge-pfas-health-27ef39f1561f66548b1cca5ce46062d4.

[52] *Nearly a Third of Local Governments*, *supra* note 48.

sludge anytime soon due to declining fiscal health and already limited public health budgets. The report found a recent "dip in fiscal confidence" among municipal finance officers, with "the data show[ing] signs of tightening budgets and growing concern over external pressures that could reshape local fiscal landscapes."[53] Moreover, the report found that only about 1% of municipal general fund expenditure was directed towards public health between 2023 and 2025.[54]

**3.** Assuming local governments can leap over these technical and fiscal hurdles to regulating PFAS in sewage sludge, many are likely to run headlong into equally cumbersome legal challenges. Indeed, for decades, state preemption challenges have thwarted efforts by local governments across the country to enact regulations on the land application of sewage sludge.[55] In some cases, courts have struck down stringent sewage sludge ordinances on the grounds that they are preempted by more lax statewide environmental laws. For example, in Pennsylvania a court found that the state's Solid Waste Management Act preempted a township ordinance requiring chemical testing and compliance with

---

[53] Nat'l League of Cities, *City Fiscal Conditions 2025*, at 5 (2025), https://www.nlc.org/resource/city-fiscal-conditions-2025/.
[54] *Id.* at 12–13.
[55] *See* Rachel Fullmer, *A Cow Palace Coup: Expanding the Reach of RCRA to Combat Agricultural Pollution*, 28 Geo. Env't L. Rev. 501, 508–11 (2016) (collecting cases around the country and noting the failure of "many legal efforts aimed at curbing the use of biosolids in food production [by] defending local and municipal ordinances that regulate or restrict biosolids use").

notice and signage requirements prior to sewage sludge land application. *See Commonwealth v. East Brunswick Township*, 980 A.2d 720, 723–34 (Pa. Commw. Ct. 2009); *see also Wash. Dep't of Ecology v. Wahkiakum County*, 337 P.3d 364, 368–69 (Wash. Ct. App. 2014) (finding county ordinance banning land application of "class B" sewage sludge conflicted with sewage sludge management regulations).

In other cases, Right to Farm ("RTF") laws make local control over the land application of sludge extraordinarily difficult. RTF laws proliferated with the onset of an agricultural economic crisis in the late 1970s, and by the mid-1990s, had been enacted in every state.[56] Originally, these laws served as liability shields, protecting defendants from nuisance claims arising from the environmental impacts of agricultural activities.[57] But over time, state legislatures expanded RTF laws further, ensuring that they weakened local government control over land use and siting decisions, sometimes for the purpose of competing for the business of large agricultural operations.[58] Today, RTF laws restricting local government authority to regulate agricultural practices are in effect in 62% of states.[59] RTF

---

[56] *See* Loka Ashwood et al., *Empty Fields, Empty Promises: A State-by-State Guide to Understanding and Transforming the Right to Farm* 3 (2023).
[57] *Id.* at 5–7.
[58] *Id.*; N. William Hines, *CAFOs and U.S. Law*, 107 Iowa L. Rev. Online 19, 44 (2022).
[59] *See* Ashwood et al., *supra* note 56, at 6–7.

laws have not prevented the loss of farmland.[60] Rather than the small proprietor or family farmers RTF laws were originally intended to protect, the biggest beneficiaries tend to be large operations, like concentrated animal feeding operations or corporate sewage sludge recyclers.[61]

Among those bearing the costs of RTF laws, including litigation costs, are resource-strapped local governments seeking to regulate sewage sludge. For example, an RTF law in New York State prohibits local laws that "unreasonably restrict" many farming operations in agricultural districts. *See* N.Y. Agric. & Mkts. Law § 305-a (McKinney 2026). The law has resulted in litigation leading to the invalidation of a local sewage sludge management regulation. *In re Application of Town of Wheatfield v. Ball*, No. 903925-17, 2018 WL 4916171, at *13 (N.Y. Sup. Ct. July 31, 2018). Similarly, as mentioned above, Amicus Plainfield has been sued for enacting an ordinance to control PFAS in sludge under Pennsylvania's Agriculture, Communities and Rural Environment Act ("ACRE"). Under that law, municipalities are prohibited from enacting "unauthorized" local ordinances that restrict "normal" agricultural operations. *See* 3 Pa. Stat. and Cons. Stat. §§ 312, 313 (West 2025). Any person aggrieved by the ordinance may sue a municipality

---

[60] *See* Danielle Diamond et al., *Agricultural Exceptionalism, Environmental Injustice, and U.S. Right-to-Farm Laws*, 52 Env't L. Rep. 10727, 10747 (2022), https://animal.law.harvard.edu/wp-content/uploads/Diamond.pdf.
[61] *See* Ashwood et al., *supra* note 56, at 4–11.

under ACRE, and if the municipality loses, it may be liable for the plaintiff's litigation costs. *Id.* §§ 315(b), 317(1).

Thus, today many local governments, like Amici, are faced with a stark choice between accepting the dumping of PFAS-contaminated sewage sludge within their municipal boundaries (and the attendant public health risks), or attempting to overcome a gauntlet of technical, budgetary, and legal challenges to enacting their own complex environmental regulations. EPA can and must resolve this dilemma by complying with its duties to identify and regulate PFAS in sewage sludge pursuant to CWA Section 405(d)(2)(C).

III.    **Section 405(d)(2)(C) of the CWA imposes a non-discretionary biennial duty to regulate newly identified PFAS in sewage-sludge.**

Congress enacted subparagraph (d)(2)(C) of CWA Section 405 to create a federal regulatory floor protecting communities, like those represented by Amici, from toxic pollutants, like PFAS, in sewage sludge. The subparagraph states that "[f]rom time to time, but not less often than every 2 years, the Administrator shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants [which may be present in sewage sludge] and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C). The district court's conclusion that this provision's "biennial deadline applies only to the 'shall review' command, and not to any subsequent identification or regulation

23

[of toxic pollutants] that may result from that review," *see Farmer v. EPA*, No. 24-1654, at 6–7 (D.D.C. Sep. 29, 2025), is contrary to both the statute's plain text and legislative history. Under the provision EPA is required to update its regulations to protect the public from any new PFAS in sewage sludge identified during or before the biennial review period.

**1.** When subparagraph (d)(2)(C) is read in context, it is evident that Congress intended for EPA to identify and regulate new pollutants in sewage sludge, like PFAS, biennially. *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016) (discerning statutory meaning from "surrounding subsections"). Indeed, none of the subparagraphs of paragraph (d)(2) allow for a mere passive review of existing regulations. Rather, each subparagraph indicates that Congress wanted EPA to act promptly to identify and regulate pollutants. *See* 33 U.S.C. § 1345(d)(2).

For example, in subparagraphs (d)(2)(A) and (B), Congress set initial 1987 and 1988 deadlines for identifying and regulating toxic pollutants in sewage sludge. *See id.* § 1345(d)(2)(A)–(B). Congress's desire for swift action by EPA is evident from the fact that these two subparagraphs give the agency less than one year to proceed from identifying new pollutants to finalizing regulations. *See id.*

Similarly, in subparagraph (d)(2)(D), Congress specified that EPA "shall require compliance [with new regulations] as expeditiously as practicable," *see id.*

§ 1345(d)(2)(D), evincing Congress's desire for prompt action by EPA to address newly identified pollutants. Indeed, the title of the broader paragraph itself indicates that Congress's purpose is the "[i]dentification and regulation of toxic pollutants," *id.* § 1345(d)(2), not simply the passive review of regulations with no action. *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (noting that "[s]ection headings . . . 'supply cues' as to what Congress intended" (citation omitted)).

Thus, surrounding provisions and textual cues confirm that subparagraph (d)(2)(D) requires the timely identification and regulation of pollutants by EPA. *See* 33 U.S.C. § 1345(d)(2)(C); *see also Pharm. Rsch. & Mfrs. of Am. v. Thompson*, 251 F.3d 219, 224 (D.C. Cir. 2001) (noting that the words of a statute "draw meaning from context").

**2.** The legislative history of subparagraph (d)(2)(D) also confirms this reading. Specifically, in a 1986 floor speech, Senator Robert T. Stafford noted that he sponsored the legislation because EPA had "utterly failed" to issue regulations that "approximate[d] compliance with Section 405 of the act" by the statute's original 1978 deadline. *See* 132 Cong. Rec. 32383 (1986). Senator Stafford expressed dismay at the fact that "EPA has no limits whatsoever on the toxicity of marketed sewage sludge products, and no limits for the many other toxic pollutants in sewage sludge which is landfilled or land spread." *Id*. To remedy EPA's failure to timely regulate pollutants in sludge, Senator Stafford noted that the legislation

"gives EPA additional deadlines." *Id*. Most notably, Senator Strafford stated that under the law:

> *At least every 2 years*, or more often if the data indicate, EPA must review its section 405 regulations for the purpose of identifying additional toxic pollutants which may be present in sewage sludge and *must promulgate regulations for these additional pollutants*. This requirement ensures that EPA's rules keep pace with developing technical knowledge and adequately protect health and the environment.

*See id*. (emphasis added).

Senator Stafford's statement that EPA biennially "must promulgate regulations" for any new pollutants identified clarifies that the lawmaker believed subparagraph (d)(2)(D) establishes a strict, mandatory regulatory timetable.

**3.** Recent caselaw about analogous provisions of the CWA also confirms that subparagraph (d)(2)(D) creates a mandatory biennial duty to identify and regulate toxic pollutants in sewage sludge. In *Waterkeeper Alliance v. U.S. Environmental Protection Agency*, the Ninth Circuit panel analyzed two types of CWA provisions setting forth EPA's duties to review and revise outdated effluent limitation regulations. 140 F.4th 1193, 1215 (9th Cir. 2025). The Panel found that while one set of provisions established clear periodic deadlines for EPA to review effluent limitation regulations, the regulations also granted the agency some discretion to decline to revise outdated regulations by specifying in the statutory text that revisions are only required "if appropriate." *Id.* at 1215–17 (analyzing 33

U.S.C. §§ 1311(d), 1314(b), (g)). In addition, the Panel found that another CWA provision also gives EPA some discretion to decline to revise outdated regulations because the provision does not set periodic deadlines and only requires revisions of outdated regulations "from time to time." *Id.* (analyzing 33 U.S.C. § 1317(b)).

Thus, as *Waterkeeper Alliance* demonstrates, Congress knew how to draft legislation in a manner that gave EPA discretion to decline to update its regulations, but it did not do so in Section 405(d)(2)(C). *See Collins v. Yellen*, 594 U.S. 220, 248 (2021) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citations omitted)).

Indeed, Congress could have specified that EPA only needs to identify and regulate new toxic pollutants "if appropriate," or it could have excluded its biennial deadline from the subparagraph. But Section 405(d)(2)(D) does neither. Instead, it includes a biennial deadline for revision of outdated regulations, and lacks any language tempering EPA's duty to update obsolete sewage sludge regulations. For these reasons too, EPA's duty to identify new pollutants, like PFAS, and update sewage sludge regulations is mandatory.[62]

---

[62] Moreover, even if Congress had included discretionary language in Section 405(d)(2)(D), EPA's discretion to decline to update its regulations would not be

## CONCLUSION

EPA's compliance with CWA Section 405(d)(2)(C) would significantly benefit local governments, like Amici, by preserving their limited resources and protecting the health of their residents. For the reasons stated above, as well as the arguments advanced by Plaintiffs-Appellants' Opening Brief, this Court should reject the district court's mistaken interpretation of the CWA and reverse the decision to dismiss this case.[63]

---

unlimited. The Panel in *Waterkeeper Alliance* held that EPA is required to make a judicially reviewable determination on whether to revise its effluent limitations regulations within the CWA's timeline, and that the determination must be overturned if it is unreasonable. *See* 140 F.4th at 1215–23 (finding EPA's decision to decline to update regulations irrational in part because the agency ignored unregulated pollutants). Here, EPA did not even comply with this minimal requirement to make a rational determination.

[63] Pursuant to Fed. R. App. P. 29(a)(4)(E): Amici Curiae state that no counsel for any party authored this brief in whole or in part. No person, entity, party, or counsel, other than Amici and their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(G), I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Fed. R. App. P. 29(a)(5) because it contains 6,495 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Circuit Rule 32(f).

I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) as it has been prepared in Microsoft Word 365 using 14-point Times New Roman typeface and is double-spaced (except for headings, footnotes, and block quotations).

Dated: March 24, 2026

*/s/ Michael Youhana*
Michael Youhana

# CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March, 2026, I electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the CM/ECF System the foregoing Final Amicus Brief. All participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

*/s/ Michael Youhana*
Michael Youhana