**[ORAL ARGUMENT NOT YET SCHEDULED]**

**No. 25-5431**

---

# IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

JAMES FARMER, et al.,
*Plaintiffs-Appellants,*

v.

ENVIRONMENTAL PROTECTION AGENCY, *et al.,*
*Defendants-Appellees*

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES,
*Intervenor below.*

---

On Appeal from the United States District Court for the District of Columbia
No. 24-cv-01654-DLF (Hon. Dabney L. Friedrich)

---

**AMICUS BRIEF OF ROBERT BIERSCHENK, JAMES BUCKLE, EGIDE DOSTIE II, JASON GROSTIC, ALLISON JUMPER, ROBERT O'NEAL, TRUCKERS MOVEMENT FOR JUSTICE, ORGANIC TRADE ASSOCIATION, CENTER FOR FOOD SAFETY, DELAWARE RIVERKEEPER NETWORK, KENTUCKY RESOURCES COUNCIL, KENTUCKY WATERWAYS ALLIANCE, SAVE PLAINFIELD TOWNSHIP, AND SIERRA CLUB IN SUPPORT OF PLAINTIFFS-APPELLANTS AND REVERSAL**

---

Erica Kyzmir-McKeon*
Erica A. Fuller
Nora Bosworth*
Conservation Law Foundation
62 Summer Street, Boston, MA
607-743-4260
ekyzmir-mckeon@clf.org

*Counsel for Amici Curiae Robert Bierschenk, James Buckle, Egide Dostie II, Jason Grostic, Allison Jumper, Robert O'Neal, and Truckers Movement for Justice*

*Application for Admission pending

Ashley Wilmes
Tom FitzGerald
Kentucky Resources Council, Inc.
Post Office Box 1070
Frankfort, Kentucky 40602-1070
502-875-2428
ashley@kyrc.org

*Counsel for Amici Curiae Organic Trade Association, Center for Food Safety, Delaware Riverkeeper Network, Kentucky Resources Council, Kentucky Waterways Alliance, Save Plainfield Township, and Sierra Club*

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND FILING OF SEPARATE BRIEF

As required by Circuit Rules 28(a)(1) and 29(d), counsel for *amici curiae* hereby certify as follows:

### A. Parties

- All parties are listed in Plaintiffs-Appellants' Opening Brief.
- Erica Kyzmir-McKeon, Nora Bosworth, and Erica A. Fuller are counsel for *amici curiae* Truckers Movement for Justice, Robert Bierschenk, James Buckle, Egide Dostie II, Jason Grostic, Robert O'Neal, and Allison Jumper in support of Plaintiffs-Appellants in No. 25-5431.
- Ashley Wilmes and Tom FitzGerald are counsel for *amici curiae* Organic Trade Association, Center for Food Safety, Delaware Riverkeeper, Kentucky Resources Council, Kentucky Waterways Alliance, Save Plainfield Township Inc., and Sierra Club, in support of Plaintiffs-Appellants in No. 25-5431.
- Earthjustice attorney Michael Youhana is counsel to Amici Curiae, Plainfield Township, Pennsylvania; the Town of Thurston, New York; and the Town of Cameron, New York in support of Plaintiffs-Appellants in No. 25-5431.

### B. Rulings Under Review

The decision at issue on appeal is the United States District Court for the District of Columbia's September 29, 2025 Memorandum Opinion and Order granting defendants' Motion to Dismiss plaintiffs' Complaint.

## C. Related Cases

Counsel for *amici curiae* are not aware of any related cases.

## D. Separate Brief

Undersigned counsel is aware of one additional potential *amicus*, submitted by Earthjustice on behalf of municipalities and pursuant to the local rules that brief is permitted to be a separate brief.

*/s/ Ashley Wilmes*
Ashley Wilmes

*Counsel for Amici Curiae, Kentucky Resources Council et al.*

*/s/ Erica A. Fuller*
Erica A. Fuller

*Counsel for Amici Curiae, Robert Bierschenk et al.*

Dated: March 24, 2026

## CIRCUIT RULE 29(a)(4)(E) STATEMENT

Pursuant to D.C. Circuit Rule 29(a)(4)(E), counsel for *amici curiae* certifies that:

- Counsel for *amici curiae* authored this brief in whole and without participation by other parties or their counsel;
- No party or their counsel contributed money that was intended to fund preparing or submitting this brief; and
- No person other than the *amici curiae*, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

*/s/ Ashley Wilmes*
Ashley Wilmes

*Counsel for Amici Curiae, Kentucky Resources Council et al.*

*/s/ Erica A. Fuller*
Erica A. Fuller

*Counsel for Amici Curiae, Robert Bierschenk et al.*

Dated: March 24, 2026

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to the United States Court of Appeals for the District of Columbia Rule 26.1 and Federal Rule of Appellate Procedure 26.1, counsel for *amici curiae* state that no party to this brief is a publicly held corporation, issues stock, or has a parent corporation.

*/s/ Ashley Wilmes*
Ashley Wilmes

*Counsel for Amici Curiae*, *Kentucky Resources Council et al.*

*/s/ Erica A. Fuller*
Erica A. Fuller

*Counsel for Amici Curiae*, *Robert Bierschenk et al.*

Dated: March 24, 2026

## TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES, AND FILING OF SEPARATE BRIEF .......... iii

CIRCUIT RULE 29(a)(4)(E) STATEMENT .......... v

RULE 26.1 DISCLOSURE STATEMENT .......... vi

TABLE OF AUTHORITIES .......... viii

GLOSSARY OF ABBREVIATIONS .......... xi

IDENTITY AND STATEMENT OF INTERESTS OF AMICI CURIAE .......... 1

ARGUMENT .......... 10

I. PFAS in Sludge Causes Harm to Human Health and the Environment .......... 10

II. The Reading of EPA's Mandate In 33 U.S.C. 1345 Proffered by Plaintiff Appellants Is Consistent With and Wholly Supported by the Legislative History and the Plain Language of the Statute .......... 15

A. The Legislative History Demonstrates Congress' Intent for EPA to Identify and Regulate Toxic Pollutants in Sewage Sludge at Least Biennially .......... 17

B. The District Court Erroneously Concluded that "For the Purpose of" is a Prospective Duty Untethered from EPA's Biennial Duty Under Section 405(d)(2)(C) .......... 22

C. EPA's Failure to Promulgate Regulations for Additional Toxic Pollutants in Sewage Sludge Has Adverse Impacts in Kentucky and Numerous Other States Whose Standards Are Bound to Those of EPA .......... 24

CONCLUSION .......... 27

# TABLE OF AUTHORITIES

**Cases**

*Azar v. Allina Health Servs.*, 587 U.S. 566 (2019) .......... 23

*Law v. Siegel*, 571 U.S. 415, 422 (2014) .......... 23

*TRW v. Andrews,* 534 U.S. 19, 31 (2001) .......... 24

**Federal Statutes**

33 U.S.C. § 1251(a)(1) .......... 22, 25

33 U.S.C. § 1251(b) .......... 24

33 U.S.C. § 1270 .......... 25

33 U.S.C. § 1272(b)(1) .......... 23

33 U.S.C. § 1313(e)(2) .......... 23

33 U.S.C. § 1314(b) .......... 23

33 U.S.C. § 1342(j) .......... 23

33 U.S.C. § 1345(d)(2) .......... 16, 18

33 U.S.C. § 1345(d)(2)(C) .......... 1, 16, 17, 20-22

42 U.S.C. § 7512a(a)(6) .......... 23

**State Statutes**

ID Code § 39-107D (2025) .......... 26

Ariz. Rev. Stat. Ann. § 49-104(A)(16) .......... 26

KRS 224.50-765 (2023) .......... 26

MS Code § 49-17-34 (2024) .......... 26

N.C. Gen. Stat. Sec. 150B-19.3 .......... 26

S.D. Codified Laws § 1-41-3.4 .......... 26

Wisc. Stat. Ann. Sec. 283.11(2)........................................................................ .26

**Legislative Materials**

99 Cong., 2d Sess. H. Rep. Conf. Report 99-1004…………………………….17-18

Congressional Record, Vol.132, daily ed., S16424-S16611 (Senate Debate on Conference Report to Accompany S. 1128, October 16, 1986)……………….....18-21

**Regulations and Administrative Documents**

7 C.F.R. § 205.105(g) .........................................................................................8

40 C.F.R. Part 503 ............................................................................................ ..26

90 Fed. Reg. 3859-3864..................................................................................... ..13

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CWA | Clean Water Act |
| EPA | Environmental Protection Agency |
| MCL | Maximum Contaminant Level |
| PCBs | Polychlorinated Biphenyls |
| PFAS | Per- and polyfluoroalkyl substances |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctanesulfonic Acid |
| POTW | Publicly Owned Treatment Works |
| ppb | Parts per billion |
| ppt | Parts per trillion |
| USDA | U.S. Department of Agriculture |

## IDENTITY AND STATEMENT OF INTERESTS OF *AMICI CURIAE*

*Amici* submit this brief in support of Plaintiff-Appellants' appeal seeking reversal of the District Court decision, which misconstrued Section 405(d)(2)(C) of the Clean Water Act ("CWA"), 33 U.S.C. § 1345(d)(2)(C). *Amici* are farmers, truckers, environment and water protection organizations, trade associations, and individuals who have been harmed by the failure of the Environmental Protection Agency ("EPA") to regulate per- and polyfluoroalkyl substances ("PFAS") in sewage sludge ("sludge"), including Perfluorooctanoic Acid ("PFOA") and Perfluorooctanesulfonic Acid ("PFOS"). All *amici* have an interest in ensuring the Court understands the significant environmental and human health impacts stemming from EPA's refusal to regulate PFAS in sewage sludge.

All parties have consented to the filing of this brief.

### A. Impacted Farmers and Individuals

*Amici* include farmers who have lost their farms and livelihoods because of PFAS-contaminated sludge spread on their land and individuals who have fed their families PFAS-contaminated food. These farmers and individuals come from red and blue states across the country, including Kentucky, Maine, Michigan, New Hampshire, Oklahoma, and South Carolina. They are farmers and individuals who have suffered health problems related to their exposure to PFAS in sludge, including heart attacks, pulmonary issues, high cholesterol, vaccine resistance, and

mental health distress. *Amici* have also suffered severe financial harms, including the loss of their farms and income.

*Amicus* Robert Bierschenk is an Oklahoma farmer who for the past 32 years has owned and lived on a 160-acre farm. Ex. A. at ¶¶ 1-2. Unbeknownst to him, sewage sludge was spread on his land before he bought it. *Id.* at ¶ 6. Additionally, the farmer across the road from his house has applied thousands of loads of sludge. *Id.* at ¶ 7. Dust from the neighbor's farm travels by air to his farm and Robert is concerned that the dust is contaminated with PFAS. *Id.* at ¶ 9. Robert believes that the PFAS in the sludge that was land applied on his farm and the sludge from his neighbor's farm has exacerbated his pulmonary issues. *Id.* at ¶ 10. Robert also has a 45-acre lake on his land that is now contaminated with PFAS. *Id.* at ¶ 11. The lake is loaded with fish and for many years he and his friends would catch and eat the fish from the lake. *Id.* at ¶ 12. He can no longer do so because the fish are contaminated with PFAS and unsafe to eat. *Id.* at ¶ 13.

*Amicus* James Buckle is a Maine farmer who has worked on or managed farms for almost 30 years. Ex. B at ¶¶ 1-2. Farming is, and has long been, his sole source of income. *Id.* at ¶ 2. The farm he has lived on for the last 12 years is certified organic and he has never spread sludge on his land. *Id.* at ¶ 4. However, other farmers spread sludge near his farm starting in the nineties. *Id.* at ¶ 5. In 2021, James tested his water for PFAS and the results showed extremely high

levels, averaging 120-130 ppt. *Id.* at ¶ 8. At its peak, the readings were as high as 300 ppt. *Id.* James was surprised because the nearest spread license had been issued for land over **two miles** from his farm. *Id.* at ¶ 6. After finding out about the contamination, he paused all sales for the season because he was worried that his crops were also contaminated with PFAS. *Id.* at ¶ 12. This put a severe financial stress on him. He had spent 8 years building his farm and had put a couple million dollars into it. *Id.* at ¶ 11. Four years after discovering the contamination, he is just starting to get out of the economic hole. *Id.* at ¶ 19. He is still paying off a loan that he took out to cover the season's losses and he is still struggling to regain the customers that he lost after discovering the contamination. *Id.*

*Amicus* Egide Dostie II is a Maine dairy farmer. Ex. C at ¶ 1-2. He has never land applied sludge on his farm, however, sludge had been spread on his farm in the 80s and 90s. *Id.* at ¶¶ 3, 10. In October 2020, Egide tested his wells for PFAS and they were highly contaminated, with one PFAS compound at levels as high as 2,000 ppt. *Id.* at ¶ 11. After that, the Department of Agriculture came in and shut down his farm. *Id.* at ¶ 7. Over the following year, he kept milking his cows and dumping the milk in an effort to decontaminate it of PFAS. *Id.* at ¶ 9. He lost 20 percent in milk revenue and, eventually, he lost his whole farming enterprise. *Id.* During this time, he also had his soil tested for PFAS and about half of his land, and all his pastureland, was contaminated. *Id.* at ¶ 10. Because of this, the farm

could no longer remain organic and in 2023 he sold all his cows. *Id.* at ¶¶ 16-17. His farm is now worthless. *Id.* at ¶ 19.

*Amicus* Jason Grostic is a Michigan cattle farmer. Ex. D at ¶ 1-2. In January 2022, life as he knew it came to a crashing halt when he was served with a seizure notice from the state of Michigan, telling him that he could no longer sell the beef from his organic farm because testing had found elevated levels of PFAS. *Id.* at ¶ 3. Since 2015, he had been using sludge to fertilize his crops, which were then fed to his cattle. *Id.* at ¶¶ 5-6. He thought this was a safe and cost-effective fertilizer, especially since it was recommended and approved by the EPA. *Id.* at ¶ 6. In fact, the sludge was contaminated with PFAS and the PFAS from the sludge contaminated the soil and water on his farm and then his cattle feed. *Id.* at ¶ 5. Jason's farm is now unusable and he has gone years without an income. *Id.* at ¶ 9. Michigan has prohibited the property from ever again being used for agriculture. Jason has also suffered from health issues that can be linked to his exposure to PFAS in sludge, including cholesterol levels that are four times higher than they should be and heart attacks in July and August of 2025. *Id.* at ¶ 13. This crisis has also taken a toll on his mental health. *Id.* at ¶ 15. His former customers have called him a murderer and have accused him of poisoning them with contaminated beef. *Id.*

*Amicus* Allison Jumper lives in New Hampshire with her husband and three kids. Ex. E at ¶ 1. In 2020, her family's farm was shut down because high levels of PFAS had been found. *Id.* at ¶ 2. Unbeknownst to her and her family, sewage sludge had been spread on her family's farm decades earlier. *Id.* at ¶ 3. Her family had never used sewage sludge fertilizer. *Id.* For years, Allison and her family ate meat from the farm that was highly contaminated with PFAS and unsafe to eat. *Id.* at ¶¶ 7, 12. During this same time, her children had alarmingly high cholesterol levels and weak responses to vaccines. *Id.* at ¶¶ 8, 19. Allison and her family had their blood tested for PFAS and the results were devastating. Her then ten-year-old son had levels of PFOS higher than more than 95 percent of Americans. *Id.* at ¶ 15. Her two younger children, her husband, and she had levels higher than 75 percent of Americans. *Id.* She and her family are now trying to adjust to their new normal, where they must go for PFAS tests annually and continually monitor their health. *Id.* at ¶ 18.

*Amicus* Robert "Robbie" O'Neal is a South Carolina farmer. Ex. F at ¶ 1-2. For most of the nineties, he used sludge as fertilizer on his farm. At the time, no officials or local farmers were aware of a need to be concerned about PFAS contamination. *Id.* at ¶ 3. In 2020, Robbie received a letter from EPA stating that the drinking wells on his property were highly contaminated with PFAS because of the sludge that had been spread on his farm. *Id.* at ¶ 4. The sludge came from a

textile facility that had been declared a Superfund site because of PFAS contamination. *Id.* at ¶ 6. His wells had PFOS levels at 4,200 ppt, 4,500 ppt, and 4,800 ppt. *Id.* at ¶ 4. After finding out about his wells, he had his farm's soil tested for PFAS and the results were devastating- PFOS levels ranged from 1,700 ppt to 3,300 ppt. *Id.* at ¶ 9. He had to abandon his fields because of the contamination. *Id.* at ¶ 11. Robbie suffers from medical conditions that can be linked to his exposure to PFAS, including a thyroid disorder, high cholesterol, and high blood pressure. *Id.* at ¶ 13.

### B. Truckers Movement for Justice

*Amicus* Truckers Movement for Justice ("TMJ") is an organization of nearly 15,000 owner-operators and company drivers from across the United States and Mexico. Its membership includes truck drivers who have been exposed to toxic PFAS chemicals while transporting and land applying sludge.

Truck drivers, including those represented by *amicus* TMJ, are exposed to toxic PFAS chemicals every time they transport sludge to farms for land application.[1] Ex. G at ¶ 10. They are exposed when loading and unloading the sludge on trucks and when spreading the sludge on fields. *Id.* The sludge can get

---

[1] The harms described in this section are based on the personal knowledge, information, and belief of Bill Randel, the president and co-founder of *amicus* Truckers Movement for Justice.

on their skin, hair, and clothing. *Id.* at ¶ 20. They can breathe in the fumes from the sludge, and, in some instances, they can ingest the sludge or it can get in their eyes. *Id.* In many cases, truck drivers must literally stand in a pool of sludge as they load, unload, and spread the material. *Id.*

Despite truck drivers' constant exposure to sludge, most are unaware that it contains toxic PFAS chemicals. They are not trained on how to protect themselves from these toxic chemicals and most are not provided with appropriate personal protective equipment. *Id.* at ¶ 14. EPA's failure to regulate PFAS in sludge is directly responsible for truckers' exposure to these toxic chemicals, their lack of knowledge about the toxic threat from this exposure, and their inability to protect themselves from the dangers of PFAS.

### C. Organic Trade Association

The Organic Trade Association is a membership-based business association supporting organic agriculture and products in North America. Its members span the organic supply chain from farm to table and include growers, shippers, processors, certifiers, farmers' associations, distributors, brands, retailers, material input providers, and others.

Certified organic foods are produced and certified according to federal standards set by the U. S. Department of Agriculture ("USDA") National Organic Program. USDA's organic regulations prohibit the use of sewage sludge in the

production and handling of organic food. 7 C.F.R. § 205.105(g). While sewage sludge is explicitly prohibited, application of sludge to land prior to organic certification, use of it on adjacent land, runoff from land on which sludge was applied, and groundwater contamination renders compliance with the regulation challenging and, in some instances, impossible. The absence of EPA's regulation of toxic pollution in sewage sludge therefore puts organic businesses at risk and threatens consumer confidence in the integrity of the organic label.

### D. Nonprofit Environmental, Conservation, Waterkeeper, and Clean Water Organizations

Center for Food Safety is a nationwide nonprofit organization with a mission of empowering people, supporting farmers, and protecting the planet from the adverse impacts of industrial agriculture. They address toxins in the food system and their harms to human health and the environment, including sewage sludge, pesticides, and forever chemicals, and seek responsible and lawful regulation of them. They have represented farmers, farmworkers, and conservationists in challenging recent EPA approvals of new PFAS chemicals and have an interest in ensuring that EPA regulates PFAS in accordance with the CWA and other laws.

Delaware Riverkeeper Network ("DRN") works to protect and restore the Delaware River and its associated watershed, tributaries, and habitats. DRN routinely advocates at the state and federal levels for protection of these resources

from contaminants such as PFAS, which are present in sludge that is spread on land throughout the watershed.

Kentucky Resources Council ("KRC") is a statewide environmental law and advocacy organization that provides free legal assistance to those living "downwind, downstream, and downhill" of pollution. KRC's members include rural residents adversely affected by the failure of EPA to assure that all toxic chemicals identified in wastewater sludges are regulated and limited.

Kentucky Waterways Alliance ("KWA") works to protect, restore, and celebrate Kentucky's waterways. When sludge is land-applied, it creates a significant pathway for PFAS contamination of Kentucky's soil, groundwater, and surface waters, which KWA's members rely on for drinking water, agriculture, and recreation. In a state where many residents depend on private wells and waterways are central to local economies and public health, the absence of federal regulation leaves communities vulnerable to long-term exposure to toxic PFAS chemicals.

Save Plainfield Township, Inc. is a community organization representing residents in Plainfield Township, Pennsylvania, who are concerned with a sewer authority's purchase of land within the township intended for use as a disposal site for their sewer sludge by land application. Save Plainfield educates and advocates for the protection of preserved farmlands and watersheds from the harmful effects

of contaminated sludge, including health risks from well-water and watershed contamination.

The Sierra Club is a national nonprofit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; practicing and promoting the responsible use of the earth's ecosystems and resources; educating and enlisting humanity to protect and restore the quality of the natural and human environment; and using all lawful means to carry out these objectives. Their members include farmers whose lands and health have been harmed by PFAS chemicals in land-applied sludge, and others impacted by the damage to fish, wildlife, plants, and native ecosystems caused by the dispersion of PFAS chemicals from contaminated sludges.

## ARGUMENT

Despite its clear mandate, EPA has failed to comply with its ongoing obligations under Section 405(d)(2)(C) to promulgate new regulations to protect the public from toxic PFAS in sewage sludge, exposing communities and waterways across the country to these toxic chemicals. This failure is actionable and the District Court erred as a matter of law in dismissing the case.

### I. PFAS in Sludge Causes Harm to Human Health and the Environment

For decades, EPA and state governments have encouraged farmers to spread sewage sludge on their land as fertilizer. As a direct result, sewage sludge has been

spread on millions of acres of farmland nationwide, harming people across the country, including *amici* farmers and individuals, by exposing them to PFAS in soil, water, crops, meat, fish, and dust. When *amici* Robbie O'Neal used sludge as fertilizer in the 1990s, he was told by the local university and county agents that he was helping his community by using it. Ex. F at ¶ 3. The Environmental Working Group estimates that, from 2016 to 2022, 19.1 billion pounds of sewage sludge was applied to farmland across the nation.[2] In 2018 alone, more than 2 million dry tons of sludge were used on 4.6 million acres of farmland.[3]

The dangers of PFAS, called "forever chemicals" because of their failure to break down in the environment or in our bodies, are well-established and widely known. These toxic substances are linked to a growing number of health harms.[4] In a recent court filing, EPA itself acknowledged that "[a] large and robust body of scientific evidence indicates PFAS exposure can result in cancer and a broad range of other adverse health effects, including developmental, cardiovascular, liver,

---

[2] Colin M. Pohlman, *"Toxic Terroir"? PFAS in Agricultural Biosolids*, 39 Nat. Res. & Env't 19, 20 (2024).

[3] Hiroko Tabuchi, *Something's Poisoning America's Land. Farmers Fear "Forever Chemicals."* New York Times, (Aug. 31, 2024), *accessible at* https://www.nytimes.com/2024/08/31/climate/pfas-fertilizer-sludge-farm.html.

[4] *Health risks of widely used chemicals may be underestimated*, HARVARD T.H. CHAN SCHOOL OF PUBLIC HEALTH (June 27, 2018), https://hsph.harvard.edu/news/pfas-health-risks-underestimated/; *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, U.S. ENVT'L PROT. AG., https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas (last updated Nov. 5, 2025).

kidney, immune, endocrine, metabolic, reproductive, and musculoskeletal effects."[5]

**Virtually all sewage sludge-based fertilizers tested have been found to contain PFAS.**[6] When PFAS-containing sludge is spread on farms, PFAS leach into the soil, surface water, and groundwater, creating numerous pathways for human exposure to PFAS.[7] For example, after sewage sludge is land applied, PFAS in the sludge enter soil, where the chemicals can persist long-term or be taken up by plants, which humans and farm animals consume.[8] When farm animals consume PFAS-contaminated crops, this can lead to contamination of the animals'

---

[5] *Am. Water Works Ass'n, et al., v. EPA, et al.*, D.C. Cir. Case No. 24-1188, Final Br. of Respondent EPA at 1 (March 6, 2026).

[6] For example, a 2025 report from Massachusetts found that every sludge sample taken from 114 wastewater treatment facilities contained high concentrations of PFAS, ranging from tens to thousands parts per billion (ppb). MassDEP, *Data Analysis Report: PFAS Testing Study for NPDES POTWs (PRF-77), available at https://www.mass.gov/doc/massdep-pfas-testing-study-for-npdes-potws/download*.

[7] *See* EPA, *EPA Biosolids PFOA & PFOS Problem Formulation Meeting Summary, p.* 14, 17 (2020), https://www.epa.gov/sites/default/files/2021-02/documents/biosolids-pfoa-pfos-meeting-summary-nov-2020.pdf.

[8] *See* M. Christina Schilling Costello & Linda S. Lee, *Sources, Fate, and Plant Uptake in Agricultural Systems of Per- and Polyfluoroalkyl Substances*, 10 Current Pollution Reps. 799, 803, 805–11 (2024); Gwynn R. Johnson, *PFAS in Soil and Groundwater Following Historical Land Application of Biosolids*, 211 Water Rsch. 211 Water Rsch.,119035 (2022); Weston S. Chambers, Jaida G. Hopkins & Sean M. Richards, *A Review of Per- and Polyfluorinated Alkyl Substance Impairment of Reproduction*, 3 Frontiers Toxicology (2021); Bei Wen et al., *Field Study on the Uptake and Translocation of Perfluoroalkyl Acids (PFAAs) by Wheat (Triticum aestivum L.) Grown in Biosolids-Amended Soils*, 184 Env't Pollution 547 (2014).

milk and meat. Once spread, these toxic substances can remain in the soil for generations, and PFAS concentrations increase with each application.

As *amici* Robert Bierschenk accurately notes, "[i]f the land is contaminated, the crops get contaminated. The contaminated crops are then eaten by livestock, contaminating their meat and milk. It's a whole chain of contamination." Ex. A at ¶ 14. EPA's own Draft Sewage Sludge Risk Assessment for PFOA and PFOS confirms that a single application of sewage sludge containing one part per billion (ppb) of PFOS or one ppb of PFOA on land results in significant human health risks, including cancer.[9] The amount of PFAS in sludge often significantly exceeds these levels.

*Amici* farmers and individuals have had their lives upended by PFAS contamination in sewage sludge. It has contaminated their water, soil, crops, and livestock. One amicus had PFOS levels at 4,800 ppt in his drinking water well and 3,300 ppt in his soil. This is, respectively, **1,200 and 800 times** more than EPA's 4 ppt Maximum Contaminant Level ("MCL") for PFOS. This contamination has led to the financial ruin of *amici* farmers who can no longer farm their land or sell their crops and meat. For example, *amici* Egide Dostie II and Jason Grostic have both lost their farms due to PFAS contamination from land applied sludge. The Department of Agriculture shut down Egide Dostie II's farm after testing found

---

[9] 90 Fed. Reg. 3859-3864 (Jan. 15, 2025).

levels of one PFAS compound as high as 2,000 ppt in his well. The state of Michigan has prohibited Jason from ever using his land for agriculture again.

PFAS contamination from sewage sludge has also contributed to numerous physical and mental health harms to *amici* farmers and individuals. For example, Allison Jumper's young children have suffered from unusually high cholesterol levels that can be linked to their consumption of meat contaminated with PFAS from the land application of sludge.

*Amici* farmers and individuals represent just a handful of the many people whose lives have been devastated by the land application of PFAS-contaminated sludge and who have had to bear the economic, environmental, and health costs of contamination because of EPA's failure to regulate PFAS in sewage sludge. Importantly, most states do not systematically test farms for PFAS contamination. If they did, the amount of contamination and resulting impacts on farmers would be even more staggering.

The impacts of PFAS-contaminated sludge on farmland go far beyond the devastating impacts to farmers. These toxic chemicals also become airborne, spreading off-site, and they can easily migrate to nearby ponds, creeks, and rivers through surface runoff and groundwater discharges.[10] Once in surface water, PFAS bioaccumulate in aquatic life and move up the food chain to fish, birds, and

[10] *See* Footnote 7, p. 15, 18.

wildlife. At least 16 states have issued PFAS-related fish consumption advisories, and EPA's most recent National Aquatic Resource Survey "found PFAS in freshwater fish and shellfish at levels that may impact human health."[11] Studies in fish, birds, and mammals have linked PFAS to suppressed immunity, liver damage, developmental and reproductive issues, and other health impacts.[12]

Despite these clear risks to human health, wildlife, and the environment, there are no national requirements to test sludge for PFAS, warn farmers and sludge transporters and spreaders that sludge may contain these toxic chemicals, or limit the land application of sludge that contains PFAS. EPA's complete failure to regulate PFAS in sludge has caused harm to *amici* and communities across the country.

## II. The Reading of EPA's Mandate In 33 U.S.C. 1345 Proffered by Plaintiff-Appellants Is Consistent with and Wholly Supported by the Legislative History and the Plain Language of the Statute

Congress enacted Section 405 of the CWA to create a federal regulatory floor protecting our nation's waters and communities from toxic pollutants, like

[11] EPA, *EPA Releases New Science-Based Recommendations to Help More States, Tribes, and Territories Reduce Exposure to PFAS in Fish* (2024), accessible at: https://www.epa.gov/newsreleases/epa-releases-new-science-based-recommendations-help-more-states-tribes-and-territories.

[12] Andrews, D. Q., Stoiber, T., Temkin, A. M., & Naidenko, O. V., *Discussion: Has the human population become a sentinel for the adverse effects of PFAS contamination on wildlife health and endangered species?* Science of the Total Environment, 901, 165939 (2023).

PFAS, in sewage sludge. Under Section 405(d)(2), EPA is required to identify and regulate "toxic pollutants" which, on the basis of (A) "available information on their toxicity, persistence, concentration, mobility, or potential for exposure" and (B) other information, "may be present in sewage sludge in concentrations which may adversely affect public health or the environment." 33 U.S.C. § 1345(d)(2). Acknowledging the urgency of the risk of harm caused by toxic pollutants in sewage sludge and EPA's years-long delay in identifying and regulating them, Congress included new deadlines for such regulations in the 1987 amendments to the CWA. It also required EPA to review its regulations at least every 2 years "for the purpose of identifying additional toxic pollutants" which may be present in sewage sludge and to "promulgat[e] regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C).

Notwithstanding the clear directive to EPA to biennially review and update its sewage sludge regulations to protect the public from any new toxic pollutants identified during or before the two-year review period, the District Court dismissed Plaintiff-Appellant's claims, erroneously concluding that "the biennial deadline applies only to the 'shall review' command, and not to any subsequent identification or regulation [of toxic pollutants] that may result from that review." *See* District Court Order at 6-7. This reading of Section 405(d)(2)(C) is contrary to the statute's plain text, legislative history, and the overall statutory framework

requiring EPA to regulate toxic pollutants in sewage sludge, and it offends cardinal rules of statutory construction.

### A. The Legislative History Demonstrates Congress' Intent for EPA to Identify and Regulate Toxic Pollutants in Sewage Sludge at Least Biennially

Plaintiff-Appellants are correct that the District Court's disaggregated reading of 33 U.S.C. 1345(d)(2)(C) is inconsistent with the plain language of the CWA. It is also inconsistent with its legislative history.

The Senate-House Conference Committee Report on S. 1128, discussing the language on sewage sludge regulation later incorporated as Section 405(d)(2) into the Water Quality Act of 1987 and codified at 33 U.S.C. § 1345(d)(2)(C), reflects a clear intent that the review, identification, and regulation of toxics in sludges occur concurrently. The Conference Report reflected the frustration of the Conferees with EPA's failure to have met its previous deadlines with respect to sludge regulations, explaining that:

> The conference substitute . . . sets additional 1987 and 1988 deadlines for issuing these regulations. These new deadlines are intended to put E.P.A. on a schedule to correct its failure to meet the 1978 promulgation deadline in section 405 and are not intended to excuse the Agency from its failure to meet the original deadline.

99 Cong., 2d Sess. H. Rep. Conf. Report 99-1004, at p. 160, Ex. H. The Conferees explained the purpose of including the 2-year periodic review provision:

> Similarly, the provision requiring periodic **review and revision** of sludge regulations is intended to allow for future changes in the regulations as technical knowledge increases.

*Id.* (emphasis added).

The Senate floor debate on the S. 1128 Conference Report further underscores the action-forcing intent of the 1987 amendments to 33 U.S.C. § 1345(d)(2), leaving no doubt both that the purpose of the periodic review is to identify **and regulate** additional toxics in sludges, and that the two-year timeframe was intended to cover **both** identification of such toxics and prompt promulgation of regulations.

The explanation of the amendments by their sponsor, Senator Stafford, is dispositive of Congress' intent for subsections (d)(2)(A) through (C) to all establish deadlines for EPA's review **and action** on toxic pollutants in sludges. Senator Stafford explained the need for such regulation and the intent of the amendments to the Senate:

> Contaminated sludge causes serious adverse environmental and economic effects… If landfilled or land spread, contaminated sludge can leach toxics into ground water and drinking water supplies, or introduce toxics into the food chain. If incinerated, such sludge can contaminate the atmosphere, affecting the health of POTW workers and nearby residents.

Congressional Record, Vol.132, daily ed., S16424-S16611 (Senate Debate on Conference Report to Accompany S. 1128, October 16, 1986), Ex. I.

Senator Stafford expressed frustration with the glacial pace of agency action and the intent of the 1987 amendments to end the inordinate delay:

> Of course, Congress originally directed EPA to issue comprehensive regulations covering every sludge use and disposal method by 1978. . .
>
> EPA, however, utterly failed to heed this congressional directive. Although I am told that EPA has detected at least 76 toxic priority pollutants in POTW sludge, it has issued rules only for two pollutants: cadmium and PCB's – and only if these pollutants are landfilled or land spread. EPA has no limits whatsoever on the toxicity of marketed sewage sludge products, and no limits for the many other toxic pollutants in sewage sludge which is landfilled or land spread.
>
> These skeletal rules do not even approximate compliance with section 405 of the act.

*Id.*

Senator Stafford then introduced his amendment which was incorporated into the Conference-reported bill that became H.R. 1, the Water Quality Act of 1987. He explained the amendment "directs EPA to begin the long overdue task of promulgating sludge regulations under section 405" and "also gives EPA additional deadlines . . . to put EPA on a schedule to correct its failure to meet the 1978 promulgation deadline . . ." *Id.* The Senator explained what Congress expected of the agency, which was to identify **and** regulate:

> Thus, by August 31, 1987, EPA must identify those toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment. For each such pollutant, EPA must promulgate regulations specifying acceptable management practices

> for sewage sludge containing the pollutant. EPA's rules must also establish numerical limitations for each such pollutant. EPA's rules must protect public health and the environment with an ample margin of safety, and must take care to protect the health of individuals or populations which are at higher risk than the population as a whole.
>
> EPA officials informed the Congress over 3 years ago that there were at that time sufficient data to regulate comprehensively approximately 20 of the most common toxic sludge pollutants. Congress expects EPA to regulate at least these 20 pollutants in the 1987 regulations.
>
> By June 15, 1988, EPA must issue similar regulations for all toxic pollutants which are not addressed by the 1987 regulations and which may be present in sewage sludge in concentrations which may adversely affect public health or the environment.

*Id.*

Senate Stafford then explained the EPA's ongoing rulemaking obligations imposed by new 33 U.S.C. § 1345(d)(2)(C):

> **At least every 2 years, or more often if the data indicate**, EPA must review its section 405 regulations for the purpose of identifying additional toxic pollutants which may be present in sewage sludge **and must promulgate regulations for these additional pollutants**. This requirement ensures that EPA's rules **keep pace with developing technical knowledge and adequately protect health and the environment**.

*Id.* (emphasis added).

Senator Stafford's floor speech confirms 33 U.S.C. § 1345(d)(2)(C)'s explicit requirement that EPA's biennial review **must** include identification of "additional toxic pollutants" in sewage sludge **and** promulgation "of regulations for such pollutants consistent with the requirements of" Section 405(d)(2), as a

unified action. The two-year deadline was the *outside* limit for data review and action since EPA was to conduct this review "[a]t least every 2 years, **or more often if the data indicate[.]"** Congressional Record, Vol.132, daily ed., S16424-S16611 (emphasis added). The review has a purpose that is incorporated into the required action – the identification and regulation of "**additional toxic pollutants**." 33 U.S.C. § 1345(d)(2)(C) (emphasis added).

Review for its own sake was clearly not Congress' intent, nor was mere collection of data. Concurrent action was intended on such data to "ensure that EPA's rules keep pace…and adequately protect health and the environment." *Id.* EPA abjectly failed to "keep pace," and the District Court erred as a matter of law in failing to hold the agency accountable to the plain language of the statute, as further illuminated by the above-referenced legislative history.

Congress revisited the sludge regulation issues in the 1987 CWA amendments with keen awareness and no small frustration with the pace of activity by EPA. The legislative history makes clear that Section 405(d)(2)(C) is a mandate to review **and** revise the regulations within a biennial cycle to reflect changes in knowledge concerning the presence of toxic sludge pollutants. Divorcing "review the regulations" from the two other actions mandated to occur periodically (but not less often than every 2 years) of "identifying additional toxic pollutants" and

"promulgating regulations," cannot be squared with the action-forcing intent of Congress in amending Section 405(d)(2) of the CWA.

### B. The District Court Erroneously Concluded that "For the Purpose of" is a Prospective Duty Untethered from EPA's Biennial Duty Under Section 405(d)(2)(C)

The District Court held that EPA's only duty under Section 405(d)(2)(C) is a passive one – simply to review the regulations – concluding that "'for the purpose of' imposes, at most, a prospective duty." *See* District Court Order at 6 (citation omitted). This interpretation of EPA's duty erroneously eviscerates everything after the word "paragraph" in Congress' command that EPA "shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C). That the identification and regulation of additional pollutants is contingent on there *being* "additional pollutants" in sludge that have not yet been identified or regulated does not render that uncertain or illusory. The District Court's decision allows EPA to indefinitely avoid its substantive duty, in a manner inconsistent with the plain language, legislative history, and overall goal of the CWA – to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a)(1) – and is antithetical to Congress' use of "for the purpose of" in other CWA commands.

The phrase "for the purpose of" is used in numerous places in the CWA in

ways that do not merely speak to prospective duties but rather identify requirements to take various actions and direct the exercise of discretion for those required actions. *See, e.g.,* 33 U.S.C. § 1314(b) ("For the purpose of adopting or revising effluent limitations under" CWA EPA must publish and revise regulations); 33 U.S.C. § 1313(e)(2) (EPA "shall from time to time review each State's approved planning process for the purpose of insuring that such planning process is at all times consistent with this Act."); 33 U.S.C. § 1342(j) (certain documents must "be available on request for the purpose of reproduction."); 33 U.S.C. § 1272(b)(1) (Secretary may remove contamination from navigable waters "for the purpose of environmental enhancement and water quality improvement…").[13] The "normal rule of statutory construction" is that words repeated in different parts of the same statute generally have the same meaning. *Law v. Siegel,* 571 U.S. 415, 422 (2014); *Azar v. Allina Health Servs.,* 587 U.S. 566 (2019).

Discounting everything after the words "for the purpose of" as merely a prospective and unenforceable duty would rob these provisions of their true meaning and eviscerate their purpose. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can

[13] This phrase is also used in the Clean Air Act. *See, e.g.,* 42 U.S.C.S. § 7512a(a)(6) (requiring submission of plan revision for certain areas that "shall be for the purpose of reducing carbon monoxide rather than hydrocarbon emissions.")

be prevented, no **clause**, sentence, or **word** shall be superfluous, void, or insignificant.'" *TRW v. Andrews,* 534 U.S. 19, 31 (2001) (citations omitted). Congress did not intend to create a duty of review untethered to the requirement that EPA periodically, but at least every two years, update its sludge regulations to regulate newly-identified toxic pollutants.

### C. EPA's Failure to Promulgate Regulations for Additional Toxic Pollutants in Sewage Sludge Has Adverse Impacts in Kentucky and Numerous Other States Whose Standards Are Bound to Those of EPA

As described by Plaintiff-Appellants and by Amici in these pages, the indefensible decades-long failure of EPA to have followed the mandate of Congress has had dramatic adverse impacts on the lives and livelihoods of farmers in Texas, Kentucky, Maine, Michigan, New Hampshire, Oklahoma, and South Carolina, on truckers, on organic businesses, and on wildlife and our nation's waterways. EPA's abdication of its duty is national in scope, affecting the land, waters, and people of numerous states.

These impacts demonstrate the wisdom of Congress' ongoing prophylactic mandate to EPA to identify and regulate toxic pollutants discovered in sewage sludge on a biennial cycle and the very real consequences Congress sought to avoid by requiring a periodic assessment and action thereon.

Congress described the objective of the Clean Water Act to be to "restore and maintain the chemical, physical, and biological integrity of the Nation's

waters," with the national goal "in order to achieve this objective" being "that the discharge of pollutants into the navigable waters be eliminated by 1985[.]" 33 U.S.C. § 1251(a)(1). Recognizing the role of the states, 33 U.S.C. § 1251(b), Congress provided explicitly that nothing in the CWA would preclude a state from adopting or enforcing any standard or requirement with respect to limiting discharges and abating pollution, except that a state "may not adopt or enforce any effluent limitation, or other limitation, effluent standard, prohibition, pretreatment standard, or standard of performance which is less stringent than" one adopted by EPA. 33 U.S.C. § 1270. Congress thus crafted a federal floor atop of which the architecture of pollution control and abatement would be constructed; and states could go above, but not below, that floor.

Yet unfortunately, farmers, truckers, and neighbors at risk from the EPA's generational failure to act to promulgate regulations addressing PFAS contamination in sewage sludges cannot, in many cases, look to their state's agencies to fill the gap left by EPA's seeming indifference to its Congressional mandate and human health in this regard, because their states have converted the federal floor into the state's ceiling for such clean water protections.

Kentucky is one of a number of states who have made the federal floor into the state ceiling, by adopting "no more stringent than" limitations precluding the state agency from imposing standards or limitations beyond those required under

federal law. That limit, with respect to management of sewage sludges, is expressed in Kentucky law in this manner:

> Notwithstanding any provision of law to the contrary, when biosolids are generated from wastewater treatment at a publicly owned treatment works, the biosolids shall be: (a) Designated a special waste; and (b) **Regulated in conformance with the most recent version of 40 C.F.R. pt. 503**.

KRS 224.50-765 (2023) (emphasis added).

Kentucky is not alone in limiting the stringency and scope of state sewage sludge (biosolids) regulation to the minimum standards that are provided in 40 C.F.R. Part 503. At least seven other states,[14] including Mississippi, North Carolina, Wisconsin, South Dakota, Arizona, and Idaho, have adopted broad provisions that convert the federal "floor" on regulation under the CWA to the state "ceiling."[15] The inexcusable delay in federal action thus in many states precludes the ability of citizens of those states to look to their state regulatory

---

[14] Environmental Law Institute, *State Constraints: State-Imposed Limitations on the Authority of Agencies to Regulate Waters Beyond the Scope of the Federal Clean Water Act* (May 2013).

[15] Mississippi's Code Section 49-17-34(2) is indicative of these types of restrictions, stating: "[a]ll rules, regulations and standards relating to air quality, water quality or air emissions or water discharge standards promulgated by the commission . . . shall be consistent with and shall not exceed the requirements of federal statutes and federal regulations, standards, criteria and guidance relating to air quality, water quality or air emission or water discharge standards that have been duly promulgated pursuant to the federal Administrative Procedures Act[.]" *See also*: N.C. Gen. Stat. Sec. 150B-19.3; Wisc. Stat. Ann. Sec. 283.11(2); S.D. Codified Laws § 1-41-3.4; ID Code § 39-107D; Ariz. Rev. Stat. Ann. § 49-104(A)(16).

agencies to impose limits on such contaminants in order to protect the integrity of agricultural lands, the health and welfare of those who live and work on or near the lands on which the sludges are applied, and those downstream of this pollution. Regulatory inaction, like actions, has real world consequences.

## CONCLUSION

Amici have been and continue to be harmed by EPA's failure to regulate PFAS in sewage sludge. Such harm could be remedied, and future harms prevented, if EPA were to regulate PFAS in sludge, as required by Section 405(d)(2)(C) of the Clean Water Act. For the reasons stated above, as well as the arguments advanced by Appellants' Opening Brief, this Court should reverse the District Court's decision.

DATED: March 24, 2026

Respectfully submitted,

*/s/ Ashley Wilmes*

Ashley Wilmes
(D.C. Cir. Bar No. 55022)
Tom FitzGerald
(D.C. Cir. Bar No. 36347)
Kentucky Resources Council, Inc.
Post Office Box 1070
Frankfort, Kentucky 40602-1070
502-875-2428
ashley@kyrc.org
fitz@kyrc.org

*Counsel for Organic Trade Association, Center for Food Safety, Delaware Riverkeeper, Kentucky Resources Council, Kentucky Waterways Alliance, Save Plainfield Township Inc., and Sierra Club*

*/s/ Erica Kyzmir-McKeon*
Erica Kyzmir-McKeon
(N.Y. Bar No. 4987376)
(Application for Admission pending)
Erica A. Fuller
(D.C. Cir. Bar No. 53919)
Nora Bosworth
(Application for Admission forthcoming)
Conservation Law Foundation
62 Summer Street
Boston, MA 02110
Tel: 607-743-4260
Email: ekyzmir-mckeon@clf.org
efuller@clf.org
nbosworth@clf.org

*Counsel for Amici Robert Bierschenk, James Buckle, Egide Dostie II, Jason Grostic, Allison Jumper, Robert O'Neal, and Truckers Movement for Justice*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P.29(a)(5) because this brief contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), as counted by counsel's word processing system.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Times New Roman font.

Dated: March 24, 2026

*/s/ Ashley Wilmes*
Ashley Wilmes

*/s/ Erica A. Fuller*
Erica A. Fuller

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of March 2026, I electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the CM/ECF System the foregoing Amicus Brief. All participants in the case are registered CM/ECF users, and the service will be accomplished in the appellate CM/ECF system.

*/s/ Ashley Wilmes*
Ashley Wilmes

*Counsel for Amici Curiae*

Dated: March 24, 2026