**ORAL ARGUMENT NOT YET SCHEDULED**
**No. 25-5431**

# In The United States Court of Appeals
# For The District of Columbia Circuit

_____

JAMES FARMER, et al.,

*Plaintiffs-Appellants*,

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Defendants-Appellees,*

and

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES,

*Intervenor-Appellee.*

_____

Appeal from the United States District Court for the District of Columbia
No. 24-cv-01654-DLF (Hon. Dabney L. Friedrich)

_____

**BRIEF OF THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA AS AMICUS CURIAE IN SUPPORT OF FEDERAL DEFENDANTS-APPELLEES AND INTERVENOR-APPELLEE**

_____

ANDREW R. VARCOE
CHRISTOPHER J. WALKER
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

KEITH BRADLEY
SQUIRE PATTON BOGGS
717 17th Street, Suite 1825
Denver, CO 80202
(303) 830-1776
keith.bradley@squirepb.com

KATHRYN M. BROWN
SQUIRE PATTON BOGGS
2000 Huntington Center
41 South Hight Street
Columbus, OH 43215
(614) 365-2700
kathryn.brown@squirepb.com

*Counsel for Amicus Curiae*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the Chamber of Commerce of the United States of America certifies as follows:

## 1. Parties and Amici

All parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Federal Defendants-Appellees.

## 2. Ruling Under Review

References to the rulings at issue appear in the Brief for Federal Defendants-Appellees.

## 3. Related Cases

The Chamber of Commerce of the United States of America is not aware of any related cases.

**CORPORATE DISCLOSURE STATEMENT**

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amicus curiae* submits the following disclosure statement:

The Chamber of Commerce of the United States of America states that it is a non-profit, tax-exempt organization incorporated in the District of Columbia. The Chamber has no parent corporation, and no publicly held company has 10% or greater ownership in the Chamber.

# **TABLE OF CONTENTS**

**Page**

INTEREST OF AMICUS CURIAE ...........................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................2

ARGUMENT ..........................................................................................................5

    I.     The text, structure, and design of the Clean Water Act confirm that section 405(d)(2)(C) requires EPA only to review, not to regulate.......5

    II.    Section 405(d)(2)(C) of the Clean Water Act does not authorize rulemaking via litigation. ................................................................12

    III.   Appellants' interpretation of section 405(d)(2)(c) of the Clean Water Act would disrupt bedrock principles of judicial review of agency inaction. ......................................................................................16

CONCLUSION .....................................................................................................18

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Defs. of Wildlife v. Jackson*,
  284 F.R.D. 1 (D.D.C. 2012)......................................................................3, 12

*Defs. of Wildlife v. Perciasepe*,
  714 F.3d 1317 (D.C. Cir. 2013)................................................................3, 12

*Janko v. Gates*,
  741 F.3d 136 (D.C. Cir. 2014).......................................................................5

*Kennedy v. Braidwood Mgmt., Inc.*,
  606 U.S. 748 (2025).....................................................................................10

*Nat'l Wildlife Fed'n v. Hodel*,
  839 F.2d 694 (D.C. Cir. 1988).......................................................................6

*New York v. EPA*,
  921 F.3d 257 (D.C. Cir. 2019).....................................................................16

*Prof'l Drivers Council v. Bureau of Motor Carrier Safety*,
  706 F.2d 1216 (D.C. Cir. 1983)...................................................................16

*Russello v. United States*,
  464 U.S. 16 (1983).........................................................................................9

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987).....................................................................12

*United States. v. Villanueva-Sotelo*,
  515 F.3d 1234 (D.C. Cir. 2008).....................................................................5

**Statutes**

5 U.S.C. § 553(e) ...............................................................................................3

15 U.S.C. § 2620(b) .........................................................................................17

33 U.S.C. § 1268(c)(7)(G)(i) .............................................................................9

33 U.S.C. § 1270(e)(2)(F).................................................................................9

33 U.S.C. § 1273(c)(7)........................................................................................8

33 U.S.C. § 1276a ..............................................................................................8

33 U.S.C. § 1276b(c)(3)(B)(ii) ..........................................................................9

33 U.S.C. § 1311(d) ...........................................................................................6

33 U.S.C. § 1313a ..............................................................................................8

33 U.S.C. § 1314(g)(1)....................................................................................6, 7

33 U.S.C. § 1317(a)(3)........................................................................................7

33 U.S.C. § 1317(b)(2)........................................................................................8

33 U.S.C. § 1322 (p)(4)(D)(i)(I)-(II) ..................................................................7

33 U.S.C. § 1330 .................................................................................................9

33 U.S.C. § 1342 .................................................................................................7

33 U.S.C. § 1345(d) ................................................................1, 2, 3, 5, 6, 7

33 U.S.C. § 1365(a)(2) ...................................................................................3, 12

42 U.S.C. § 6912(b) ..........................................................................................11

42 U.S.C. § 6962(e) ..........................................................................................11

42 U.S.C. § 7408 .........................................................................................10, 11

42 U.S.C. § 7409(d)(1).......................................................................................11

42 U.S.C. § 7411 .........................................................................................10, 11

42 U.S.C. § 7412(d)(6).......................................................................................10

42 U.S.C. § 7429(a)(5).......................................................................................11

42 U.S.C. § 7430 ...............................................................................................11

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ...............................................................................9

**<u>INTEREST OF AMICUS CURIAE</u>**[1]

The Chamber of Commerce of the United States of America (the "Chamber") is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

Many of the Chamber's members are subject to, or otherwise affected by, numerous regulations promulgated pursuant to the Clean Water Act, including regulations under section 405(d), which pertains to sewage sludge. *See* 33 U.S.C. § 1345(d). And virtually all the Chamber's members are subject to at least some agency regulations governed by the Administrative Procedure Act. Accordingly, the Chamber has a particular interest in ensuring that the procedures for initiating agency rulemaking, and for challenging agency regulatory decisions, are consistent with the Administrative Procedure Act and applicable statutory frameworks.

---

[1] All parties have consented to the filing of this brief. Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), *amicus curiae* states that no counsel for any party authored this brief in whole or in part and no entity or person, aside from *amicus curiae,* its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The Clean Water Act requires the Environmental Protection Agency ("EPA") to conduct a periodic review of its regulations on pollutants in sewage sludge. But the statute requires only a review; it does not mandate the outcome. Section 405(d)(2)(C) states, "[f]rom time to time, but not less often than every 2 years, the Administrator *shall review* the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C) (emphasis added). That text plainly provides one mandatory, non-discretionary duty for EPA—it "shall review the regulations." The fact that EPA's review is "for the purpose of identifying" and "promulgating regulations" does not create a second mandatory duty to regulate. Section 405(d)(2)(C) requires review and provides the reason for it; at most, the statute provides the opportunity for EPA to exercise its discretion as to whether additional regulations are needed.

Appellants' theory of section 405(d)(2)(C), however, is startling. They assert that, by simply stating the purpose of the regulatory review, i.e. informing the agency about what to consider during the review, Congress imposed a non-discretionary duty for EPA to regulate something. Further still, appellants demand that a court decide which thing EPA should regulate.

This Court should reject appellants' implausible interpretation of section 405(d)(2)(C), and appellants' attempt to rewrite the rules of the road, for three reasons.

*First*, the text, structure, and design of section 405(d)(2)(C) of the Clean Water Act—and similar environmental statutes—impose only one mandatory duty on EPA:  to review the regulations.  Section 405(d)(2)(C) says that "the Administrator *shall review* the regulations," not that the Administrator "shall review *and revise* regulations" or "shall review *and promulgate* regulations."  33 U.S.C. § 1345(d)(2)(C) (emphasis added).  Other provisions of the Clean Water Act, and provisions of other environmental statutes of the same vintage, further confirm that when Congress intends to require EPA to regulate, it knows how to do so.

*Second*, the Clean Water Act does not authorize rulemaking-by-litigation. Here, appellants have not identified a readily ascertainable mandatory duty, which is a prerequisite for a suit to compel agency action.  33 U.S.C. § 1365(a)(2); *Defs. of Wildlife v. Jackson,* 284 F.R.D. 1, 4 (D.D.C. 2012), *aff'd in relevant part in Defs. of Wildlife v. Perciasepe,* 714 F.3d 1317 (D.C. Cir. 2013).  And the Administrative Procedure Act provides a mechanism for a person to request that an agency initiate rulemaking, which appellants have not pursued.  *See* 5 U.S.C. § 553(e).  Meanwhile, what appellants seek would upend federal regulatory administration.  Ordinarily a single agency determines whether and when to impose additional regulations on

American businesses and other parties—subject to appropriate judicial review. Under appellants' approach, for this Clean Water Act regulatory program, every two years, interest groups could race to courthouses around the country, each demanding that a given district court decide that particular group's targeted concern is one that requires immediate regulation. This litigation will divest agencies of the opportunity to initially consider whether to regulate and tear away from the public the opportunity to participate in rulemaking. Under appellants' approach, only litigants and potential intervenors will be able to participate.

*Third*, appellants' interpretation of the Clean Water Act disrupts two key components of judicial review of agency inaction. The first type of judicial review is via citizen petitions for rulemaking, which is typically how individuals urge agencies to initiate rulemaking. Remarkably, if an agency denies such a petition, and the petitioner seeks judicial review of the denial, and *prevails* in that suit, the outcome would still not be an order to impose regulations, the relief that appellants demand here. The second type is when Congress has authorized a court to order rulemaking—an extraordinary remedy that when allowed is specified expressly, not infrequently with details in the statute about standards and processes. All of that is conspicuously absent from section 405(d)(2)(C).

Rather than initiating a proper citizen suit or challenging a denial of a rulemaking petition, appellants seek a new, atextual remedy—an order compelling

regulation of a substance, which is tantamount to a court-granted right to regulate, outside the rulemaking process contemplated by the Administrative Procedure Act. This Court should, as the district court did, reject appellants' implausible interpretation of the Clean Water Act.

### **ARGUMENT**

**I.  THE TEXT, STRUCTURE, AND DESIGN OF THE CLEAN WATER ACT CONFIRM THAT SECTION 405(d)(2)(C) REQUIRES EPA ONLY TO REVIEW, NOT TO REGULATE.**

The Clean Water Act of 1972 itself and other environmental statutes from the same era uniformly demonstrate that when Congress requires EPA to regulate, it does so expressly and unambiguously. Congress also consistently distinguishes between reviewing and regulating, and between reviewing and revising regulations, in these statutes.

The Court's "interpretive task begins with the statute's language," construed according to its "plain and unambiguous meaning." *United States. v. Villanueva-Sotelo*, 515 F.3d 1234, 1237 (D.C. Cir. 2008). "[T]he legislature says in a statute what it means and means in a statute what it says there." *Janko v. Gates*, 741 F.3d 136, 139 (D.C. Cir. 2014).

The plain text only requires that EPA review regulations—not revise or promulgate regulations. Section 405(d)(2)(C) states, "the Administrator *shall review* the regulations." 33 U.S.C. § 1345(d)(2)(C) (emphasis added). It does not

5

say "shall regulate," or even "shall identify additional pollutants." Those potential activities of "identifying" and "promulgating regulations" are specified as the "purpose" of the review. *Id.* That does not mean that Congress established a duty for EPA to identify pollutants at each two-year review and to promulgate corresponding regulations. If Congress meant to do so, it would have said, "the Administrator shall review, identify, and promulgate regulations."

The overall structure of the Clean Water Act confirms that Congress knows how to mandate that EPA regulate or revise regulations and declined to do so in section 405(d)(2)(C). When "Congress includes particular language in one section of a statute, but not in another … [w]e must respect that choice" and "assume that a distinction was intended." *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 764 n.113 (D.C. Cir. 1988) (citations omitted).

For instance, the Clean Water Act provision addressing the "[r]eview and revision of effluent limitations" states: "Any effluent limitation required by paragraph (2) of subsection (b) of this section *shall be reviewed* at least every five years *and, if appropriate, revised* pursuant to the procedure established under such paragraph." 33 U.S.C. § 1311(d) (emphases added). Thus, if (and only if) EPA concludes that a revision is appropriate, section 1311(d) requires EPA to make such a revision. Section 1314(g)(1), which pertains to establishing guidelines for pretreatment of pollutions, provides similarly: "For the purpose of assisting States

in carrying out programs under section 1342 of this title, the Administrator shall publish … and *review* at least annually thereafter and, *if appropriate, revise* guidelines for pretreatment of pollutants which he determines are not susceptible to treatment by publicly owned treatment works." *Id.* § 1314(g)(1) (emphases added). Section 1314(g)(1), like section 405(d)(2)(C)'s language at issue in this case, states that the review is "[f]or the purpose" of an activity—for section 1314(g)(1), "assisting States." On appellants' theory of section 405(d)(2)(C), it would follow that section 1314(g)(1) imposes on EPA a mandatory, non-discretionary duty that its annual review *shall* assist States. But section 1314(g)(1) proceeds to describe what EPA must do: If it finds a revision appropriate, carry out that revision. It makes no sense to argue that section 1314(g)(1) imposes a non-discretionary duty of assisting States, alongside the discretionary mandate for appropriate revisions.

More examples abound in the Clean Water Act of Congress's distinguishing between reviewing and revising regulations. Section 1317(a)(3) states that "[e]ach such effluent standard (or prohibition) shall be *reviewed and, if appropriate, revised* at least every three years." *Id.* § 1317(a)(3) (emphasis added). Section 1322 uses nearly identical language: "Not less frequently than once every 5 years, the Administrator, in consultation with the Secretary, shall" "*review* the standards of performance in effect under this paragraph" and "*if appropriate, revise* those standards of performance." *Id.* § 1322(p)(4)(D)(i)(I)-(II) (emphases added).

Congress also clearly mandates when EPA must revise regulations upon a trigger of circumstances. For example, "[t]he Administrator *shall*, from time to time, as control technology, processes, operating methods, or other alternatives change, *revise such standards* following the procedure established by this subsection for promulgation of such standards." *Id.* § 1317(b)(2) (emphases added). Here, section 405(d)(2)(C) provides only that EPA "shall review"—it does not mandate that EPA promulgate or revise regulations.

Section 405(d)(2)(C) differs from all these examples. It does not connect the word "shall" to the act of regulating. It does not specify a circumstance or finding that obligates EPA to regulate. Congress knows how to require EPA to revise or issue regulations, and simply did not do so in section 405(d)(2)(C).

Moreover, the Clean Water Act regularly distinguishes between reviewing, on one hand, and promulgating and revising regulations on the other. *See id.* § 1313a ("The *review, revision, and adoption or promulgation* of revised or new water quality standards[.]" (emphasis added)); *id.* § 1276a(d)(1) ("Not later than 5 years after December 23, 2022, the Director, in conjunction with the Estuary Partnership, shall *review and revise* the comprehensive conservation and management plan[.]" (emphasis added)); *id.* § 1276a(d)(2) ("Not less often than once every 5 years … the Director shall *review, and revise as appropriate*, the San Francisco Bay Plan." (emphasis added)); *id.* § 1273(c)(7) ("[T]he Administrator shall … ensure that the

comprehensive conservation and management plan approved for the Basin … is *reviewed and revised* in accordance with section 1330 of this title not less often than once every 5 years[.]" (emphasis added)); *id.* § 1270(e)(2)(F) ("The Plan … shall … be *reviewed and revised*, as necessary, at least once every 5 years[.]" (emphasis added)); *id.* § 1268(c)(7)(G)(i) ("Not less often than once every 5 years, the Administrator … shall *review, and revise as appropriate*, the Initiative Action Plan[.]" (emphasis added)); *id.* § 1276b(c)(3)(B)(ii) ("Not less often than once every 5 years … the Puget Sound Federal Leadership Task Force shall *review, and revise as appropriate*, the Federal Action Plan." (emphasis added)). As used in this statute (and routinely throughout the U.S. Code), *review*, *promulgate*, and *revise* have distinct meanings.

When it comes to section 405(d)(2)(C), Congress's decision not to include "shall promulgate" or "shall revise," in addition to "shall review," must be respected. To construe the statute otherwise would violate the bedrock canon that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation omitted); *accord* Antonin Scalia & Bryan A. Garner, *Reading Law:  The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect. … None should

9

needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.").

Other environmental statutes enacted in the 1970s draw similar distinctions between reviewing and revising, and these statutes include similar "review and revise" language as the Clean Water Act. *Cf. Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 771 (2025) (reviewing "many statutes" and holding that "[w]hen Congress wants to depart from" a standard, "it knows how to do so").

For example, the Clean Air Act of 1970 requires EPA to "at least every 8 years, *review and, if appropriate, revise* [certain emission] standards following the procedure required by this subsection for promulgation of such standards." 42 U.S.C. § 7411(b)(1)(B) (emphasis added). Similarly, the Clean Air Act provides that "[t]he Administrator shall *review, and revise as necessary* (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years." *Id.* § 7412(d)(6) (emphasis added).

Many other provisions of the Clean Air Act require "review and revision" of regulations or standards, demonstrating Congress's desire to distinguish between "review" and such terms as "revise" and "modify." *E.g.*, *id.* § 7408(c) ("The Administrator shall from time to time review, and, as appropriate, modify, and reissue any criteria or information on control techniques issued pursuant to this

section."); *id.* § 7409(d)(1) ("[A]t five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under section 7408 of this title and the national ambient air quality standards promulgated under this section and shall make such revisions in such criteria and standards and promulgate such new standards as may be appropriate[.]"); *id.* § 7429(a)(5) ("[A]t 5 year intervals thereafter, the Administrator shall review, and in accordance with this section and section 7411 of this title, revise such standards and requirements."); *id.* § 7430 ("[A]t least every 3 years thereafter, the Administrator shall review and, if necessary, revise, the methods … used for purposes of this chapter to estimate the quantity of emissions [of certain pollutants.]").

Similarly, the Resource Conservation and Recovery Act of 1976 requires that "[e]ach regulation promulgated under this chapter shall be *reviewed and, where necessary, revised* not less frequently than every three years." *Id.* § 6912(b) (emphasis added); *see also id.* § 6962(e) ("The Administrator … shall prepare, review not less frequently than once every 5 years, and, if appropriate, revise, … guidelines for the use of procuring agencies in complying with the requirements of this section.").

In the provision at issue in this case, Congress has been painfully plain: section 405(d)(2)(C) of the Clean Water Act requires EPA to "*review* the

11

regulations … for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants," but it does not require EPA to "revise" the regulations or "promulgate" additional regulations. Section 405(d)(2)(C) lacks the language that Congress regularly used, throughout the Clean Water Act and other environmental statutes, to mandate revisions of regulations (or even to require an agency to decide in its discretion whether such a revision is appropriate).

## II. SECTION 405(d)(2)(C) OF THE CLEAN WATER ACT DOES NOT AUTHORIZE RULEMAKING VIA LITIGATION.

Appellants ultimately seek an order requiring EPA to regulate specific substances that appellants have identified. Such regulation-by-litigation lacks any statutory imprimatur. This is a citizen suit, which citizens may use only when an agency does not comply with a "nondiscretionary duty that is 'readily-ascertainable.'" *Defs. of Wildlife,* 284 F.R.D. at 4 (quoting *Our Children's Earth Found. v. EPA*, 527 F.3d 842, 851 (9th Cir. 2008)); 33 U.S.C. § 1365(a)(2); *cf. Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (Clean Air Act), *superseded on other grounds by statute*.

It bears emphasis that serious problems would follow from appellants' approach. Ordinarily, and absent a specific textual mandate, decisions about whether to promulgate specific regulations under a statute like the Clean Water Act are assigned to an agency to make in the first instance. Whether to add or revise

regulations in a particular area involves a range of practical considerations.  What are the risks from a given substance or set of substances?  What are the costs of using a particular regulatory tool to address those risks—not just the dollars spent for control measures, but also, among other things, the secondary consequences for other parts of a waste system arising from adding such measures?  What other mechanisms are, or could be, in place or underway (whether under the statute at issue or other statutes), and what would the costs of those measures be?  How robust is the scientific knowledge about the risks at issue and about the effectiveness of control measures?  These are just a few of the myriad questions that EPA would presumably consider as it assesses whether to initiate rulemaking targeting a given substance or set of substances under a particular statutory provision—and EPA would also be considering such questions about other substances as well.

Appellants want to short-cut that process by having a district court order that EPA must regulate the particular substances that they have chosen (and indeed that EPA must prioritize sewage sludge above other issues EPA is working on).  But if appellants can obtain a court order that EPA has a non-discretionary duty to regulate specific substances, others can also seek the same relief, directed to other substances.  There is no obvious stopping point to the duty that appellants would have this Court create.

The resulting litigation-driven patchwork of decision-making about what substances to regulate would give rise to serious instability. Section 405(d)(2)(C) mandates a review every two years. A round of litigation over EPA's supposedly non-discretionary duties to regulate various substances would not even be completed before the next supposedly non-discretionary duty kicks in. This Court should make clear that the text, structure, and design of the Clean Water Act do not permit such judicial regulation of the environment via provisions like 405(d)(2)(C).

To be sure, judicial review is an important check on improper agency action. But what appellants propose is something else entirely: conscripting the courts as first-line regulatory decisionmakers. Adding to the risks, there may well be regulatory topics that lack champions like appellants. Appellants have told the district court about their preferred regulatory actions. A plaintiff cannot be expected to inform a court about other priorities that might, in the agency's expert judgment, be more important or time-sensitive than the plaintiff's priorities and preferred approaches. Yet the avenue for court-driven rulemaking sought by appellants would force EPA to divert its limited resources from those other priorities. That would inevitably create a risk of delaying important agency actions and decisions with momentous consequences for the public—including, but not limited to, enforcement decisions, steps in other rulemakings, and the development of guidance to inform the regulated community and the public writ large.

Congress's ordinary arrangement for taking account of considerations like those set forth above is to place the first-instance decision-making in the hands of a single agency—not 94 federal district courts. The agency can investigate and develop its own information (as a court ordinarily cannot) on questions like those above. The agency can make the assessment that one topic should be a higher priority than another. It is presumably for this reason that so often, when Congress does mandate that an agency revise regulations, that mandate is triggered only by a determination that the revision is "appropriate" in light of the relevant considerations.

Appellants' approach also ensures that only one party—the plaintiff—is guaranteed the opportunity to participate in what would normally be agency rulemaking. There is no public comment period in this instance, which means only appellants'—with possibly an intervenor's—view is considered. Many members of the public do not have the capacity or means to hire counsel to intervene in a district court case.

In short, appellants' proposal is a radical departure from the ordinary operation of regulatory processes under the Administrative Procedure Act, the Clean Water Act, and countless other regulatory statutes. Appellants' proposal threatens to impose massive costs on the U.S. economy. And it threatens to unleash a destabilizing cycle of unending court cases to wrest control of important,

discretionary policymaking decisions from EPA into the hands of motivated plaintiffs. This Court should hold that statutory requirements to review, without more, do not require an agency to revise or promulgate new regulations.

## III. APPELLANTS' INTERPRETATION OF SECTION 405(d)(2)(C) OF THE CLEAN WATER ACT WOULD DISRUPT BEDROCK PRINCIPLES OF JUDICIAL REVIEW OF AGENCY INACTION.

If adopted, appellants' implausible interpretation of section 405(d)(2)(C)— i.e. that the "shall review" clause constitutes an enforceable duty to issue more regulations—would contradict at least two bedrock principles of judicial review of agency inaction.

First, as the district court observed, a person wanting EPA to regulate can submit a petition for rulemaking. That process would of course have EPA make the decision, in the first instance, about how to respond. Strikingly, if EPA denied a petition, and the petitioner sued over that outcome, the remedy from a court would be the ordinary Administrative Procedure Act remedy of setting aside the denial. *See New York v. EPA*, 921 F.3d 257, 261 (D.C. Cir. 2019) (explaining that relief includes "set[ting] aside the agency's judgment" or "overturn[ing] EPA's denial"). The court would not respond by ordering EPA to issue the petitioner's preferred rule. *See Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1223 (D.C. Cir. 1983) ("[The petitioner] had no right to compel the agency to hold rulemaking proceedings addressing *its specific recommendations*."). What

16

appellants demand is a remedy far beyond the Administrative Procedure Act norm.

Second, when Congress has taken the extraordinary step to authorize a court to order rulemaking, Congress typically has done so explicitly, in detail, and with protections for the agency's resources. Take, for example, section 21 of the Toxic Substances Control Act, which dates from just two years after Clean Water Act section 405(d)(2)(C). Under section 21, a court can order EPA to undertake a regulatory action regarding a chemical substance. The provision says so expressly: "the court shall order [EPA] to initiate the action requested." 15 U.S.C. § 2620(b)(4)(B). It describes what standard the court should use for the decision. *Id.* § 2620(b)(4)(B)(ii) ("demonstrate[] … by a preponderance of the evidence that … [the substance] presents an unreasonable risk of injury to health or the environment"). And before coming to court, the plaintiff must petition EPA for the regulatory action, and "set forth the facts" substantiating the request; in response to which EPA can "conduct such investigation or proceeding as [EPA] deems appropriate." *Id.* § 2620(b)(1)-(2). Then, even if the outcome is a court order to undertake the rulemaking, the court must postpone its order if EPA explains that other substances are higher priorities. *Id.* § 2620(b)(4).

Here, appellants demand a court order that is more extreme than would be possible for either of the preceding examples (petitions for rulemaking under the Administrative Procedure Act or under the Toxic Substances Control Act). The

court intervention they seek would entitle them absolutely to the regulations they want, without regard to the agency's other priorities, and without regard to the substantive considerations that would usually inform EPA's regulatory decisions. This Court should hold that section 405(d)(2)(C) of the Clean Water Act does not subject EPA to such a rigid duty, without specifying processes, protections, or standards for it to arise. It merely requires EPA to perform a review.

## CONCLUSION

The Court should affirm the district court's judgment.


May 12, 2026

Respectfully submitted,


*/s/ Keith Bradley*
KEITH BRADLEY
SQUIRE PATTON BOGGS (US) LLP
717 17th Street, Suite 1825
Denver, CO 80202
(303) 830-1776
keith.bradley@squirepb.com

KATHRYN M. BROWN
SQUIRE PATTON BOGGS (US) LLP
2000 Huntington Center
41 South Hight Street
Columbus, OH 43215
(614) 365-2700
kathryn.brown@squirepb.com

ANDREW R. VARCOE
CHRISTOPHER J. WALKER
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062
(202) 463-5337

# CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) because it contains 3,986 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), as determined by the word-count function of Microsoft Office 365.

This document further complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally-spaced typeface using Microsoft Office 365 in 14-point Times New Roman Font.

*/s/ Keith Bradley*
Keith Bradley