## NO. 25-5431

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

JAMES FARMER, *et al*.,
*Plaintiffs-Appellants*,

V.

ENVIRONMENTAL PROTECTION AGENCY, *et al.,*
*Defendants-Appellees*, and

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
*Intervenor For Defendant-Appellee*

Appeal from The United States District Court
for The District of Columbia
No. 24-Cv-01654-DLF (Hon. Dabney L. Friedrich)

**AMICUS BRIEF OF THE COALITION OF RECYCLERS OF RESIDUAL ORGANICS BY PRACTITIONERS OF SUSTAINABILITY ("CRROPS"), DR. SALLY BROWN, THE CALIFORNIA ASSOCIATION OF SANITATION AGENCIES ("CASA"), THE MID-ATLANTIC BIOSOLIDS ASSOCIATION ("MABA"), THE MIDWEST BIOSOLIDS ASSOCIATION ("MBA"), THE NORTH EAST BIOSOLIDS & RESIDUALS ASSOCIATION ("NEBRA"), THE NORTHWEST BIOSOLIDS ASSOCIATION ("NWB"), THE VIRGINIA BIOSOLIDS COUNCIL ("VBC"), AND THE WATER ENVIRONMENT ASSOCIATION OF TEXAS ("WEAT") IN SUPPORT OF INTERVENOR FOR DEFENDANT-APPELLEE, NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES**

Frederic Andes
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL  60606
Phone:  (312) 214-8310
Email:  Fredric.Andes@btlaw.com

Andre Monette
BARNES & THORNBURG LLP
655 W. Broadway, Suite 1300
San Diego, CA  92101
Phone:  (619) 321-5003
Email:  Andre.Monette@btlaw.com

Erika Powers
BARNES & THORNBURG LLP
24 Frank Lloyd Wright Drive, Suite A-330
P.O. Box 511
Ann Arbor, MI  48105
Phone:  (734) 489-8006
Email:  Erika.Powers@btlaw.com

*Counsel for The Coalition of Recyclers of Residual Organics by Practitioners of Sustainability, Dr. Sally Brown, The California Association of Sanitation Agencies, The Mid-Atlantic Biosolids Association, The Midwest Biosolids Association, The North East Biosolids & Residuals Association, The Northwest Biosolids Association, The Virginia Biosolids Council, And The Water Environment Association of Texas*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(l), the above listed *amici curiae* certify as follows:

## 1.     Parties and Amici

Except for the *amici curiae* listed in this brief, and the United States Chamber of Commerce, all parties, intervenors, and *amici* appearing in this Court are listed in the Brief for Intervenor for Defendants-Appellees.

## 2.     Ruling Under Review

References to the rulings at issue appear in the Brief for Intervenor for Defendants-Appellees.

## 3.     Related Cases

*Amici curiae* are not aware of any related cases.

## 4.     Separate Brief

Counsel for *amici curiae* are aware of an additional amicus brief submitted in support of Intervenor for Defendant-Appellee by the United States Chamber of Commerce. A separate brief is necessary and appropriate to ensure that *amici's* distinct viewpoints and interests are presented to the Court of Appeals. *Amici* are scientists and organizations representing wastewater utilities and other organizations that support ongoing use of biosolids for agricultural purposes in the United States. They share a common interest in maintaining stability in biosolids regulation. They support sensible regulations that are based on accurate fact finding, and the best

available scientific evidence, and that are feasible for biosolids producers and users to implement.

Because of their role in the production, management and use of biosolids, Biosolids Amici and their members will be directly impacted by the Court of Appeals decision in this case. They have an interest that is acute and direct. Biosolids Amici welcome and support the Chamber of Commerce's brief but believe that Biosolids Amici's roles in producing, managing and using biosolids provide a viewpoint that differs from the broader concerns represented by the Chamber of Commerce. The differing constituencies and differing potential impacts of the decision warrant consideration by the Court of Appeals.

*Amici* are very familiar with the questions involved in this litigation and can offer the Court of Appeals insights that would not otherwise be shared with the Court and that will offer a counter perspective to the amicus briefs filed in support of Plaintiff-Appellants in this case.

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1, *amici curiae* submits the following disclosure statement:

*Amici curiae* are individuals or non-profit, tax-exempt organizations and do not have shareholders. No *amici* have a parent corporation, and no publicly held company has 10% or greater ownership of any of the *amici*.

# CIRCUIT RULE 29(A)(4)(E) STATEMENT

Pursuant to D.C. Circuit Rule 29(a)(4)(E), counsel for *amici curiae* certifies that:

Counsel for *amici curiae* authored this brief in whole and without participation by other parties or their counsel; no party or their counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the *amici* curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting this brief.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedures Act, 5 U.S.C. §§ 551-559 |
| CASA | The California Association of Sanitation Agencies |
| CRROPS | The Coalition of Recyclers of Residual Organics by Practitioners of Sustainability |
| EPA | Environmental Protection Agency |
| LNG | Liquefied Natural Gas |
| MABA | The Mid-Atlantic Biosolids Association |
| MBA | The Midwest Biosolids Association |
| NEBRA | The North East Biosolids & Residuals Association |
| NPDES | National Pollutant Discharge Elimination System |
| NWB | The Northwest Biosolids Association |
| PEER | Public Employees for Environmental Responsibility |
| PFAS | Per- and polyfluoroalkyl substances |
| POTW | Publicly Owned Treatment Works |
| VBC | The Virginia Biosolids Council |
| WEAT | The Water Environment Association of Texas |
| WRRF | Water Resource Recovery Facilities |

**TABLE OF CONTENTS**

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .......... i

CORPORATE DISCLOSURE STATEMENT ....................................... iii

CIRCUIT RULE 29(a)(4)(E) STATEMENT .......................................... iv

GLOSSARY OF ABBREVIATIONS ................................................... v

IDENTITY AND INTEREST OF AMICI CURIAE .................................... 1

ISSUE PRESENTED ................................................................... 5

SUMMARY OF ARGUMENT ........................................................ 6

ARGUMENT ............................................................................ 8

I. LAND APPLICATION OF BIOSOLIDS IS HIGHLY REGULATED, AND ENVIRONMENTALLY AND ECONOMICALLY BENEFICIAL. .............................. 10

    A. Land Application of Biosolids is an Environmentally Sustainable Method of Resource Recovery. .......................................... 11

    B. PEER and their Amici are using scare tactics; the Science on PFAS is still developing and there is no conclusive evidence demonstrating that PFAS in biosolids poses a substantial health risk. ...................................................................... 13

    C. EPA regulations and guidance ensure land application is safe and protective of public health. ............................................. 16

    D. Farmers and Public Utilities rely on the ability to reuse biosolids. .... 18

II. A 24-MONTH TIMELINE IS TOO SHORT TO REPEATEDLY ISSUE NEW REGULATIONS, ESPECIALLY FOR CHEMICALS SUCH AS PFAS. ...................... 21

    A. Section 405 is Clear: EPA is Not Obligated to Promulgate New Regulatory Limits for Toxic Chemicals on a 24 Month Timeline. ..... 21

    B. The APA rulemaking process takes time. ............................... 24

C.     Truncated timelines risk improper standards and increased litigation.................................................................26

D.     The logistics of changing operations are enormous and cannot reasonably be completed every two years.........................................28

III.   **STATES RETAIN AUTHORITY TO REGULATE BIOSOLIDS MANAGEMENT.** ......29

CONCLUSION .................................................................................31

CERTIFICATE OF COMPLIANCE .................................................................33

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*City and County of San Francisco v. Env't Prot. Agency*,
604 U.S. 334 (2025).................................................................23

*Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety &*
*Health Admin.*,
595 U.S. 109 (2022).................................................................22

*Sackett v. Env't Prot. Agency*,
598 U.S. 651 (2023).............................................................22, 23

*Utility Air Regulatory Group v. Env't Prot. Agency*,
573 U.S. 302 (2014).................................................................22

*Whitman v. American Trucking Ass'ns, Inc.*,
531 U.S. 457 (2001).................................................................23

**Statutes**

5 U.S.C. § 553(c) .......................................................................25

33 U.S.C. § 1251(b) ...................................................................23

33 U.S.C. § 1345(d)(2)(A)(i) .........................................................7

33 U.S.C. § 1345(d)(2)(C) .....................................................7, 21, 23

33 U.S.C. § 1370 .......................................................................29

Administrative Procedures Act ...............................................22, 24, 25

Clean Water Act...............................................1, 6, 7, 8, 9, 15,24

Clean Water Act Section 405.............................................................6

Clean Water Act Section 405(d)........................................................27

Clean Water Act Section 510 (33 U.S.C. § 1370) ................................29

Clean Water Act section 405(d)(2)(C)..............................................5,21

PFAS Act .......................................................................................27, 28

**Other Authorities**

40 C.F.R. 503.1(a) ....................................................................................16

40 C.F.R. 503 ...............................................................16, 17, 24, 25, 30

44 Fed. Reg. 53438, 53449 ......................................................................16

49 Fed. Reg. 24358, 24359 ......................................................................16

56 Fed. Reg. 33186 ..................................................................................16

58 Fed. Reg. 9248 ....................................................................................25

64 Fed. Reg. 42552 ..................................................................................25

68 Fed. Reg. 61084 ..................................................................................25

72 Fed. Reg. 14220 ..................................................................................25

90 Fed. Reg 3859 .....................................................................................26

90 Fed. Reg. 16128 ..................................................................................26

*American Farm Bureau Federation et al., Comment Letter on Draft
  Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and
  Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-
  2024-0504-0001 at 2, 3, 5 (Aug. 13, 2025),
  https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-
  0150................................................................................................10, 17, 29

*Basic Information About Sewage Sludge and Biosolids*, U.S. Env't
  Prot. Agency (May 12, 2026),
  https://www.epa.gov/biosolids/basic-information-about-sewage-
  sludge-and-biosolids ..............................................................................18
*Biosolids Beneficial Reuse Factsheet*, Vt. Dep't of Env't Conservation
  (June 2015),
  http://static1.squarespace.com/static/54806478e4b0dc44e1698e88/
  t/5852d7a7f5e231640d1e8c7b/1481824168549/VT-
  BiosolidsBeneficialReUseFactSheet2015.pdf.......................................11

*Biosolids Disposal Disrupted in Maine*, North East Biosolids & Residuals Assc. (Mar. 22, 2023), https://www.nebiosolids.org/biosolids-disposal-disrupted-in-maine .................20

*California Association of Sanitation Agencies, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-2024-0504-0001 at 2, 12-13 (Apr. 1, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0031 ...............................................................................................11, 15

*Chokepoint: How the War With Iran Threatens Global Food Security*, Ctr. for Strategic and Int'l Studies (Mar 11, 2026), https://www.csis.org/analysis/chokepoint-how-war-iran-threatens-global-food-security ...............................................................................18, 19

*CRROPS, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 6 (Aug. 13, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0223 ....................................................................................................24

*Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA-HQ-OW-2024-0504-0001, Regulations.gov https://www.regulations.gov/docket/EPA-HQ-OW-2024-0504 (last visited May 14, 2026)......................................................26

*FINAL: Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS) and Related Salts*, EPA Document No. 815R24007, U.S. Environmental Protection Agency, Off. of Water (Apr. 2024), https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfos.pdf ..................................14, 15

*Hawk Ridge Composting Facility in Maine is Closing its Doors*, North East Biosolids and Residuals Assc. (Oct 31, 2025), https://www.nebiosolids.org/hawk-ridge-closing....................................20

*Illinois Farm Bureau et al., Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-2024-0504-0001 (Aug. 14, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0182 ....................................................................................................12

*Land Application of Municipal Sewage Sludge for the Production of Fruits and Vegetables*, U.S. Env't Prot. Agency et al. (1981), https://www.epa.gov/sites/default/files/2020-02/documents/land-application-fruits-vegatables.pdf ...................................................................... 16-17

*Madison Metropolitan Sewerage District, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 2 (Apr. 1, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0044 ................................................................................................19, 20

*Maine Official Urges States to Weigh Biosolids Disposal Options Before Ban*, Inside PFAS Policy (Oct. 28, 2025), https://insideepa.com/pfas-news/maine-official-urges-states-weigh-biosolids-disposal-options-ban ................................................................29

*National Academy of Sciences, Biosolids Applied to Land: Advancing Standards and Practices*, 4 (2002) https://www.nationalacademies.org/read/10426/chapter/2#4) ...........................17

*National Association of Clean Water Agencies, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 12 (Aug. 14, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0225 ..................................................................................................27

s

*PFAS in Biosolids: A Review of State Efforts & Opportunities for Action*, Env't Council of the States (Jan. 2023), https://www.ecos.org/wp-content/uploads/2023/01/PFAS-in-Biosolids-A-Review-of-State-Efforts-and-Opportunities-for-Action.pdf .......................................................................................31

*Stakeholder Meeting Facilitation for Issues Related to PFAS and Biosolids*, EPA Document No. 820S24002, at 7-8 https://www.epa.gov/system/files/documents/2024-12/facilitation-issues-pfas-biosolids.pdf..................................................................30

*Toxicological Profile for Perfluoroalkyls,* U.S. Ctr. for Disease
  Control and Prevention, Agency for Toxic Substances and Disease
  Registry, at 2-4, 6 (May 2021),
  https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117
  &tid=237 ...................................................................................13, 14

*Understanding Lagoon Requirements Under 40 C.F.R. Part 503: Best
  Management Practices for Use or Disposal of Sewage Sludge*, U.S.
  Env't Prot. Agency, Off. of Water (Feb. 2024),
  https://www.epa.gov/system/files/documents/2024-02/lagoon-
  requirements-2024.pdf...............................................................17

*United States Environmental Protection Agency's Perfluorooctanoic
  Acid, Perfluorooctane Sulfonic Acid, and Related Per- and
  Polyfluoroalkyl Substances 2024 Drinking Water Maximum
  Contaminant Level, 55 Critical Reviews in Toxicology* 368–415
  (May 20, 2025) https://doi.org/10.1080/10408444.2024.2446453 ....................14

**IDENTITY AND INTEREST OF AMICI CURIAE**

The following persons and organizations (jointly referred to as *Biosolids Amici*) support Intervenor for Defendant-Appellee, but write separately to provide the Court of Appeals with information and perspective on the impacts that Plaintiff-Appellant PEER's proposed reinterpretation of the Clean Water Act would have on their members and on the sanitation and agricultural systems in the United States.

- The Coalition of Recyclers of Residual Organics by Practitioners of Sustainability (CRROPS) is a non-profit organization representing a coalition of biosolids management companies dedicated to environmentally protective biosolids management standards that protect human health and the environment that are science-based and peer-reviewed.

- Dr. Sally Brown is a research professor at the School of Environmental and Forest Sciences at the University of Washington. She has a BA from Williams College and a MS and PhD from the University of Maryland in Soil Science. Her research focuses on different aspects of the use of biosolids and composts including risks associated with contaminants, in situ restoration of contaminated sites, carbon balance for different end use options, and integration of residuals use in green urban infrastructure. She is a Fellow and former Board member in the Soil Science Society of

1

America, a former Board member in the US Compost Council, and was a two- term member of the National Academy of Science Standing Committee on Soil Science.

- The California Association of Sanitation Agencies ("CASA") is a nonprofit mutual benefit corporation composed of over 145 public agencies that collect, treat, and recycle wastewater and biosolids for millions of residents, businesses, industries, and institutions throughout California.

- The Mid-Atlantic Biosolids Association ("MABA") is a non-profit organization dedicated to ensuring that biosolids are recognized as a valuable community resource. The association's mission is to communicate the environmental and practical benefits of biosolids resources both within the biosolids community and to the public at large.

- The Midwest Biosolids Association ("MBA") represents universities, municipalities, service providers, state regulators, consultants, and other collaborators involved in biosolids management in thirteen Midwest states and the two adjoining provinces of Canada. The MBA is the voice for sustainable biosolids management in the Midwest and in the regulatory community.

- The North East Biosolids & Residuals Association ("NEBRA") was established to cooperatively promote the environmentally sound recycling or beneficial use of wastewater biosolids and other suitable "waste" residuals in New England and eastern Canada. NEBRA's members are primarily water resource recovery facilities (WRRFs), including some of the largest in the country including the Massachusetts Water Resources Authority, the Greater Lawrence Sanitary District, the Narragansett Bay Commission, and the Portland Water District.

- The Northwest Biosolids Association ("NWB") is a regional association which provides research, education and guidance on safe practices and solutions for biosolids and residuals. NWB represents over 100 utilities and supporting entities. One of NWB's primary missions is to provide reliable information and advocacy on behalf of its members and the public, and to be a leader in sustainability and utilization of renewable resources.

- The Virginia Biosolids Council ("VBC") is a coalition of municipal wastewater utilities, recycling firms, and agricultural contractors that promotes the safe, sustainable recycling of highly treated solids in Virginia. It educates the public, elected officials, and communities about biosolids management, regulations, and benefits such as improved soil health, stronger crop production, and reduced landfill use.

- The Water Environment Association of Texas ("WEAT") is a 501c3 nonprofit professional association supporting the clean water sector in Texas. WEAT's mission is to empower professionals to educate, enhance, and advocate for Clean Water across Texas. With over 5200 members, WEAT is the largest regional organization serving professions involved in all aspects of turning wastewater into clean water.

**ISSUE PRESENTED**

Does Clean Water Act section 405(d)(2)(C) require the United States Environmental Protection Agency to develop, finalize and issue new regulations imposing limits for toxic chemicals in biosolids on a 24-month timeline?

## SUMMARY OF ARGUMENT

This case involves a challenge to the United States Environmental Protection Agency's ("EPA") longstanding position that Section 405(d) of the Clean Water Act does not mandate new regulations within 24 months of the Agency initiating review and identifying toxic pollutants in biosolids. The case arises in the context of the EPA's review of per- and per and polyfluoroalkyl substances (generically referred to as "PFAS" herein), and whether their presence in biosolids requires amendment to existing regulations governing management and use of the material.

Biosolids are nutrient-rich organic materials that result from the treatment of sewage or wastewater sludge at publicly owned treatment works ("POTWs"). Land application of biosolids is a proven process that has been federally regulated for more than 30 years and has been the primary means of nutrient recycling in the US agricultural sector for more than a century. Farmers rely on biosolids to replenish the nutrients in their soil that are lost through agricultural production. Wastewater utilities, in turn, rely on farmers to reuse their biosolids. The transfer and reuse of biosolids is a critical part of the nation's public health and sanitation system. No other viable alternative disposal method can handle 100% of the biosolid production in the country.

Congress was aware of this dynamic when it passed the modern Clean Water Act in 1972 and amended it in 1977 and 1987. Section 405 of the Clean Water Act

sets forth requirements for the disposal or use of biosolids in compliance with the Act's National Pollutant Discharge Elimination System ("NPDES"). Section 405(d), added in 1977 and amended in 1986, directs EPA to issue regulations specifying acceptable management practices for biosolids containing toxic pollutants that the agency has determined "may be present in sewage sludge in concentrations which may adversely affect public health or the environment." 33 U.S.C. § 1345(d)(2)(A)(i).

Section 405(d)(2)(C) further directs EPA to "review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph." *Id.* § 1345(d)(2)(C). The review is required to occur "[f]rom time to time, but not less often than every 2 years." *Id.*

Plaintiff-Appellant Public Employees for Environmental Responsibility ("PEER") has argued that Section 405(d)(2)(C) of the Clean Water Act requires EPA to issue new regulations imposing new limitations on biosolids management every 24 months, if EPA identifies toxic pollutants in biosolids that are not as yet regulated. *Biosolids Amici* urge the Court of Appeals to reject PEERs' proposed interpretation on the grounds that it is facially invalid. The plain text of the Clean Water Act mandates review of existing regulations on a 24-month cycle but does not dictate timelines for development and promulgation of new regulations.

More importantly for *Biosolids Amici* and their members, a 24-month timeline for issuing new regulations is simply not feasible. It takes months to years of in-depth scientific review for EPA to develop and issue defensible regulations that are based on sound science and fact finding. Shortening the timeline and imposing a 24-month cycle for new regulations would put the EPA and the regulated community on a hamster-wheel of regulatory process that would waste agency resources and risk imposition of improper, incorrect standards.

Lastly, *Biosolids Amici* are aware that the Court of Appeals has received amicus briefs from at least one group asserting that state and local governments are unable to regulate biosolids at the local level. Their claim is simply untrue. States have residual authority to regulate the use and disposal of toxic chemicals within their borders. Indeed, many states are moving forward with regulation of biosolids to address the chemicals at issue in this case. Allegations to the contrary are not credible.

## ARGUMENT

For nearly 40 years, EPA has had one interpretation of Clean Water Act section 405(d) – the Agency must review its biosolids regulations on biennial basis, but the Agency is not required to issue new regulations on a 24-month cycle. PEER has challenged EPA's longstanding position, alleging that the Clean Water Act mandates

new regulations within 24 months, when EPA has identified toxic pollutants in biosolids during the review period.

PEER's claims arise in the context of EPA developing proposed regulations relating to PFAS in biosolids. PEER and their amici are attempting to use concern over PFAS to force a new legal interpretation of the Clean Water Act. Notably, no party has challenged the substance of existing EPA regulations, and no party has alleged that regulation of PFAS in biosolids would violate the Clean Water Act.

*Biosolids Amici* are scientists and organizations representing wastewater utilities, farmers that rely on biosolids reuse, and other organizations that support ongoing use of biosolids for agricultural purposes in the United States. Their members are passive receivers of PFAS who are as concerned as anyone about the impacts that PFAS could have on the nation's food supply chain.

*However,* unless and until the national population starts declining, the total amount of biosolids the nation's POTWs will have to manage will never decrease. Restricting biosolids management options will only shift the problems elsewhere (to different states/locations or media), rather than solve them. As detailed below, PEER's position increases the risk of EPA making hurried decisions that are not fully justified or do not fully consider the potential adverse consequences. Those decisions will have wide-ranging impacts. It is imperative that the Agency make them using sound science and accurate information. Promulgating effective, science-based

regulations takes time and should not be subject to artificial and otherwise impractical deadlines. For the reasons set forth below, the Court of Appeals should reject PEER's claims.

## I. LAND APPLICATION OF BIOSOLIDS IS HIGHLY REGULATED, AND ENVIRONMENTALLY AND ECONOMICALLY BENEFICIAL.

Biosolids are nutrient-rich organic materials that result from the treatment of sewage or wastewater sludge. The treatment process reduces pathogens, contaminants, and odors, making biosolids safe for certain uses. American Farm Bureau Federation et al., Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 2 (Aug. 13, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0150. Once treated, biosolids are commonly used as a fertilizer or soil conditioners for agriculture, landscaping, or reclamation projects. They can help improve soil quality by adding organic matter and essential nutrients, such as nitrogen and phosphorus. *Id.*

**A.** **Land Application of Biosolids is an Environmentally Sustainable Method of Resource Recovery.**

Despite PEER's claims and those of the amici who filed briefs in their support, the benefits of applying biosolids to agricultural land are well documented. They include:[1]

- providing a supply of plant essential nutrients;

- reducing soil erosion;

- increasing soil water holding capacity;

- improving soil structure;

- enhancing soil fertility and crop yields;

- reducing greenhouse gas emissions (including methane);

- reducing demand for fossil-fuel based commercial fertilizers;

- conserving landfill space;

- habitat conservation and coastal resilience;

- forestry restoration after wildfires;

- supporting soil and ecosystem recovery on disturbed lands; and

---

[1] California Association of Sanitation Agencies, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 2 (Apr. 1, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0031 [hereinafter *California Association of Sanitation Agencies Comment Letter*]; *see also Biosolids Beneficial Reuse Factsheet*, Vt. Dep't of Env't Conservation (June 2015), http://static1.squarespace.com/static/54806478e4b0dc44e1698e88/t/5852d7a7f5e231640d1e8c7b/1481824168549/VT-BiosolidsBeneficialReUseFactSheet2015.pdf.

- sequestering carbon in soils, thereby reducing greenhouse gasses.

*Biosolids Amici* strongly disagree with the proposition that land application of biosolids presents an unacceptable risk to human health or the environment. They are not alone in this position. During EPA's most recent rulemaking on biosolids, numerous farm bureaus and agricultural associations submitted comments in support of continued land application of biosolids. The American Farm Bureau Federation, the American Horse Council, the National Chicken Council, the National Milk Producers Federation, the National Pork Producers Council, the National Turkey Federation, the United Egg Producers, the U.S. Poultry & Egg Association, the Michigan Farm Bureau, the North Carolina Farm Bureau Federation, the Tennessee Farm Bureau Federation, the Illinois Farm Bureau, the Illinois Corn Growers Association, and the Illinois Soybean Growers all submitted comments in support of continued land application of biosolids. While many expressed concern about the impact that PFAS may have on the safety of biosolids, all supported continued reuse, and, importantly for the Court of Appeals consideration, all feel that more time is warranted for EPA to consider scientific data in the rulemaking process. *See, e.g.,* Illinois Farm Bureau et al., Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001 (Aug. 14, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0182 ("It is

imperative that the EPA spend more time obtaining well designed field studies to acquire data that is lacking for many of the model parameters.").

### B. PEER and their amici are using scare tactics; the Science on PFAS is still developing and there is no conclusive evidence demonstrating that PFAS in biosolids poses a substantial health risk.

PFAS are human-made substances that do not occur naturally in the environment. Due to the strength of the carbon-fluorine bonds, PFAS chemicals can be very stable in the environment and are resistant to degradation. The primary human exposure pathways arise from widespread PFAS use, with household products and uses serving as a major source of exposure to these chemicals. They have been detected in all environmental media including air, surface water, groundwater (including drinking water), soil, and food. Human exposure may occur from all of these media. *Toxicological Profile for Perfluoroalkyls,* U.S. Ctr. for Disease Control and Prevention, Agency for Toxic Substances and Disease Registry, at 2-4 (May 2021), https://wwwn.cdc.gov/TSP/ToxProfiles/ToxProfiles.aspx?id=1117&tid=237.

Many epidemiological studies have evaluated possible associations between PFAS exposure and a wide range of adverse health outcomes. To date, most of the studies are cross-sectional in design and do not establish causality.[2] The available

---

[2]The toxicity of PFAS has been evaluated in a large number of studies of humans and laboratory animals. Comparison of the toxicity of PFAS across species is problematic due to differences in

epidemiological studies suggest associations between PFAS exposure and several health outcomes, but again, cause-and-effect relationships have not been established. *Toxicological Profile for Perfluoroalkyls*, at 6.

While multiple studies claim to report adverse health effects of PFAS exposure at some doses, no study has established definitive human exposure thresholds that unambiguously correlate with health outcomes. Epidemiology studies on PFAS frequently show inconsistent, statistically insignificant results and lack consistent dose-response relationships within or between studies. Dennis Paustenbach et al. *United States Environmental Protection Agency's Perfluorooctanoic Acid, Perfluorooctane Sulfonic Acid, and Related Per- and Polyfluoroalkyl Substances 2024 Drinking Water Maximum Contaminant Level*, 55 *Critical Reviews in Toxicology* 368–415 (May 20, 2025) https://doi.org/10.1080/10408444.2024.2446453; *FINAL: Human Health Toxicity Assessment for Perfluorooctane Sulfonic Acid (PFOS) and Related Salts*, EPA Document No. 815R24007, U.S. Environmental Protection Agency, Off. of Water (Apr. 2024), https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfos.pdf.

---

elimination half-lives, lack of adequate mechanistic data, species differences in the mechanism of toxicity for some endpoints, and differences in measurement of exposure levels between epidemiological and experimental studies. *Toxicological Profile for Perfluoroalkyls*, at 6.

Decades of PFAS exposure research have yet to connect human-relevant molecular initiating events to disease associations in epidemiological studies. Paustenbach, *supra*. Multiple links in the chain of causation exist between land application and human use – the levels of PFAS in the biosolids, the soils in place at the point of application, the climate at the point of application, the type of crops or agricultural products being grown, whether PFAS is actually absorbed by the crops (as opposed to being present in dirt on the outside surface of the crop), the list goes on. *California Association of Sanitation Agencies Comment Letter*, *supra*, at 12–13. It is simply not clear whether plants absorb PFAS from soil, and it is even less clear whether applying biosolids to land used for agricultural production would cause crops grown on that land to contain PFAS at levels that pose a risk to human health. *Id.* at 13. More scientific inquiry is required before EPA or any other government agency imposes additional limitations on the nation's agricultural supply chain.

PEER and their amici are relying on scare tactics to obfuscate a straightforward issue of statutory interpretation. The question before the Court of Appeals is whether the Clean Water Act mandates a 24-month timeline for new regulations – not whether PFAS in biosolids is a public health risk. The evidence on the latter question is still scant. It does not justify regulation at this time, and it does not authorize a new legal interpretation of the Clean Water Act.

**C.     EPA regulations and guidance ensure land application is safe and protective of public health.**

EPA has long encouraged the application of biosolids to agricultural land as a safe and effective means of using biosolids. In fact, it has been the explicit policy of the entire federal government – including EPA – to promote the cost-effective use of biosolids for decades. *See, e.g.,* Interagency Policy on Beneficial Use of Municipal Sewage Sludge on Federal Land, 56 Fed. Reg. 33186, 33186 (July 18, 1991); Policy on Municipal Sludge Management, 49 Fed. Reg. 24358, 24359 (June 12, 1984); and, Criteria for Classification of Solid Waste Disposal Facilities and Practices, 44 Fed. Reg. 53438, 53449 (Sept. 13, 1979).

EPA has issued extensive regulations at 40 C.F.R. part 503 dictating the manner in which biosolids can be applied to land. 40 C.F.R. 503.1(a). On multiple occasions and in multiple published documents, EPA has provided additional guidance and promoted use of biosolids to support agricultural operations.  *See* 56 Fed. Reg. 33186; 49 Fed. Reg. 24358; and, 44 Fed. Reg. 53438, 53449; *see also Land Application of Municipal Sewage Sludge for the Production of Fruits and Vegetables*, U.S. Env't Prot. Agency et al. (1981), https://www.epa.gov/sites/default/files/2020-02/documents/land-application-fruits-vegatables.pdf, and, *Understanding Lagoon Requirements Under 40 C.F.R. Part 503: Best Management Practices for Use or Disposal of Sewage Sludge*, U.S. Env't    Prot.    Agency,    Off.    of    Water    (Feb.    2024),

https://www.epa.gov/system/files/documents/2024-02/lagoon-requirements-2024.pdf.

The Part 503 regulations were thoughtfully developed with an extensive and timely scientific review that shaped these robust regulations, building in continuous, quality control measures to ensure public and environmental health throughout time. Reviews by the National Academy of Sciences have confirmed the safety of the regulation and approach through two major reviews of the EPA's biosolids program finding that land application presents negligible risk with proper management and encourage continued research-based review of the regulation. (National Academy of Sciences, *Biosolids Applied to Land: Advancing Standards and Practices*, 4 (2002) https://www.nationalacademies.org/read/10426/chapter/2#4)

Existing EPA regulations and guidance help ensure that biosolids meet specific treatment benchmarks to reduce pathogens and limit heavy metals and other contaminants. Once treated to meet these standards, biosolids can be applied to agricultural fields, but the Part 503 regulations impose limits on the amount that can be applied based on the nutrient needs of the crops and the characteristics of the soil. *American Farm Bureau Federation et al. Comment Letter*, *supra*, at 3.

EPA collects annual biosolids reports from several thousand POTWs in the United States. Using data from the reports submitted in 2024, the EPA estimates that approximately 2.39 million dry metric tons of biosolids were land applied in

2024. *Basic Information About Sewage Sludge and Biosolids*, U.S. Env't Prot. Agency, https://www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids (last visited May 12, 2026). That amounted to 60% of the biosolids produced in the United States. *Id.* Wastewater treatment is a critical piece of municipal infrastructure, and these systems' inputs, treatment processes, and ultimate outputs are subject to rigorous monitoring.

**D.     Farmers and Public Utilities rely on the ability to reuse biosolids.**

When farmers use biosolids, they reduce the demand for chemical fertilizers that are made from fossil fuels and that are therefore subject to cost fluctuations in the international oil market. Nitrogen fertilizers accounted for the vast majority (59 percent) of global fertilizer use in 2023. *Chokepoint: How the War With Iran Threatens Global Food Security*, Ctr. for Strategic and Int'l Studies (Mar 11, 2026), https://www.csis.org/analysis/chokepoint-how-war-iran-threatens-global-food-security. Of that, roughly 45 percent was used for growing staple grain and cereal crops like wheat, rice, and maize, which provide over 40 percent of global caloric intake. *Id.*

The Middle East is the leading exporter of both liquified natural gas ("LNG"), a major feedstock for synthetic nitrogenous fertilizers, and fertilizers themselves, including urea and ammonia. A vast majority of these exports pass through the Strait of Hormuz and are subject to geopolitical constraints impacting passage through the

Strait. *Id.* All told, the strait supports 20 percent of global LNG exports and 20–30 percent of global fertilizer exports, including 35 percent of global urea exports. *Id.* Further, because these fertilizers are made from LNG, increases in the price of the commodity raises the price of fertilizer. Biosolids help avoid reliance on fossil fuel production in the American agricultural supply chain.

Without question, farmers rely on the ability to use biosolids in support of their agricultural operations. Public utilities likewise rely on farmers to be the end user of their biosolids. *California Association of Sanitation Agencies Comment Letter*, at 2. There is no other feasible alternative. The cost associated with other methods of disposal is very high, and in many cases, there is no other option. For example, as stated in recent comments to EPA, current costs for biosolids disposal for the Madison Metropolitan Sewerage District are approximately $1.5 million per year. Madison Metropolitan Sewerage District, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 2 (Apr. 1, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0044. Diverting 100% of the agency's biosolids to a landfill will more than double the cost of disposal and cost the agency (and therefore the public) as much as $5 million per year. *Id.*

In 2022, Maine banned the land application, sale, and distribution of biosolids-based products. *Biosolids Disposal Disrupted in Maine*, North East

Biosolids & Residuals Assc. (Mar. 22, 2023), https://www.nebiosolids.org/biosolids-disposal-disrupted-in-maine. Wastewater treatment plants in Maine were forced to send their biosolids to landfills or out of state, and costs for disposal skyrocketed. *Id.* In Scarborough, annual biosolids disposal budget increased from $200,000 to $600,000 (200%). *Id.* In Kennebec Sanitary District costs increased by $553,000. *Id.* Portland Water's biosolids budget went up by $1 million. *Id.* Subsequently, landfills and other disposal sites across the state experienced overloading and structural issues related to taking biosolids, with some being forced to cease accepting them, and some being forced to close. *Hawk Ridge Composting Facility in Maine is Closing its Doors*, North East Biosolids and Residuals Assc. (Oct 31, 2025), https://www.nebiosolids.org/hawk-ridge-closing. Wastewater treatment plants in Maine now send significant volumes of their biosolids out of state for disposal *Id.* The effect of Maine's ban on land application has been to dramatically raise costs for public utilities and farmers, and to shift the "burden" of biosolids to other states. Maine's policy did not fix any issues, it just created new ones.

Plaintiff-Appellant's requested revisions to EPA's reading of Section 405 would risk recreating the Maine scenario on a nation-wide basis. A truncated rulemaking timeline limits the amount of time EPA can spend considering available information. Without accurate, up to date information, there is a significant risk of EPA issuing regulations that are unsupported by the evidence, and costly and

disruptive to the nation's system of wastewater management. There is also significant risk that EPA could end up adopting regulations that act as *de facto* bans on land application. Unnecessary bans on land application of biosolids will have a direct impact on all individuals that rely on sanitation as an essential service, causing undue financial hardship to the general public and the agricultural community. As detailed below, PEER's reading is not supported by the plain text of the Act and should be rejected by this Court.

II.  **A 24-MONTH TIMELINE IS TOO SHORT TO REPEATEDLY ISSUE NEW REGULATIONS, ESPECIALLY FOR CHEMICALS SUCH AS PFAS.**

A.  **Section 405 is clear: EPA is not obligated to promulgate new regulatory limits for toxic chemicals on a 24-month timeline.**

Clean Water Act section 405(d)(2)(C) very clearly mandates a biennial review of existing regulations that dictate how biosolids can be used in the United States. The statute states that the review is "for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C). The direction is simple – conduct a review every two years, do so for the purpose of issuing future regulations relating to toxic pollutants in biosolids. There is no textual tie between the timeline for reviewing existing regulations, and the deadline for issuing new regulations. Any other reading of the statute imports new terms and requirements.

Nonetheless, PEER has asked the Court of Appeals to ignore the basic structure of the statutory text and impose a mandatory 24-month deadline for reviewing existing regulations, identifying which toxic pollutants need regulation and at which levels, then issuing such regulations in compliance with the Administrative Procedures Act ("APA"). If Congress had intended this outcome, it would have used different and more clear language directing the EPA to accomplish those tasks on the requested timeline. The Supreme Court has consistently rejected efforts to expand the scope of statutes when considering issues of national significance. *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022).

The issue has arisen time and again in the environmental setting. *See Utility Air Regulatory Group v. Env't Prot. Agency*, 573 U.S. 302 (2014) (declining to expand the definition of the term "air pollutant" to include carbon dioxide because the effect of the reading would dramatically alter the regulatory landscape); and, *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 680 (2023) ("Particularly given the CWA's express policy to "preserve" the States' "primary" authority over land and water use, § 1251(b), this Court has required a clear statement from Congress when determining the scope of "the waters of the United States."). *See also id*. at 677 ("We have often remarked that Congress does not 'hide elephants in mouseholes' by 'alter[ing] the fundamental details of a regulatory scheme in vague terms or ancillary

provisions'" (quoting *Whitman v. American Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001)); and, *City and County of San Francisco v. Env't Prot. Agency*, 604 U.S. 334 (2025) (refusing to expand the meaning of the terms "effluent limit" and "any other limitation" to include receiving water limitations because of the impact on the overall statutory scheme).

In this case, Section 405(d)(2)(C) is not ambiguous. It includes direction to EPA to conduct a biennial review of the Agency's biosolids regulations to determine if there are additional toxic pollutants in biosolids that should be regulated. EPA is directed to use the information obtained during the review "for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C. § 1345(d)(2)(C). There is no timeline for issuing final regulations based on the mandated review – for good reason.

An interpretation of Section 405(d) that mandates new regulations on a 24-month cycle would fundamentally alter how EPA, the states and the regulated community manage biosolids and by extension, their wastewater treatment plants. It would undermine the effectiveness of the rulemaking process by forcing EPA to issue regulations when limited information is available or when the volume of data is large and the agency lacks capacity to adequately analyze and incorporate it into the final rule. Equally important, it would potentially limit the ability of the regulated community and other interested parties to participate in the rulemaking process.

**B. The APA rulemaking process takes time.**

*Biosolids Amici* do not argue or in any way propose that regulation of biosolids is improper or that EPA lacks the authority to issue regulations on the management and disposal of biosolids. To the contrary, *Biosolids Amici* have asked EPA to regulate PFAS in biosolids, stating in comments to the Agency that "the EPA has a responsibility to clearly state the schedule for next steps so states and stakeholders in general understand the path forward that will result in amended Part 503 rules that build on the current program, which has proven successful for more than forty years." CRROPS, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 6 (Aug. 13, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0223.

However, it should be clear that the 24-month timeline proposed by PEER is far too short for EPA to consider all relevant information and issue appropriate and feasible regulations. Clean Water Act rulemaking actions are subject to the APA. Section 553 of the APA requires publication of notice of the proposed rule, and an opportunity for any interested party to submit written data, views, or arguments. The APA further requires the rulemaking agency to consider the information submitted and to provide a general statement of the basis and purpose of the final rule. 5 U.S.C.

§ 553(c). By design, complying with APA mandates is deliberative, and not a speedy process.

Since 1989, EPA has promulgated four rules on discharge and reuse of biosolids. *See* Initial Standards for Toxics in Biosolids ("Description of 40 CFR 503"), 58 Fed. Reg. 9248 (Feb. 19, 1993); Standards for the Use or Disposal of Sewage Sludge, 64 Fed. Reg. 42552 (Aug. 4, 1999); Dioxin Rule, 68 Fed. Reg. 61084 (Oct. 24, 2003); Guidelines Establishing Test Procedures for the Analysis of Pollutants; and Analytical Methods for Biological Pollutants in Wastewater and Sewage Sludge, 72 Fed. Reg. 14220 (Mar. 26, 2007). The average period between the notice of proposed rulemaking and the issuance of the final rule was 3.3 years. *See id*. That does not include the time necessary for EPA to review existing regulations and data and draft a proposed rule.

EPA's rulemakings are often contentious and involve high levels of engagement from the public. The Agency's most recent efforts on PFAS and biosolids include issuing a proposed health risk assessment for PFAS in biosolids. EPA published the draft health risk assessment on January 15, 2025. Draft Sewage Sludge Risk Assessment for PFOA and PFOS, 90 Fed. Reg 3859 (Jan. 15, 2025). After receiving requests from the public, EPA extended the comment period to April 16, 2025 and again to August 14, 2025. *See* Notice of Comment Period Extensions, 90 Fed. Reg. 3859 (Feb. 21, 2025), and, Extension of Comment Period, 90 Fed. Reg.

16128 (Apr. 17, 2025). EPA ultimately received more than 25,000 comments on the proposed health risk assessment. *See Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid*, Docket No. EPA-HQ-OW-2024-0504-0001, Regulations.gov https://www.regulations.gov/docket/EPA-HQ-OW-2024-0504 (last visited May 14, 2026). Many of the comments included significant, new scientific information that the public wanted EPA to consider as part of the rulemaking process. *See, e.g., California Association of Sanitation Agencies Comment Letter*, at 6.

**C. Truncated timelines risk improper standards and increased litigation.**

Rushing the rulemaking process creates the opportunity for error and removes the opportunity for EPA to adopt regulations that are based on the best science available. This is especially true when dealing with complex chemicals like PFAS.

PFAS is unlike the other compounds/elements that EPA has sought to regulate in biosolids. Daily exposure to PFAS across a wide range of products and pathways is ongoing for all people. *California Association of Sanitation Agencies Comment Letter*, at 6. There is wide disagreement on the science EPA has relied on to date. *See CRROPS Comment Letter*, at 4-5 ("CRROPS also directs EPA to more recently published comprehensive literature review examining scientific literature on health hazards of PFOS and PFOS."). National Association of Clean Water Agencies, Comment Letter on Draft Sewage Sludge Risk Assessment: Perfluorooctanoic Acid

and Perfluorooctane Sulfonic Acid, EPA Docket No. EPA-HQ-OW-2024-0504-0001, at 12 (Aug. 14, 2025), https://www.regulations.gov/comment/EPA-HQ-OW-2024-0504-0225 ("the Draft Risk Assessment mischaracterizes risk and hazards from impacted biosolids and leaves the results open to misinterpretation based on unrealistic assessment results.").

Recent studies have identified major flaws in prior EPA analyses of PFAS in drinking water and questioned the Agency's "precautionary principle" approach that imposed stringent and costly regulations without supporting evidence. *See Paustenbach*, *supra*. Other failings included reliance on faulty epidemiological data; claims that specific non-cancer effects, such as heart disease, would be prevented under the promulgated rule, when the cited studies do not show an increased incidence of heart disease even in highly exposed populations; reliance on animal data despite ample toxicology data that animals, particularly rodents, are poor predictors of the human response to PFAS exposures; and asserting that PFAS act through a shared mechanism of action (i.e., PPARα pathway induction) with almost no data to support the claim. *Id.* Moving forward with regulations that are not feasibly implementable by the regulated community or supported by accurate, up-to-date science only invites litigation and regulatory uncertainty. PEER's proposed reading of Clean Water Act section 405(d) would mandate an extremely short period for EPA to issue regulations. It is very likely, and perhaps assured, that EPA will not

be able to keep up with this timeline given the practical constraints on the rulemaking process.

**D. The logistics of changing operations are enormous and cannot reasonably be completed every two years.**

As noted above, thousands of POTWs across the nation produce biosolids on a daily basis that must be managed in a manner that complies with applicable law. *California Association of Sanitation Agencies Comment Letter*, at 2. Changes to the regulatory scheme can create major difficulties in the management process, as is evident in Maine where there is already "buyer's remorse." Indeed, Melanie Loyzim, commissioner of Maine's Department of Environmental Protection was recently quoted saying,

> "I would suggest that any state that is considering a prohibition [on the land-application of biosolids] should plan for where those materials are going to go first," . . . Maine banned the land-application of biosolids due to concerns around . . . PFAS "and then realized that [they] did not have enough landfill capacity to handle that long-term."'

Pavithra Rajesh, *Maine Official Urges States to Weigh Biosolids Disposal Options Before Ban*, Inside PFAS Policy (Oct. 28, 2025), https://insideepa.com/pfas-news/maine-official-urges-states-weigh-biosolids-disposal-options-ban.

A two-year cycle for rulemaking creates the potential for repeated changes to operations and disposal methods at wastewater treatment plants. "Whipsawing" the nation's wastewater treatment plants will be costly and will have unforeseen, unintended consequences. Those potential consequences go beyond the nation's

15,000 POTWs. The agricultural community has expressed concern that EPA will issue an overly restrictive regulation on biosolids application, one that would amount to a *de facto* ban on biosolids. *American Farm Bureau Federation et al. Comment Letter*, at 5. Such a ban would prove costly and disastrous for the many agricultural operations that rely on biosolids for fertilizer and soil augmentation.

Imposing regulatory changes on a short timeline will force wastewater treatment plants to alter operations and find new ways to dispose of their biosolids. Doing that takes time and is not achievable on a 24-month basis.

**III.    STATES RETAIN AUTHORITY TO REGULATE BIOSOLIDS MANAGEMENT.**

In their amicus brief, Plainfield Township et al, have alleged that state and local governments are without power to regulate biosolids.  This is simply untrue. Section 510 of the Clean Water Act (33 U.S.C. § 1370) expressly reserves to the states the power to establish and enforce their own water pollution controls and allows states to implement stricter standards or more comprehensive pollution control programs than those mandated by the federal government. EPA has made it abundantly clear that states are not precluded from imposing requirements for the use or disposal of sewage sludge that are more stringent than the Part 503 rules. *Stakeholder Meeting Facilitation for Issues Related to PFAS and Biosolids*, EPA Document No. 820S24002, at 7-8 (Dec. 2024),

https://www.epa.gov/system/files/documents/2024-12/facilitation-issues-pfas-biosolids.pdf.

In fact, states have taken a variety of actions to manage PFAS in biosolids. As noted above, Maine has pursued an outright ban on land application of biosolids. New Hampshire, Massachusetts, and Michigan have reporting requirements for monitoring PFAS in biosolids. Sarah Grace Hughes, *PFAS in Biosolids: A Review of State Efforts & Opportunities for Action*, Env't Council of the States (Jan. 2023), https://www.ecos.org/wp-content/uploads/2023/01/PFAS-in-Biosolids-A-Review-of-State-Efforts-and-Opportunities-for-Action.pdf. Michigan has tiered levels for PFOS in sewage sludge for land application that require different actions and has worked to identify industrial releases. *Id.* Some state regulators have recommended voluntary testing and permittees may be engaged in voluntary monitoring programs to better understand PFAS coming into treatment plants and remaining in biosolids. *Id.*

There can be little question that states retain the authority to regulate biosolids management. Many states are relying on information from EPA to provide the scientific basis for regulation. Their reliance highlights the need for EPA to have sufficient time to investigate and develop the best factual basis for regulation, consistent with the requirements of Section 405(d)(2)(c) of the Act.

# CONCLUSION

For the reasons set forth herein, *amici* request that the Court of Appeals deny Plaintiff-Appellant's claims.

Dated: May 22, 2026

Respectfully submitted,

**Counsel for The Coalition of Recyclers of Residual Organics by Practitioners of Sustainability, Dr. Sally Brown, The California Association of Sanitation Agencies, The Mid-Atlantic Biosolids Association, The Midwest Biosolids Association, The North East Biosolids & Residuals Association, The Northwest Biosolids Association, The Virginia Biosolids Council, And The Water Environment Association of Texas**

By: */s/ Fredric Andes*
One of its Attorneys
Fredric Andes
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL  60606
Phone:  (312) 214-8310
Email:  Fredric.Andes@btlaw.com

Erika Powers
BARNES & THORNBURG LLP
24 Frank Lloyd Wright Drive, Suite A-330
P.O. Box 511
Ann Arbor, MI  48105
Phone:  (734) 489-8006
Email:  Erika.Powers@btlaw.com

Andre Monette
BARNES & THORNBURG LLP
655 W. Broadway, Suite 1300
San Diego, CA 92101
Phone:  (619) 321-5003
Email:  Andre.Monette@btlaw.com

*Counsel for The Coalition of Recyclers of Residual Organics by Practitioners of Sustainability, Dr. Sally Brown, The California Association of Sanitation Agencies, The Mid-Atlantic Biosolids Association, The Midwest Biosolids Association, The North East Biosolids & Residuals Association, The Northwest Biosolids Association, The Virginia Biosolids Council, And The Water Environment Association of Texas*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Rule 29(a)(4)(G), because it contains 6,385 words, excluding the partes of the filing exempted by D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type style requirements and it was prepared using Microsoft Word in Times New Roman 14-point font and is double-spaced, with the exception of the headings, footnotes and block quotations.

/s/ Fredric Andes
Fredric Andes

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 22nd day of May, 2026, I electronically filed with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit via the CM/ECF System the foregoing Amicus Brief of the Coalition of Recyclers of Residual Organics by Practitioners of Sustainability ("CRROPS"), Dr. Sally Brown, the California Association of Sanitation Agencies ("CASA"), the Mid-Atlantic Biosolids Association ("MABA"), the Midwest Biosolids Association ("MBA"), the North East Biosolids & Residuals Association ("NEBRA"), The Northwest Biosolids Association ("NWB"), the Virginia Biosolids Council ("VBC"), and the Water Environment Association of Texas ("WEAT") in Support of Intervenor for Defendant-Appellee, National Association of Clean Water Agencies pursuant to Fed. R. App. P. 26.1 and Circuit Rule 26.1. All participants in the case are registered CM/ECF users, and the service will be accomplished in the appellate CM/ECF system.

*/s/ Fredric Andes*
Fredric Andes