**ORAL ARGUMENT NOT YET SCHEDULED**
No. 25-5431

---

**United States Court of Appeals for the D.C. Circuit**

---

JAMES FARMER, et al.
*Plaintiffs-Appellants,*

*v.*
ENVIRONMENTAL PROTECTION AGENCY, et al.
*Defendants-Appellees*

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
*Intervenor below*

---

Appeal from the United States District Court for the District of Columbia
No. 24-cv-01654-DLF (Hon. Dabney L. Friedrich)

---

# PLAINTIFFS-APPELLANTS' REPLY TO BRIEFS OF DEFENDANTS-APPELLEES, INTERVENOR NACWA, AMICUS US CHAMBER OF COMMERCE (FOR EPA AND INTERVENOR), AND ADDITIONAL NON-GOVERNMENT AMICI (FOR INTERVENOR) CROPPS, ET AL.

---

TABLE OF CONTENTS


INTRODUCTION ....................................................................................1

FACTUAL CORRECTIONS ....................................................................4

SUMMARY OF ARGUMENT ..................................................................5

ARGUMENT ..........................................................................................7

I. Neither EPA nor its allies dispute that "from time to time but not less often than every two years" is a discernable deadline supporting jurisdiction for a CWA citizen suit. ..........................................................................7

II. EPA's Biosolids Biennial Reports do not review "the regulations." ..............9

III. Appellants' interpretation of the words "for the purpose of" is the correct one…..........................................................................................11

A. The dictionary supports Appellants' reading of "for the purpose of," not EPA's construction.....................................................................11

B. Should the words "for the purpose of" be susceptible to multiple meanings, Appellants' interpretation is the right one. ..................................12

IV. NACWA and their amici mischaracterize what Appellants seek and what effect a lower court ruling could have, and most of their arguments go to remedy or the merits, not the jurisdictional inquiry before this Court. ...........................22

V. Whether the Biennial Biosolids Report 9 fulfills EPA's duty is necessarily at issue because the lower court found there to be no unmet statutory duty............26

CONCLUSION ......................................................................................26

## TABLE OF AUTHORITIES

CASES

*Ala. Power Co. v. Costle,*
636 F.2d 323 (D.C. Cir. 1979)........................................................................24

*Am. Hosp. Ass'n v. Price*,
867 F.3d 160 (D.C. Cir. 2017)........................................................................24

*Appalachian Voices v. McCarthy*,
989 F. Supp. 2d 30 (D.D.C. 2013)....................................................................15

*Ass'n of Am. Railroads v. Costle*,
562 F.2d 1310 (D.C. Cir. 1977)........................................................................10

*Cmty. In-Power & Dev. Ass'n, Inc. v. Pruitt*,
304 F. Supp. 3d 212 (D.D.C. 2018) ..................................................................24

**Defs. of Wildlife v. Jackson*,
284 F.R.D. 1 (D.D.C. 2012) ..............................................................................7

**Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................................................................. 2, 7, 12, 13

*Me. Cmty. Health Options v. U.S.*,
590 U.S. 296 (2020) ........................................................................................19

*Nat. Resources Def. Council. v. Reilly*,
1991 U.S. Dist. LEXIS 5334 ..............................................................................26

*Nat. Resources Def. Council v. Train*,
510 F.2d 692 (D.C. Cir. 1974)........................................................................24

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ....................................................................................22
*Sierra Club v. Leavitt*,
355 F. Supp. 2d 544 (D.D.C. 2005) ...............................................................14
*Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987).......................................................................... 8, 17
*Social Security Bd. v. Nierotko*,
327 U. S. 358 (1946) ....................................................................................26

STATUTES

33 U.S.C. § 1345 (d)(1) ....................................................................................18
33 U.S.C. § 1345 (d)(2)(A)..................................................................................6
33 U.S.C. § 1345 (d)(2)(A)(i) .............................................. 1, 5, 9, 19, 21, 23, 27
33 U.S.C. § 1345 (d)(2)(A)(ii))..............................................................................9
33 U.S.C. § 1345 (d)(2)(B))...............................................................................5, 6
33 U.S.C. § 1345 (d)(2)(B)(i)),..............................................................................9
33 U.S.C. § 1345 (d)(2)(C) ............................... 1, 2, 3, 5, 6, 7, 9, 10, 11, 17, 21, 27
33 U.S.C. § 1345 (d)(2)(D)..................................................................................6

REGULATIONS

40 C.F.R. § 141.61 (c)(2))...............................................................................24
58 Fed. Reg. 9248 (Feb. 19, 1993) ......................................................................4
64 Fed. Reg. 72045, 72047 (Dec. 23, 1999)............................................................5
66 Fed. Reg. 66228 (Dec. 21, 2001)......................................................................5
66 Fed. Reg. 66229 (Dec. 21, 2001)......................................................................5
68 Fed. Reg. 61084, 61085 (Oct. 24, 2003).............................................................5

OTHER AUTHORITIES

*99 Cong., 2d Sess. H. Rep. Conf. Report 99-1004 ................................................17
*132 Cong. Rec. S16424-S16611, (daily ed., Oct. 16, 1986) (Senate Debate on Conference Report to Accompany S. 1128, October 16, 1986)...........................15
*Biosolids Biennial Report No. 9 (Dec. 22) ........................................... 8, 10, 11, 27
*EPA IG Report: No. 19-P-0002, "EPA Unable to Assess the Impact of Hundreds of Unregulated Pollutants in Land-Applied Biosolids on Human Health and the Environment," (Nov. 15, 2018) ........................................................................3

* = Source primarily relied upon

## INTRODUCTION

The provision at issue reads:

> From time to time, but not less often than every 2 years, the Administrator shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph.

33 U.S.C. § 1345(d)(2)(C), (Clean Water Act Section 405(d)(2)(C)). The District Court, EPA, and EPA's intervenor and amici allies acknowledge that the phrase "not less often than every [two] years" presents a sufficiently clear time limit to support a CWA citizen suit lawsuit for failure to perform a nondiscretionary duty. The sole question is the scope of that two-year duty.

Appellants' position is that Section 405(d)(2)(C) requires a review of "*the regulations promulgated under this paragraph*" to ensure they keep Americans safe from pollutants in sludge and, if not, to remedy that problem by identifying and regulating those pollutants by the end of the two-year period. EPA's reviews may not skip determining *whether* any "additional toxic pollutants" meet the criteria that Congress established which, if met, require regulation.[1] And if substances are shown to meet the criteria, EPA may not decline to identify and

---

[1] EPA "shall" identify and regulate toxic pollutants "which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment." Section 1345(d)(2)(A)(i).

regulate them. EPA and its allies instead urge an interpretation under which EPA satisfies its duty simply by conducting "a review" that need not reach any conclusions about the regulations' sufficiency.

The touchstone of statutory interpretation, whether discerning plain meaning in the context of the statute or interpreting an ambiguous term, is always Congress' intent. Even unclear statutes "do—in fact, must—have a single, best meaning," fixed by Congress "'at the time of enactment.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) (citation omitted). Here, it is indisputable that the 1987 amendments to Section 405 were intended to and did *remove discretion* from a foot-dragging EPA with a long history of analysis-paralysis concerning toxic pollutants in sludge, decried by both Congress and the Third Circuit. Congress rejected former iterations from 1972 and 1977 that had given EPA broad discretion on sludge regulation and instead imposed: (1) criteria defining which substances EPA *must* regulate and (2) tight time limits for initial and continuing cycles of identifying and regulating pollutants that meet the criteria.

Appellants' interpretation effectuates Congress' intent, while that of EPA and its allies turns statutory interpretation into a game of "Gotcha," using imagined linguistic ambiguity to restore to EPA the discretion that the 1987 amendments removed. That Congress could have possibly intended "for the purpose of" to mean "for the *eventual, aspirational* purpose of" vitiates the statute's plain language and

structure, disregards the legislative history and historical context, and puts EPA back where it started, with no timeline to take action to protect the public and environment. EPA's interpretation requires no review of "the regulations" to determine whether they sufficiently protect the public. EPA's own Inspector General agreed. EPA IG Report: No. 19-P-0002, "*EPA Unable to Assess the Impact of Hundreds of Unregulated Pollutants in Land-Applied Biosolids on Human Health and the Environment*," (Nov. 15, 2018)[2] (discussed in Appellants' Opening Br. 18-19). Determining which of the dueling statutory interpretations of Section 405(d)(2)(C) effectuates Congress' intent is not a close call: it is Appellants'.

The District Court's dismissal was in error. Appellants are not obligated to resort to years-long processes like petitioning for rulemaking when the CWA itself provides the mechanism that Congress established to ensure that EPA performs nondiscretionary duties: the citizen suit provision. The complaint presents facts sufficient to support claims that toxic pollutants exist that meet the statutory criteria requiring regulation, and that EPA has failed to even consider *whether* to regulate them for far longer than two years. That is all that is necessary to survive EPA's motion to dismiss and allow the case below to proceed to the merits. That

[2] Available at: https://www.epa.gov/sites/default/files/2018-11/documents/_epaoig_20181115-19-p-0002.pdf (accessed Aug. 5, 2026).

EPA considers its duty onerous goes to remedy and has no bearing on statutory interpretation, the only issue before this Court.

## FACTUAL CORRECTIONS

EPA opens its brief claiming that the CWA required EPA "to promulgate regulations of sewage sludge by a date certain, which the agency did." EPA Br. 1. The agency did <u>not</u> promulgate its initial regulations by the date certain; it acted almost six years late, impelled by a **CWA citizen suit**. *See* 58 Fed. Reg. 9248 (Feb. 19, 1993).[3] While EPA's brief later admits these dates, Appellants want to ensure a complete and accurate understanding at the outset. EPA's misstatement, intentional or not, highlights the truth at the heart of this case: that citizen suits to force the promulgation of sludge regulations are not only possible, but have been *critical* in assuring EPA follows Congress' mandates regarding sludge.

Additionally, EPA and NACWA both make the patently false claim that the (one and only) time EPA proposed regulating an additional substance beyond those it belatedly regulated in 1993, it acted pursuant to the biennial review provision. EPA Br. 4-5; NACWA Br. 12-13. As explained in *great detail* in the very Federal

---

[3] *See* 66 Fed. Reg. at 66229 (Dec. 21, 2001) ("EPA did not meet the timetable in section 405(d) for promulgating the first round of regulations, and a citizen's suit was filed to require EPA to fulfill this mandate. (*Gearhart v. Whitman*, Civ. No. 89–6266–HO (D. Ore.)). In accordance with the consent decree entered by the court in this case, EPA promulgated the first round of sewage sludge regulations in 1993.").

Register notices they cite, EPA was acting pursuant to "Round Two" (Section 405(d)(2)(**B**)), constrained by a Round Two-specific timeline imposed under a court-supervised consent decree resulting from **a CWA citizen suit**. *See* 68 Fed. Reg. 61084, 61085 (Oct. 24, 2003); 66 Fed. Reg. 66228, 66229 (Dec. 21, 2001); 64 Fed. Reg. 72045, 72047 (Dec. 23, 1999). The biennial review provision (Section 405(d)(2)(**C**)) appears nowhere in these notices. EPA has *never* proposed regulating (much less regulated) a single additional toxic pollutant under the biennial review provision since Congress enacted it almost forty years ago in 1987.

## SUMMARY OF ARGUMENT

Congress' amendments to Section 405 of the CWA in 1987 were all about *removing discretion* that prior iterations of the statute had given EPA. Congress mandated that EPA identify and regulate "those toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment," Section 405(d)(2)(A)(i), in two initial rounds *each shorter than two years* and biennially thereafter, Section 405(d)(2)(A), (B), and (C). This is a coherent statutory scheme intended to produce standards to control the pollutants. Further evidence of the continuity between the initial and continuing rounds is Congress' mandate that "[t]he management practices and numerical criteria established under

subparagraphs (A), (B), and (C) shall be adequate to protect public health and the environment . . ." Section 405(d)(2)(D).

EPA and its allies' position – that Congress intended that the periodic reviews contain no time constraints nor standards for identifying and regulating emerging hazards – clashes intractably with the statute's plain language, structure, and legislative history, is wholly inconsistent with the action-forcing time frames for the two initial rounds, and ignores the historical context.

Appellants' interpretation, in contrast, suffers from none of these problems. The words "for the purpose of" in Section 405(d)(2)(C) define the outcome EPA's biennial review must achieve: the identification and regulation of any toxic pollutants in sludge meeting mandatory criteria requiring regulation (or a reasoned basis for concluding that no substances qualify). This is consistent with the time frames Congress mandated for the two initial rounds, the statutory language and its legislative history, and the historical context in which Congress drafted the amendments. This is the "single, best meaning," that Congress "fixed at the time of enactment," *Loper Bright*, 603 U.S. at 400 (internal citation omitted), and cannot be altered because EPA prefers to have unreviewable discretion or because it has gotten behind on its duties. A court can make a clear-cut factual determination of whether EPA failed to identify and regulate qualifying pollutants within the two-year timeframe and order a remedy. Appellants' complaint alleges a failure to

fulfill a nondiscretionary duty under the CWA and should proceed to the merits upon remand.

Finally, the task before the District Court on EPA's motion to dismiss was to determine whether Plaintiffs' complaint alleged an *unperformed nondiscretionary statutory duty* under the CWA. If this Court agrees with Appellants that EPA's biennial review must identify any toxic pollutants meeting the statutory criteria requiring regulation, then it necessarily follows that EPA's Biosolids Biennial Report No. 9, which does not purport to identify substances requiring regulation, does not satisfy this duty. Thus, this Court should answer the jurisdictional question by finding that Plaintiffs-Appellants *have* alleged an unperformed nondiscretionary duty and can proceed to the merits.

## ARGUMENT

### I. Neither EPA nor its allies dispute that "from time to time but not less often than every two years" is a discernable deadline supporting jurisdiction for a CWA citizen suit.

A recurring duty is sufficient to support citizen suit jurisdiction. *Defs. of Wildlife v. Jackson*, 284 F.R.D. 1, 4 (D.D.C. 2012). At no point do EPA or its allies (nor did the District Court) dispute that the language "[f]rom time to time, but not less often than every 2 years," provides sufficiently discernable parameters to form a nondiscretionary duty for purposes of the CWA's citizen suit provision. Instead,

they argue that the non-discretionary duty and two-year timeframe apply only to the word "review" and not to the remainder of the sentence.

Because all agree that a recurring duty supports citizen suit jurisdiction, their arguments about Congress knowing how to impose a date-certain deadline (*see, e.g.*, EPA Br. 19; NACWA Br. 21) are but a red herring. There was nothing wrong with Congress setting the outer boundary of the recurring duty to conduct a review that would achieve regulation of additional qualifying pollutants within two years, while leaving EPA flexibility *within that period* to decide how much time to devote to subtasks like identifying additional pollutants and proposing regulations.

It would be an impermissible "product of a set of inferences based upon the overall statutory scheme," *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987), if Appellants were to argue (as they never have) that EPA must, for example, identify qualifying pollutants via proposed regulations within five months because that is what Congress required for Round Two, or that any proposed regulations must be finalized in six months as for Round One or within one year as for Round Two. *See* Sections 405(d)(2)(B)(i) and (d)(2)(A)(i)-(ii)). But the two-year period itself is not a product of inferences at all. It clearly provides a timeframe to support citizen suit jurisdiction. All this Court must do is determine what scope Congress intended for that duty.

## II. EPA's Biosolids Biennial Reports do not review "the regulations."

EPA must "review *the regulations promulgated under this paragraph* for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of [Section 405(d)(2)(d)]." Section 405(d)(2)(C) (emphasis added). Before we even get to the meaning of the words "for the purpose," it is important to recognize that Congress mandated a periodic review of the *regulations themselves*: the set of numerical limitations and other standards applicable when sludge is land-applied, incinerated, or landfilled.

The fundamental flaw underlying all EPA and its allies' other arguments is that EPA's Biosolids Biennial Reports do not purport to substantively review *the regulations* to assess or ensure their adequacy. EPA's Biosolids Biennial Report No. 9 (Dec. 2022)[4] was the document that EPA itself claimed fulfilled its Section 405(d)(2)(C) duty. See, e.g., the very large print on its cover page which reads:

**Biennial Review of 40 CFR part 503**
**To Fulfill Clean Water Act Section 405(d)(2)(C)**

*Id*. But as Mark Twain once wrote, "saying so don't make it so." The Biosolids Biennial Report simply does not review *the regulations*. EPA explains its biennial "review" process thus: "Every two years, EPA collects and reviews publicly available information about pollutants that have been found in biosolids [i.e., land-

[4] *Available at* https://www.epa.gov/biosolids/biennial-reviews-sewage-sludge-standards (last accessed Aug. 4, 2026).

applied sewage sludge] in the U.S. since the last biennial review." *Id*. at 1. The report admits that it does not assess whether "there is sufficient information about the pollutants to determine whether they pose a risk to human health or the environment." *Id*. It is simply a literature review; it does not review *the regulations*. The Court should reject EPA's claim that it has no unmet nondiscretionary CWA duty because the general principle that courts show deference to an agency's interpretation of a statute it administers "has no application where . . . the agency has misinterpreted its statutory mandate." *Ass'n of Am. Railroads v. Costle*, 562 F.2d 1310, 1318-1319 (D.C. Cir. 1977).

By pointing this out, Appellants are not, as EPA alleges, trying to sneak in a separate "failure to review" claim not raised below. Appellants' position was, is, and always has been that EPA's purely informational biennial reports do not fulfill its nondiscretionary duties under Section 405(d)(2)(C), which requires EPA to review the regulations to assess their ongoing sufficiency, a task that encompasses the actions of identifying any toxic pollutants that meet the statutory criteria requiring regulation and regulating those pollutants within each two-year time frame (or determining that none meet the criteria). EPA's reports simply do not do this and have never done it. It is all the same argument.

## III. Appellants' interpretation of the words "for the purpose of" is the correct one.

EPA and its allies' argument rests on their contention that the words "for the purpose of" can only mean one thing: a signaling of aspirational, general goals that separate EPA's *review* from the tasks of *identifying and regulating emerging threats*. Thus, (gotcha, Congress!) EPA extricates itself from having to take any meaningful action on any timeframe. This interpretation vitiates Congress's intent and fails under the plain language of the statute and traditional rules of statutory interpretation.

### A. The dictionary supports Appellants' reading of "for the purpose of," not EPA's construction.

The dictionary definitions EPA cites for its interpretation in fact support Appellants' reading. EPA Br. 16 (defining "purpose" as "that which a person sets before himself as an object to be *reached* or *accomplished*," or "an object to be *attained*" (emphasis Appellants')). As explained in Appellants' opening brief, this Court's analysis could end there: the statute contains a two-year time frame in which EPA must identify new qualifying pollutants and regulate them.

While EPA and its allies insist that their interpretation is the only possible "plain meaning," clearly that is not the case. Even if the Court does not agree that Appellants' interpretation is the true "plain meaning" in this context, certainly it cannot conclude that Appellants' interpretation is not even a possible reading of

the statute. And if both readings are possible, then the Court must determine which is the "single, best meaning," that Congress "fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400 (internal citation omitted).

### B. Should the words "for the purpose of" be susceptible to multiple meanings, Appellants' interpretation is the right one.

Should the Court find the words "for the purpose of" susceptible to multiple meanings, it should not defer to EPA's interpretation of the law. Courts, not agencies, have "special competence in resolving statutory ambiguities." *Loper Bright*, 603 U.S. at 400-01. Courts must resolve ambiguities using "every tool at their disposal," *id*. at 400, and basing their conclusion "on the traditional tools of statutory construction, not individual policy preferences." *Id*. at 403. In resolving the ambiguities, a court's role is to interpret the law to effectuate–not thwart–Congress's intent, even where Congress' mandate may seem difficult to achieve.

#### 1. The analogies used by EPA and its allies are inapposite.

While there may be contexts in which the phrase "for the purpose of" can be aspirational and deadline-free, such as when someone exercises daily "for the purpose of living longer" (EPA Resp. Br. 18) or "to become an accomplished weightlifter" (NACWA Br. 29),[5] those false analogies do not remotely

[5] Similarly inapposite is NACWA's citation to the criminal law context, where a court had to determine whether conduct came within the scope of a statute prohibiting transportation for an "immoral purpose." NACWA Br. 28. Nor is the analogy about a doctor conducting rounds of tests to diagnose a mysterious illness,

approximate the situation at hand. In amendments all about removing EPA's discretion and instead forcing action to ensure public safety, the idea that "for the purpose of" has the same aspirational, deadline-free meaning as a person exercising in the hope of living longer is absurd and untenable.

To add just one more analogy: a parent requires a child to examine his room weekly "for the purpose of" identifying any items meeting previously established criteria for dirtiness and cleaning those items. The obvious objective is not the act of *examining the room*, but cleaning anything that qualifies as dirty before the next week. If, for months on end, the child presented a growing list of objects present in the room without analyzing whether they met the criteria that require cleaning, no parent would find this appropriate, no matter how much the child (destined for law school, evidently) argued that Webster's Dictionary establishes that "purpose" must be interpreted in a deadline-free, aspirational manner.

The *recurring nature* of EPA's duty to review the regulations to assess their ongoing sufficiency would make no sense if the prior review need not reach any conclusions or have any practical effect. Even where an agency has full discretion

---

*id*. at 28-29, a good fit, as this is not an iterative process: EPA was supposed to identify and regulate pollutants for which information is *available in the given time period* (and in any case, keeping a burgeoning list of substances present in the patient's blood *without analyzing them,* as EPA has done with substances present in sludge cannot be fairly characterized has having the "purpose" of reaching an eventual diagnosis).

regarding the substance of its final decision (which here it does not because Congress curtailed its discretion by imposing specific statutory criteria requiring regulation as explained *infra* 18-22), an agency with a periodic review duty "may [not] simply make no formal decision to revise or not to revise, leaving the matter in a bureaucratic limbo." *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 550 (D.D.C. 2005) (quotation omitted). "It is rudimentary administrative law that discretion as to the substance of the ultimate decision does not confer discretion to ignore the required procedures of decisionmaking." *Id*. (citing *Bennett v. Spear*, 520 U.S. 154, 172 (1997)). *See also Appalachian Voices v. McCarthy*, 989 F. Supp. 2d 30, 56 (D.D.C. 2013) (a reviewing court has jurisdiction to compel an agency to make a formal decision under a recurring statutory review provision).

**2. The legislative history shows that Congress intended the biennial review provision to require EPA to catch and address emerging threats in sludge in two-year intervals.**

EPA attempts to discount the legislative history by arguing that the Court should end its analysis with EPA's plain language interpretation. Yet, as explained *supra* at Section III.B., that is not credible. EPA's real problem with legislative history is simply that none of it supports its position; rather, it contravenes it.

Congress faced a situation where EPA's inexcusable inaction left Americans unprotected from toxic pollutants in sewage sludge for excessive lengths of time. As the Amendments' sponsor explained at the conference report stage, Congress

intended that, "[a]t least every two years, or more often if the data indicate, EPA must review its Section 405 regulations for the purpose of identifying additional toxic pollutants which may be present in sewage sludge *and must promulgate regulations* for these additional pollutants." 132 Cong. Rec. S16424-S16611, (daily ed., Oct. 16, 1986) (Senate Debate on Conf. Report to Accompany S. 1128) (emphasis added). *See also* Ex. I to Br. of Amici Bierschenk et al., along with these amici's excellent detailed discussion of legislative history in their brief at 17-22.

EPA claims that floor statements by individual legislators are not illuminating, EPA Br. 21, but this is not the statement of a random member of Congress during the early stages of drafting that was ultimately rejected. This was the explanatory statement the bill's own sponsor made when presenting to the Senate the conference report that the House had passed unanimously, confirming the meaning of the final language that Congress was about to enact. Notably, Congress did not change the language of the biennial provision after this confirmation of its meaning. It understood the language of the biennial review provision, as written, to give EPA a two-year deadline not just to create a report with no practical consequences, but to identify and regulate emerging threats, just as Congress had required for Rounds One and Two.

EPA and its allies offer no legislative history, other than the improbable claim that "Congress was focused on getting EPA to promulgate regulations in the

first instance" and therefore "the reviews and revisions were not as central to Congress's goals, so Congress chose to require only the reviews." EPA Br. 22. To the contrary, Congress's concern with getting EPA to finally act in the first instance after its long delays further *supports* Appellants' point: that Congress enacted Section 405(d)(2)(C) to avert recurrence of the same problem in the future. Congress even went so far in the 1987 version as to purposefully *retain* the long-expired one-year (1978) deadline present in the law's 1977 version, even while setting new future deadlines, just to make a point about how egregious EPA's failures were.[6] In this context, it is inconceivable to conclude that Congress did not care how long EPA might take in the future to assess emerging threats.

In the almost forty years since Congress enacted these amendments, the tragedy that Congress was attempting to prevent has sadly occurred, as the stories of Appellants and their Amici so vividly show. This Court should finally give the biennial review provision the meaning that the legislative history clearly shows Congress intended.

---

[6] "These new deadlines are intended to put EPA on a schedule to correct its failure to meet the 1978 promulgation deadline in section 405 are not intended to excuse the Agency from its failure to meet the original deadline." 99 Cong., 2d Sess. H. Rep. Conf. Report 99-1004. Note: this explanation highlights the faultiness of NACWA's argument alleging that there are "intertwined rulemaking provisions on different cycles." NACWA Br. 33-34.

### 3. Congress did not need to use alternate phrasing to get across its meaning.

EPA and its allies argue that in Section 405(d)(2)(C), Congress needed to say "and identify" / "and regulate" rather than "for the purpose of identifying and regulating" if it wanted the actions of "identifying" and "regulating" to be anything more than mere "general guidance about the aims and objectives of the review." EPA Br. 15. Plaintiffs reiterate the reasoning in their opening brief.

Nor did Congress need to use the specific phrase "review and, as necessary, revise." EPA Br. 19, Chamber Br. 6-9. Congress already included the power to revise at the end of Section 405(d)(1) when it stated, "The Administrator is authorized to revise any regulation issued under this subsection." And as EPA correctly points out, it has done this on occasion for certain already-regulated pollutants. EPA Br. 7. It would certainly be nice if EPA more frequently reevaluated the numerical limitations and management practices for the existing pollutants it regulates, but that's not what this case is about.

No, Congress was requiring something different and far more specific: that EPA add *"additional toxic pollutants"* to its sludge regulations so the list of regulated substances in sludge would not be frozen in time after Rounds One and Two. Alternative phrasing is always possible. Quibbling with Congress choice of the verbs' gerund form rather than the infinitive (e.g., NACWA Br. 32) is simply unpersuasive. The alternative formulations EPA and its allies propose all mean the

same thing that the language as currently written means: EPA must not leave identified toxic pollutants in sludge unregulated for more than two years.

#### 4. Section 1345(d)(2)(C) contains a nondiscretionary duty because the District Court can make a clear-cut factual determination about whether the duty was violated.

*Sierra Club v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987) (argued and decided after the enactment of the amendments here at issue) was the case that first imposed the "readily-ascertainable deadline" requirement for nondiscretionary duties in citizen act suits. But it was not about whether a duty *with a clear deadline* can be broken up such that only part of it is subject to the deadline. The main point of *Thomas* is that the language regarding a duty's timing must be clear enough to enable a court to make "a clear-cut factual determination of whether a violation did or did not occur." *Thomas* at 791.

Here, the District Court can readily do that upon remand. EPA "*shall* identify [for regulation] those toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment." Section 405(d)(2)(A)(i) (emphasis supplied). The word "'shall' typically 'creates an obligation impervious to . . . discretion.'" *Me. Cmty. Health Options v. U.S.*, 590 U.S. 296, 310 (2020) (citation omitted). Thus, where available information shows that substances meet these

criteria, EPA is obligated to regulate them. It does not have the discretion to ignore them. It does not have the discretion to decline to review “the regulations” to determine *whether* substances like these should be added.

Upon remand the Parties would present evidence about the six PFAS to which Plaintiffs-Appellants will limit the case.[7] In evaluating the evidence, the lower court will certainly duly consider EPA’s expertise and judgment, but if the evidence clearly shows that some or all of the six substances “*may* be present in sewage sludge in concentrations which *may* adversely affect public health or the environment” and EPA failed to identify and regulate them within the two-year time frame (a time frame the judge is capable of calculating), that is a clear-cut factual determination. For any substances qualifying for mandatory regulation, EPA retains discretion over the regulation’s substantive details, and Intervenor NACWA and its amici would have every opportunity to participate in the notice

[7] These are PFOA, PFOS, HFPO-DA (GenX), PFNA, PFHxS, and PFBS, which are PFAS that EPA, in 2024, found are dangerous enough to require regulation in municipally-supplied drinking water. All of these were found on the individual Appellants’ (Farmer, Alessi, Coleman, Coleman, and Schultz) farms and some have impacted the members of Appellants Maine Organic Farmers and Gardeners Association and Potomac Riverkeeper Network. EPA also found, in a Draft Risk Assessment from January 2025, that PFOA and PFOA pose unreasonable risks to human health and the environment when present in biosolids in the miniscule concentration of one part per billion. 90 Fed. Reg. 3859-3864 (Jan. 15, 2025): Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS), ADD- 165-171. Available at: https://www.epa.gov/system/files/documents/2025-01/draft-sewage-sludge-risk-assessment-pfoa-pfos.pdf, last accessed Aug. 5, 2026.

and comment process. But the two-year deadline and the criteria requiring regulation provide a sufficiently clear nondiscretionary duty that citizens can sue EPA for failing to perform.

EPA protests that the statute "does not mention PFAS or any other specific chemical that EPA must regulate," EPA Br. 12, but Section 405(d)(2)(C) is all about identifying and neutralizing threats *unknown at the time of drafting*.[8] The unavoidable lack of specificity does not make the provision any less mandatory. And to be clear: Section 405(d)(2)(C) explicitly incorporates the mandatory criteria of Section 405(d)(2)(A)(i) by reference by using the words "*additional* toxic pollutants" (emphasis added) and "consistent with the requirements of this paragraph." Indeed, it would defy common sense to imagine that Congress intended these criteria to apply only initially and never thereafter, nor do the text, legislative history, or historical context of the provision support such conclusion.

Note that Section 405(d)(2)(C) stands in stark contrast to those in most nondiscretionary duty cases because here Congress did *not* leave the determination of whether regulation is necessary to EPA's discretion: instead it established mandatory criteria that constitute judicially manageable standards that a court can evaluate. EPA cites APA case *Norton v. Southern Utah Wilderness Alliance*, 542

[8] By EPA's logic, a testator would need to know the names of not-yet-conceived future descendants when crafting a will–a clear impossibility.

U.S. 55 (2004) (flagged in its Table of Authorities as a case on which EPA chiefly relies) for the proposition that courts cannot enforce statutory commands that leave a great deal of discretion to an agency. EPA Br. 16. But EPA conveniently omits the duty at issue in *Norton*: that the Bureau of Land Management manage certain lands "so as not to impair the suitability of such areas for preservation as wilderness." *Id*. at 59 (quoting 43 U.S.C. § 1782(c)). That is extremely broad, with no criteria defining what Congress meant by not impairing the suitability.

In another case upon which EPA chiefly relies, *Environmental Defense Fund v. Thomas*, 870 F.2d 892 (2d Cir. 1989), the language at issue required EPA's Administrator, at five-year intervals, to "promulgate such new standards *as may be appropriate*." *Id.* at 895 (emphasis added) (quoting 42 U.S.C. § 7409(d) (1982)); *see* EPA Br. 16. EPA does not quote this language in its brief–presumably because it very obviously grants EPA a broad measure of discretion that Section 405 simply does not. Similarly, Amicus Chamber of Commerce cites a slew of statutory provisions that contain language requiring agencies to review and revise "if appropriate," "as appropriate," or "as necessary," Chamber Br. 6-11, all phrases that denote discretion and are conspicuously absent from Section 405(d)(2)(C).

In contrast, Section 405 expressly limits EPA's discretion over both the content and timing of the regulatory process, so NACWA's argument that EPA has broad discretion over its regulatory agenda, NACWA Br. 34-36, is not applicable

here. If the pollutants at issue meet the statutory criteria, and if EPA has failed to regulate them within the relevant biennial period, then upon remand the District Court can assign liability and impose a swift, but not impossible, timeframe for remedying the violation. At a minimum, EPA must determine *whether* any substances meet the criteria in Section 405(d)(2)(A)(i).

Either way, the point is that *it is Congress, and not Appellants, that set those criteria.* This is not legislation via litigation; it is litigation to enforce legislation.

## IV. NACWA and their amici mischaracterize what Appellants seek and what effect a lower court ruling could have, and most of their arguments go to remedy or the merits, not the jurisdictional inquiry before this Court.

NACWA's amici accuse Appellants of "using scare tactics." CRROPS et al. Br at 13, 15. Presumably what they mean by this phrase is that they consider irrelevant the real-life stories of harm from PFAS in sludge, such as that of South Carolina farmer Robert O'Neal who last used sludge on his farm in the 1990s and who received a letter from EPA in 2020 informing him that the sludge spreading had contaminated his drinking water wells with PFAS, including three different measurements of over **4,000** parts per trillion. Ex. F to Bierschenk et al. Brief. (EPA limits PFOS and PFOA to **4** parts per trillion in municipal water systems. 40 C.F.R. § 141.61 (c)(2)). Or that of Allison Jumper of New Hampshire whose children for years ate meat from their grandparents' family farm (last spread with biosolids decades earlier) and ended up with PFAS levels in their blood higher than

75% -- and in the case of her 10-year old, 95% -- of Americans. Ex. E to Bierschenk et al. Br. These are not scare tactics: these are real people's lives. They illustrate what happens when EPA shirks a mandatory duty to stay on top of emerging threats in sludge for over three decades.

These same amici also use the classic tobacco industry tactic of claiming the science is still inconclusive. It most certainly is not, but in any case, this Court is obviously not the place to debate the merits and the science.

Rather, it is NACWA and their allies that are being alarmist, with sky-is-falling claims about how remanding to the District Court to enforce the statute will lead to catastrophic consequences. This is pure and unsubstantiated speculation. Should the District Court place EPA on a timeline for proposing regulations for certain PFAS that meet the statutory criteria requiring regulation (or even just a timeline for deciding *whether* to regulate them), there is ample case law establishing that to remedy overdue statutory duties, courts impose swift *but not impossible* remedies. See generally *Nat. Res. Def. Council v. Train*, 510 F.2d 692, 705, 712-13 (D.C. Cir. 1974), *Ala. Power Co. v. Costle*, 636 F.2d 323, 359 (D.C. Cir. 1979), *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 168 (D.C. Cir. 2017); *Cmty. In-Power & Dev. Ass'n, Inc. v. Pruitt*, 304 F. Supp. 3d 212 (D.D.C. 2018) (Brown Jackson, J.).

The bulk of NACWA's amici's arguments do not address issues of statutory interpretation at all, but rather go to the merits or to remedy and therefore Appellants will not address them except to point out that Appellants have never:

- argued that EPA must identify and regulate additional toxic pollutants in *every* two-year period: only in those periods for which available information shows the existence of <u>qualifying</u> toxic pollutants;
- suggested that the District Court determine *how* EPA should regulate any pollutant (i.e., which numerical limitations or management practices to require);
- advanced the theory that any court could order EPA to skip the traditional rulemaking process: rule proposal in the Federal Register, including notice and comment opportunities through which Intervenor NACWA, its amici, and anyone else could submit reams of feedback;
- argued that the District Court should ban land application of biosolids entirely;
- argued that EPA's regulations be limited to land-application, without concern for the harms of potential shifts to other disposal methods. To the contrary, EPA must biennially review *the Section 503 regulations*, which assess the relative risks of *all* the use and disposal methods and regulate accordingly to protect public health and the environment. This appoint appears to escape EPA, whose "Biosolids Biennial Reports" limit EPA's information gathering efforts to the context of land applied sludge.

Much of EPA and its allies' argument boils down to this: they consider it difficult for EPA to comply with a two-year timeframe for identifying and regulating additional toxic pollutants, and therefore that cannot be what Congress meant. That is not, however, how statutory interpretation works. Neither EPA nor

the judiciary can rewrite the statute. In fact, in the mid-1980s Congress absolutely *was* aware that EPA was having massive problems getting regulations on the books, yet it still imposed less-than-two-year time frames for Rounds One and Two and a two-year time frame for future rounds of regulation. What matters here is what Congress thought EPA was capable of and directed EPA to do, not what EPA (then or now) or its allies think is achievable. An administrative agency must follow a statute's commands as written rather than supplanting them with others it may prefer. *Social Security Bd. v. Nierotko*, 327 U. S. 358, 369 (1946).

Where EPA has missed a statutory deadline for a nondiscretionary duty, arguments regarding how long compliance will take instead go to the issue of *remedy*. An agency cannot excuse its failure to meet a deadline "simply by presenting feasibility and scientific integrity arguments." *Nat. Resources Def. Council, Inc. v. Reilly*, 1991 U.S. Dist. LEXIS 5334, at *15. That is especially true here, where it should not take decades of information-gathering to make the simple determination of whether six PFAS "may be present in sewage sludge in concentrations which may adversely affect public health or the environment." Plaintiffs and their farming family Amici could certainly attest that they are.

## V. Whether the Biennial Biosolids Report 9 fulfills EPA's duty is necessarily at issue because the lower court found there to be no unmet statutory duty.

In the last portion of its brief, EPA appears to accuse Appellants of pressing a "failure to review" claim that they did not raise below. Appellants do not dispute that EPA released a document that it called a "review." Rather, Appellants' consistent position has been that EPA's informational biennial reports do not fulfill its duty under Section 405(d)(2)(C) to review the regulations to assess their ongoing sufficiency, including by identifying any toxic pollutants requiring regulation and regulating them within each two-year time frame.

The District Court's conclusion that then-Plaintiffs had not alleged a failure by EPA to perform a non-discretionary duty amenable to a citizen suit appears to necessarily encompass the underlying conclusion that EPA's Biosolids Biennial Report No. 9 met any non-discretionary duty that EPA had. If this Court agrees with Appellants that the biennial review must include the identification of additional toxic pollutants meeting the criteria for regulation, Plaintiffs' complaint *does* allege an unmet nondiscretionary duty, because EPA's Biosolids Biennial Reports simply do not identify pollutants for regulation.

## CONCLUSION

It is clear from the language, statutory structure, legislative history, and historical context of Section 405(d)(2)(C) that when available information shows

that a substance in sludge meets the substantive criteria articulated in Section 405(d)(2)(A)(i), EPA must identify and address that emerging threat within two years through its Section 405(d)(2)(C) review process. That is a nondiscretionary duty with a two-year timeline that provides a basis for Appellants' Clean Water Act citizen suit. This Court should reverse the dismissal of this CWA citizen suit and remand so the District Court can consider the merits of Appellants' claims regarding the six PFAS they will advance on remand.

And even if this Court finds that EPA retains some discretion as to which pollutants qualify for regulation under the criteria in Section 405(d)(2)(A)(i), EPA nonetheless has a nondiscretionary CWA duty to review the regulations to reach a determination as to whether additional substances require regulation. Therefore, this Court should still find that EPA has a mandatory duty that has not been fulfilled to identify and regulate additional toxic pollutants meeting the standards of the statute, or make a reasoned finding that there are currently no such additional pollutants meeting the criteria for regulation.

Respectfully submitted this fifth day of August, 2026,

*/s/ Laura Dumais*
Laura Dumais, DC Bar No. 1024007
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 792-1277 / ldumais@peer.org

/s/ Paula Dinerstein

PAULA DINERSTEIN
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337 / pdinerstein@peer.org

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

I certify that this reply brief complies with Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,451 words, excluding the parts of the filing exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface and type style requirements of FRAP 32(a)(5) and (6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14- point font.

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337 / ldumais@peer.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2026, I electronically filed the foregoing reply brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337 / ldumais@peer.org

## CERTIFICATE OF NON-USE OF GENERATIVE AI

I certify that Appellants' attorneys did not use generative information technology (AI) in drafting our opening brief nor in this reply brief. While this certification is not required, I feel this is important information to convey.

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337 / ldumais@peer.org