ORAL ARGUMENT NOT YET SCHEDULED
No. 25-5431

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

JAMES FARMER, et al.,
*Plaintiffs-Appellants,*

v.

ENVIRONMENTAL PROTECTION AGENCY, et al.,
*Defendants-Appellees, and*

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
*Intervenor for Defendant-Appellee*

Appeal from the United States District Court
for the District of Columbia
No. 24-cv-01654-DLF (Hon. Dabney L. Friedrich)

# FINAL BRIEF OF INTERVENOR FOR DEFENDANT-APPELLEE NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES

Andrew C. Silton
James B. Slaughter
Allyn L. Stern
BEVERIDGE & DIAMOND, P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036
(202) 789-6000
asilton@bdlaw.com

*Counsel for Intervenor for Defendant-Appellee*
*National Association of Clean Water Agencies*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND RULE 26.1 DISCLOSURE

### A. Parties and Amici

Plaintiffs-Appellants' opening brief identifies all parties that appeared in the district court and this Court. No amici appeared in the district court. All amici that have filed briefs in this Court are listed in the briefs of Robert Bierschenk *et al.* and Plainfield Township *et al.*

**Corporate Disclosure:** NACWA has no parent company, and no publicly held company has a 10% or greater ownership interest in NACWA.

### B. Rulings Under Review

The ruling under review is identified in Plaintiffs-Appellants' opening brief.

### C. Related Cases

NACWA is not aware of "any other related cases" as defined by Circuit Rule 28(a)(1)(C).

*/s/ Andrew C. Silton*
Andrew C. Silton
*Counsel for Intervenor for Defendant-Appellee National Association of Clean Water Agencies*

TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES, AND RULE 26.1 DISCLOSURE........i

TABLE OF CONTENTS........ii

TABLE OF AUTHORITIES........iv

INTRODUCTION........1

JURISDICTIONAL STATEMENT........4

STATEMENT OF ISSUES........4

STATUTES AND REGULATIONS........4

STATEMENT OF THE CASE........4

A. NACWA's members collect and treat wastewater to protect public health and the environment, generating biosolids that must be responsibly managed........5

B. EPA maintains a comprehensive regulatory scheme governing the treatment and beneficial reuse of sewage sludge........10

C. EPA is evaluating whether PFAS warrant regulation under 33 U.S.C. § 1345........13

D. Procedural History........17

SUMMARY OF ARGUMENT........20

STANDARD OF REVIEW........24

ARGUMENT........24

I. The Clean Water Act does not set deadlines for EPA to regulate additional pollutants in sewage sludge........25

A. The statute's ordinary meaning does not force EPA to decide every two years which pollutants need to be regulated........27

B. The statute's structure confirms that EPA has no biennial rulemaking obligation.......... 31

C. Plaintiffs' interpretation is inconsistent with the Clean Water Act's approach to rulemaking.......... 34

II. EPA has discretion to determine whether PFAS in sewage sludge must be regulated.......... 35

A. Scientific and policy determinations about the need to regulate are discretionary.......... 36

B. Determining whether to regulate PFAS is a scientific and policy question Congress assigned to EPA, not courts. .......... 40

III. The adequacy of EPA's biennial reviews is not at issue in this case. .......... 42

CONCLUSION .......... 46

CERTIFICATE OF COMPLIANCE.......... 48

## TABLE OF AUTHORITIES

### Cases

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
72 F.4th 1324 (D.C. Cir. 2023) .................................................. 44

*Barnhart v. Sigmon Coal Co.*,
534 U.S. 438 (2002) ............................................................ 30

*Cboe Global Markets, Inc. v. SEC*,
155 F.4th 704 (D.C. Cir. 2025) .................................................. 37

*CIC Servs., LLC v. I.R.S.*,
593 U.S. 209 (2021) ............................................................ 28

*Citizens for Const. Integrity v. United States*,
70 F.4th 1289 (10th Cir. 2023) .................................................. 37

*City & Cnty. of San Francisco v. EPA*,
604 U.S. 334 (2025) ............................................................ 33

*Cleveland v. United States*,
329 U.S. 14 (1946) ............................................................ 28

*Ctr. for Biological Diversity v. EPA*,
141 F.4th 153 (D.C. Cir. 2025) .................................................. 38

*E. I. du Pont de Nemours & Co. v. Train*,
430 U.S. 112 (1977) ............................................................ 30

*Env't Def. Fund v. Thomas,*
870 F.2d 892 (2d Cir. 1989) ................................................ 37, 39

*Groff v. DeJoy*,
600 U.S. 447 (2023) ........................................................ 27, 28

*Grupo Dataflux v. Atlas Glob. Grp., L.P.*,
541 U.S. 567 (2004) ............................................................ 36

*Authorities upon which we chiefly rely are marked with asterisks.

*Gunpowder Riverkeeper v. Regan*,
2021 WL 3722714 (D.D.C. Aug. 23, 2021) .......... 40

*IBP, Inc. v. Alvarez*,
546 U.S. 21 (2005) .......... 29

*iTech U.S., Inc. v. Renaud*,
5 F.4th 59 (D.C. Cir. 2021) .......... 27

*Kennecott Copper Corp. v. Costle*,
572 F.2d 1349 (9th Cir. 1978) .......... 39

*Kingman Park Civic Ass'n v. Williams*,
348 F.3d 1033 (D.C. Cir. 2003) .......... 44

*Leather Indus. of Am., Inc. v. EPA*,
40 F.3d 392 (D.C. Cir. 1994) .......... 41

*Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*,
881 F.3d 912 (D.C. Cir. 2018) .......... 45

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 38, 41

*New York v. EPA*,
921 F.3d 257 (D.C. Cir. 2019) .......... 34

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 24

*NRDC v. Thomas*,
885 F.2d 1067 (2d Cir. 1989) .......... 39

*Rudisill v. McDonough*,
601 U.S. 294 (2024) .......... 33

**Sanitary Bd. of City of Charleston v. Wheeler*,
918 F.3d 324 (4th Cir. 2019) .......... 37, 39, 41, 43

*Scott v. City of Hammond*,
741 F.2d 992 (7th Cir. 1984) .......... 43

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
605 U.S. 168 (2025) .......................................................................38

**Sierra Club v. Thomas*,
828 F.2d 783 (D.C. Cir. 1987)...................................... 24, 25, 32, 37, 42

*Sierra Club v. Wheeler*,
956 F.3d 612 (D.C. Cir. 2020).............................................................36

*Soundboard Ass'n v. Fed. Trade Comm'n*,
888 F.3d 1261 (D.C. Cir. 2018)...........................................................43

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560, (2012) ..........................................................................30

*U.S. Postal Serv. v. Konan*,
146 S. Ct. 736 (2026) .........................................................................30

*U.S. Sugar Corp. v. EPA,*
113 F.4th 984 (D.C. Cir. 2024) ....................................................34, 38

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2000) ...........................................................................35

*Zook v. McCarthy*,
52 F. Supp. 3d 69 (D.D.C. 2014).........................................................40

**Statutes**

5 U.S.C. § 553(c) ..................................................................................12

5 U.S.C. § 701 ........................................................................................2

5 U.S.C. § 704 ......................................................................................43

5 U.S.C. § 706(1).............................................................................18, 19

5 U.S.C. § 706(2)(A)........................................................................ 18, 43

33 U.S.C. § 1311 ..................................................................................30

33 U.S.C. § 1314(b)..........................................................................29, 32

33 U.S.C. § 1342 .............................................................................. 5

33 U.S.C. § 1345 ..........................................2, 3, 4, 10, 13, 16, 24, 25, 46

33 U.S.C. § 1345(d)(1)......................................................................12, 33

33 U.S.C. § 1345(d)(1)(A)..................................................................10, 34

33 U.S.C. § 1345(d)(2).................................................. 15, 21, 32, 33, 34

33 U.S.C. § 1345(d)(2)(A)................................................... 10, 25, 32, 33

33 U.S.C. § 1345(d)(2)(A)(i) ........................................... 10, 25, 33, 34, 41

33 U.S.C. § 1345(d)(2)(A)(ii) ............................................................11, 33

33 U.S.C. § 1345(d)(2)(B)..................................................................32, 33

33 U.S.C. § 1345(d)(2)(B)(i) ..............................................................10, 33

33 U.S.C. § 1345(d)(2)(B)(ii) ............................................................11, 33

*33 U.S.C.§ 1345(d)(2)(C) .... 12, 19, 21, 22, 25, 26, 27, 29, 30, 31, 32, 33, 34, 35

33 U.S.C. § 1345(d)(2)(D) ................................................................... 32

33 U.S.C. § 1365(a)(2)......................................................... 17, 24, 36, 43

42 U.S.C. § 7408(a)(1)(A)...................................................................40

**Regulations**

40 C.F.R. Part 403............................................................................15

40 C.F.R. Part 503.......................................................... 6, 7, 11, 12, 41

**Other Authorities**

Diana Lin et al., *Residential Wastewater as a Major Source of Per- and Polyfluoroalkyl Substances to Municipal Wastewater*, 4 ACS ES&T Water 4847 (2024) ..........................................................................15

Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS), 90 Fed. Reg. 3859 (Jan. 15, 2025) ........................................ 16

EPA, *A Plain English Guide to the EPA Part 503 Biosolids Rule* (Sep. 1994), https://perma.cc/4CZ7-MTN5 ........................................ 12

EPA, *Basic Information about Sewage Sludge and Biosolids* (Sep. 26, 2025), https://perma.cc/LK9R-5HHF ........................................ 6

EPA, *Biennial Review of 40 C.F.R. Part 503 to Fulfill Clean Water Act Section 405(d)(2)(C): Biosolids Biennial Report No. 9 (Reporting Period 2020–2021)* (Dec. 2022), https://perma.cc/7DNH-MLDH......... 15

EPA, *Biosolids Program Strategy: Fiscal Year 2020–2025* (Oct. 2021), https://perma.cc/P7HY-6GPF ........................................ 7

EPA, *Biosolids Technology Fact Sheet: Land Application of Biosolids* (Sep. 2000), https://perma.cc/G3YQ-YWT2 ........................................ 7

EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS)* (Aug. 15, 2025), https://perma.cc/WAA3-GV8Y ........................................ 16

EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS)* (the Draft PFAS Risk Assessment) (Jan. 2025), https://perma.cc/UA2B-HJCS ............ 14

EPA, *Land Application of Biosolids* (Jan. 5, 2026), https://perma.cc/G5H3-FTV5 ........................................ 7

EPA, *Municipal Solid Waste Landfills Economic Impact Analysis for the Proposed New Subpart to the New Source Performance Standards* (June 2014), https://perma.cc/2ZFQ-PZX3 ........................................ 7

EPA, *Per- and Polyfluoroalkyl Substances (PFAS) in Sewage Sludge* (Aug. 15, 2025), https://perma.cc/ALP8-HE34 ........................................ 15

EPA, *PFAS Explained*, https://perma.cc/ZP87-LEF6 (last visited May 7, 2026) ........................................ 14

EPA, *Sewage Sludge Laws and Regulations* (Jan. 5, 2026), https://perma.cc/FDP2-HU36 ............ 12

Mass. Dep't of Env't Prot., *2022 Solid Waste Data Update* (Nov. 2023), https://perma.cc/NS39-42HP ............ 7

Me. Dep't of Env't Prot., *An Evaluation of Biosolids Management in Maine and Recommendations for the Futur*e (Dec. 15, 2023), https://perma.cc/M4V4-TJL3 ............ 9

NACWA, *2025 Cost of Clean Water Index*, https://perma.cc/AKQ8-S86N (last visited May 11, 2026) ............ 9, 17

Standards for the Use or Disposal of Sewage Sludge, 58 Fed. Reg. 9245 (Feb. 19, 1993) ............ 11, 42

Standards for the Use or Disposal of Sewage Sludge, 66 Fed. Reg. 66228 (Dec. 21, 2001) ............ 13

Standards for the Use or Disposal of Sewage Sludge: Decision Not to Regulate Dioxins in Land-Applied Sewage Sludge, 68 Fed. Reg. 61084 (Oct. 24, 2003) ............ 13

Taro Gomi, *Everyone Poops* (1993) ............ 6

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| EPA | U.S. Environmental Protection Agency |
| PFAS | Polyfluoroalkyl substances |
| PFOA | Perfluorooctanoic acid |
| PFOS | Perfluorooctane sulfonic acid |

## INTRODUCTION

This case concerns the regulation of a fundamental function performed by municipalities nationwide: the protection of human health and the environment through the provision of clean water services. Sanitation systems are a cornerstone of modern society that public utility members of the National Association of Clean Water Agencies (NACWA) work twenty-four hours a day, seven days a week to keep safe, reliable, and affordable. When and how they are regulated directly impacts the critical infrastructure—indeed, the literal foundations—of every city and town in the country.

Process and transparency matter the most when the stakes are this high. Citizen involvement is a key aspect of that process, but so is the development, with broad stakeholder input, of a robust scientific, technical, economic, and policy record upon which expert agencies can make informed decisions.

The Plaintiffs-Appellants' (hereafter, Plaintiffs) interpretation of the Clean Water Act would prevent development of such a record in the context of sewage sludge regulation at the expense of human health, the environment, and the provision of affordable clean water services.

Specifically, Plaintiffs argue that 33 U.S.C. § 1345 is the only provision in the Act that authorizes private parties to use courts to compel the U.S. Environmental Protection Agency (EPA) to issue regulations prior to the agency determining whether or when such regulations may be necessary or appropriate.

In addition to being unsupported by the statutory text and judicial precedent, Plaintiffs' interpretation would disregard long-standing EPA risk assessment and regulatory practices, while simultaneously excluding essential stakeholders—including many regulated entities—from the decision-making process. Such a misuse of the Clean Water Act's citizen suit provision is therefore not only legally unjustified; it will also have concrete ramifications for clean water utilities and the communities they serve.

Empowering private parties to dictate through litigation which regulations a federal agency must promulgate is the antithesis of the transparent, fully informed, reasoned decision-making required under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*. That Congress would create such a process in 33 U.S.C. § 1345 for regulations that address how municipalities perform vital sanitation services for

hundreds of millions of people strains credibility.

The Court should reject Plaintiffs' novel theory and instead uphold the district court's decision preserving the roles Congress assigned expert agencies and citizens under the Clean Water Act. As the district court correctly noted, this would not leave Plaintiffs without recourse. Should they seek to compel the regulation of any pollutant under 33 U.S.C. § 1345, they can petition EPA to conduct such a rulemaking and challenge any subsequent denial if the agency determines regulation is not warranted. *See* Mem. Op. 4, 9 [JA43, 48]; Fed. Appellees' Br. 23–24. Importantly for NACWA's members, this petition process protects not only the rights of all citizens to participate but also the well-established rulemaking mechanisms that help EPA make sound policy and scientific judgments based on robust public input. The district court's decision safeguards these processes, and the Court should affirm.

## JURISDICTIONAL STATEMENT

NACWA concurs with Plaintiffs' Jurisdictional Statement (at 3), with the exception that the district court correctly held it lacked subject matter jurisdiction.

## STATEMENT OF ISSUES

Whether the Clean Water Act authorizes private litigants to bring lawsuits to compel EPA to promulgate regulations under 33 U.S.C. § 1345 for specific pollutants which the agency has not yet determined to meet the statutory criteria for requiring regulation.

## STATUTES AND REGULATIONS

Copies of applicable statutes and regulations are contained in the Addendum to Plaintiffs' opening brief.

## STATEMENT OF THE CASE

This case poses fundamental questions concerning the regulation of sanitation services provided throughout the country. NACWA intervened below—over Plaintiffs' strenuous objections—because the outcome of this case will impact public utilities' ability to safely and affordably provide clean water services in a manner that best protects human health and the environment.

### A. NACWA's members collect and treat wastewater to protect public health and the environment, generating sewage sludge that must be responsibly managed.

NACWA is a national nonprofit trade association representing more than 360 local public clean water utilities that enforce EPA and state standards related to the management of wastewater and stormwater systems across the country. Ex. B to Mem. Supp. Mot. Intervene (Krantz Decl.) ¶ 5 [JA72]. NACWA's members serve a large majority of the Nation's population connected to public sewer systems. *Id.* Its members' publicly owned treatment works collect and treat enormous volumes of wastewater from homes, businesses, and institutions. *Id.* ¶ 7 [JA72]. They discharge treated effluent to waterbodies in accordance with strict standards imposed through discharge permits issued under the Clean Water Act by EPA or states that have received authorization. *See generally* 33 U.S.C. § 1342.

Critically for this case, the work of clean water utilities does not end with treating wastewater to rigorous permitting standards. NACWA's members must also responsibly manage the thousands of tons of solid residuals (known as sewage sludge) removed daily from wastewater as part of the treatment process. Krantz Decl. ¶ 7 [JA72]. As

we all learn at a very young age, everyone poops. *See generally* Taro Gomi, *Everyone Poops* (1993). It is one of the most important operational and public-health responsibilities of local governments and NACWA's members to safely manage on a daily basis that human necessity. Krantz Decl. ¶ 6, 7 [JA72].

There are currently only three methods clean water utilities can use to manage sewage sludge: beneficial application to land as a soil amendment and fertilizer, landfilling, and incineration. EPA regulates all three methods through Clean Water Act regulations found at 40 C.F.R. Part 503 (Part 503).[1] Once sewage sludge has been treated to meet the Part 503 requirements, they are generally referred to as "biosolids."

While all three biosolids management methods are used around the country, utilities manage nearly 60% of biosolids through land application, a sustainable practice that benefits both the environment and farmland.[2] Land application recycles to the soil critical nutrients for

---

[1] State and local regulators may also impose their own requirements. *See* Ex. A to Mem. Supp. Mot. Intervene (Biosolids and PFAS Paper) 4 [JA60].

[2] EPA, *Basic Information about Sewage Sludge and Biosolids* (Sep. 26, 2025), https://perma.cc/LK9R-5HHF.

crop growth, including nitrogen, phosphorus, and potassium, and many micronutrients.[3] The bulk organic properties of biosolids improve soil health and sequester carbon.[4] Land application of municipal biosolids also reduces reliance on synthetic chemical fertilizers,[5] and often provides a more affordable option compared to commercial fertilizers, particularly for small and part-time farmers.[6]

In addition to land application, municipalities can also landfill biosolids in a monofill (a landfill that only accepts biosolids) under Part 503 or dispose of them in a municipal solid waste landfill under the Resource Conservation and Recovery Act. Krantz Decl. ¶ 10 [JA73]. Landfill capacity in certain areas of the country is already limited, however, and in some regions existing landfills are near total capacity (*e.g.*, Massachusetts is currently at 87% capacity).[7]

---

[3] EPA, *Biosolids Technology Fact Sheet: Land Application of Biosolids* (Sep. 2000), https://perma.cc/G3YQ-YWT2.

[4] EPA, *Land Application of Biosolids* (Jan. 5, 2026), https://perma.cc/G5H3-FTV5.

[5] *Id.*

[6] *See* EPA, *Biosolids Program Strategy: Fiscal Year 2020–2025* at 1 (Oct. 2021), https://perma.cc/P7HY-6GPF.

[7] Mass. Dep't of Env't Prot., *2022 Solid Waste Data Update* (Nov. 2023), https://perma.cc/NS39-42HP; EPA, *Municipal Solid Waste Landfills Economic Impact Analysis for the Proposed New Subpart to the New*

Finally, clean water agencies can manage biosolids through incineration.[8] While incinerators are still used in certain regions of the country, stringent Clean Air Act standards have resulted in an overall decrease in incinerator capacity over the last fifteen years.[9]

Each of these management options has operational, environmental, and economic constraints. Because there are only three options, actions reducing the availability of any one form of management will necessarily affect the availability and costs associated with the other two in light of the unrelenting volume of sewage sludge generated in this country daily.[10] Preserving sufficient management options is therefore critical to the functioning of municipal wastewater systems and protection of public health.[11] And as the costs of providing clean water services is outpacing inflation and expected to continue rising, ensuring the availability of affordable management options is especially vital for communities across

---

*Source Performance Standards* (June 2014), https://perma.cc/2ZFQ-PZX3.

[8] Biosolids and PFAS Paper 3 [JA59].

[9] *See* Fed. Appellees' Br. 6; *see also* Biosolids and PFAS Paper 3 [JA59].

[10] *See* Biosolids and PFAS Paper 4–5 [JA60–61].

[11] *Id.*

the country. *See generally* NACWA, *2025 Cost of Clean Water Index*, https://perma.cc/AKQ8-S86N (last visited May 11, 2026).

State attempts to impose new regulations on biosolids faster than available treatment options and science currently can support illustrate the stakes. For example, after Maine banned land application of biosolids in 2022, clean water agencies in the state were left with one available in-state management option: landfill disposal.[12] As a result of already limited landfill capacity in the state, however, these agencies have been forced to turn in part to transporting biosolids to Canada and other states at greatly increased cost, and a state-issued report has warned that Maine would face a "drastic shortfall in [landfill] capacity to accept biosolids in the state" by 2028 unless circumstances change.[13]

Federal regulation of biosolids must take such considerations into account. Failure to understand and address the complexities of managing this material could lead to an untenable situation whereby municipalities across the country could potentially be left without a safe, lawful way to

---

[12] Me. Dep't of Env't Prot., *An Evaluation of Biosolids Management in Maine and Recommendations for the Future* 1 (Dec. 15, 2023), https://perma.cc/M4V4-TJL3.

[13] *Id.*

manage the residuals produced during the wastewater treatment process.

### B. EPA maintains a comprehensive regulatory scheme governing the treatment and beneficial reuse of sewage sludge.

NACWA's members must manage their sewage sludge consistent with a comprehensive regulatory scheme established by the Clean Water Act and administered by EPA and authorized states. *See* 33 U.S.C. § 1345. The Act establishes three sets of rulemaking obligations for sewage sludge. The first required EPA, by December 27, 1978, to publish an initial set of regulations establishing guidelines for its disposal and use. *Id.* § 1345(d)(1)(A). The second and third required EPA to identify toxic pollutants that "may be present in sewage sludge in concentrations which may adversely affect public health or the environment" and to promulgate regulations establishing acceptable management practices and numeric limitations for those pollutants. 33 U.S.C. § 1345(d)(2)(A), (B). In evaluating which pollutants to regulate, Congress directed EPA to consider an array of scientific factors: "toxicity, persistence, concentration, mobility, [and] potential for exposure." 33 U.S.C. § 1345(d)(2)(A)(i), (B)(i).

Congress set deadlines for these two sets of toxic pollutant regulations. It required EPA to promulgate a final rule for the first set by August 31, 1987. *Id.* § 1345(d)(2)(A)(ii). For the second set, Congress required EPA to promulgate a final rule by June 15, 1988. *Id.* § 1345(d)(2)(B)(ii). Developing these rules proved an immense undertaking, however, and EPA did not finalize them until 1993. *See* Standards for the Use or Disposal of Sewage Sludge, 58 Fed. Reg. 9245, 9248 (Feb. 19, 1993) (codified at 40 C.F.R. pt. 503). Part 503 culminated a years-long effort that included gathering extensive information; evaluating the effect of key pollutants on highly exposed individuals, plants, animals, and high-risk populations; weighing different regulatory approaches based on varied exposure models; and considering issues like implementability and protectiveness. *See generally id.* at 9251–52. During the rulemaking process, EPA solicited and considered public comment in multiple phases and on a wide range of issues (including risk assessment) prior to promulgating the final rules.[14] All told, Part 503 is

[14] *See* 58 Fed. Reg. at 9247, 9267–70. EPA received comments from 656 commenters, including 278 municipalities and numerous associations, during the 183-day comment period on the proposed rule. *Id.* at 9267. EPA also convened two peer review groups consisting of nationwide experts (both inside and outside EPA). *Id.*

the product of EPA's exhaustive assessment of the risks posed by pollutants in sewage sludge—informed by extensive stakeholder engagement—and establishes comprehensive requirements for managing and recycling biosolids.[15]

In addition to requiring EPA to establish these initial regulations, Congress assigned EPA one more task: every two years the agency "shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants." 33 U.S.C.§ 1345(d)(2)(C). In developing any such regulations, EPA must consult with interested stakeholders and solicit public comments on its proposed rules. *See id.* § 1345(d)(1); 5 U.S.C. § 553(c).

Since 1993, EPA has followed this requirement to evaluate the need to update its Part 503 regulations every two years, with additional pollutants being extensively evaluated where EPA determined they might require regulation.[16] For instance, EPA assessed risks posed by

---

[15] *See generally* EPA, *A Plain English Guide to the EPA Part 503 Biosolids Rule* (Sep. 1994), https://perma.cc/4CZ7-MTN5.

[16] EPA, *Sewage Sludge Laws and Regulations* (Jan. 5, 2026), https://perma.cc/FDP2-HU36.

dioxins and dioxin-like compounds in sewage sludge and determined in 2001 that existing regulatory requirements for disposal of those substances at surface-disposal sites or at incinerators were adequate to protect public health and the environment, making further regulation unnecessary.[17] Two years later, EPA decided not to regulate dioxins in land-applied biosolids after concluding that the incremental risk from land application was small and uptake into crops or livestock was limited.[18]

### C. EPA is evaluating whether PFAS warrant regulation under 33 U.S.C. § 1345.

EPA is currently engaged with the science and relevant stakeholders to evaluate the risks posed by the presence of certain per- and polyfluoroalkyl substances (PFAS) in sewage sludge. PFAS are a class of synthetic chemicals manufactured since the 1940s for use in many consumer products and industrial applications due to their water-

---

[17] Standards for the Use or Disposal of Sewage Sludge, 66 Fed. Reg. 66228 (Dec. 21, 2001).

[18] Standards for the Use or Disposal of Sewage Sludge: Decision Not to Regulate Dioxins in Land-Applied Sewage Sludge, 68 Fed. Reg. 61084, 61086–89 (Oct. 24, 2003).

and heat-repelling and other properties.[19] The durable chemical bonds found in PFAS make many of these chemicals persistent in the environment,[20] and clean water utilities currently have no viable treatment options for PFAS at the scale needed for the massive volumes NACWA's members treat. Krantz Decl. ¶ 13 [JA73–74].

PFAS enter wastewater treatment systems through upstream domestic (i.e., household), industrial, and commercial sources, including household products like PFAS-treated clothing, upholstery, carpets, cookware, cosmetics, laundry detergent, and contact lenses, resulting in PFAS going down the drain and into the sewer system.[21] Even with reduction in the use of certain PFAS in products, legacy products will continue to contribute PFAS to sewer systems for the foreseeable future. Likewise, any future limits on industrial source contributions of PFAS that may be imposed under the Clean Water Act's pretreatment program,

---

[19] *See* EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS)* (the Draft PFAS Risk Assessment) (Jan. 2025), https://perma.cc/UA2B-HJCS.

[20] *See* EPA, *PFAS Explained* at 1, https://perma.cc/ZP87-LEF6 (last visited May 7, 2026).

[21] *See* Krantz Decl. ¶ 12 [JA73]; *see also* Biosolids and PFAS Paper 3 [JA59]; Draft PFAS Risk Assessment at 11 (Jan. 2025).

found at 40 C.F.R. Part 403, cannot reduce inputs from domestic sources, which in some municipalities contribute the bulk of PFAS discharged into the public sewer systems.[22] As a result, PFAS can—and foreseeably will—remain in the residual solids created during wastewater treatment. Biosolids and PFAS Paper 2 [JA58].

In EPA's Biosolids Biennial Report No. 9 (for the reporting period 2020–2021), EPA identified 13 new pollutants warranting further study, including 3 PFAS, based on its consideration of the available data.[23] Since then, EPA has initiated a biosolids risk assessment process, gathering expert input and conducting additional PFAS-related studies.[24] Specifically, EPA is now assessing two PFAS, perfluorooctanoic acid (PFOA) and perfluorooctanesulfonic acid (PFOS), to determine whether they pose risks sufficient to warrant regulation under 33 U.S.C. § 1345(d)(2). EPA released a draft risk assessment for PFOA and PFOS

---

[22] Diana Lin et al., *Residential Wastewater as a Major Source of Per- and Polyfluoroalkyl Substances to Municipal Wastewater*, 4 ACS ES&T Water 4847, 4854 (2024).

[23] EPA, *Biennial Review of 40 C.F.R. Part 503 to Fulfill Clean Water Act Section 405(d)(2)(C): Biosolids Biennial Report No. 9 (Reporting Period 2020–2021)* (Dec. 2022), https://perma.cc/7DNH-MLDH.

[24] *See* EPA, *Per- and Polyfluoroalkyl Substances (PFAS) in Sewage Sludge* (Aug. 15, 2025), https://perma.cc/ALP8-HE34.

for public comment in January 2025.[25] The comment period ended on August 14, 2025.[26] EPA will ultimately use information collected during this assessment, including input received from stakeholders, to help determine whether it needs to regulate PFOA and PFOS in biosolids under 33 U.S.C. § 1345. *See* Draft PFAS Risk Assessment 1.

NACWA and its members have been participating in the risk assessment process since its initial phases, including by providing key information about the environmental and operational implications of possible regulatory approaches. EPA's rulemaking decisions with respect to PFAS in biosolids could have major consequences for clean water utilities nationwide. Any requirements that would limit the availability of one or more of the three existing biosolids management options could pose unprecedented environmental and operational challenges and exponentially increase the costs of providing clean water services at a time when public affordability concerns are already at an all-time high.

---

[25] Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS), 90 Fed. Reg. 3859 (Jan. 15, 2025).

[26] EPA, *Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS)* (Aug. 15, 2025), https://perma.cc/WAA3-GV8Y.

*See* NACWA, *2025 Cost of Clean Water Index* 4. It is critical for communities across the country that EPA's decision-making concerning the regulation of PFAS in sewage sludge take such considerations into account.

### D. Procedural History

Seeking to circumvent EPA's ongoing risk assessment process and solicitation of public input, Plaintiffs sued EPA and its Administrator on June 6, 2024. Compl.[27] They cited a selection of scientific papers to allege that "sufficient scientific information exists" to require EPA to (a) identify 18 PFAS compounds in its next biennial review, Second Am. Compl. ¶¶ 10, 71–72 [JA12–13, 30–31], and (b) regulate a list of eleven PFAS compounds. *Id.* ¶¶ 11, 85–86 [JA13–14, 33–37]. Based on these allegations, Plaintiffs asserted five causes of action falling into three categories:

1. EPA violated a nondiscretionary duty, enforceable under the Clean Water Act's citizen suit provision, 33 U.S.C. § 1365(a)(2), by failing to identify and regulate the PFAS identified in the complaint. Second Am. Compl. ¶¶ 68–73, 80–87 (First and Fourth Causes of Action) [JA29–31, 32–37].

---

[27] Plaintiffs filed an Amended Complaint on July 23, 2024, First Am. Compl., and a Second Amended Complaint on August 14, 2024, Second Am. Compl. [JA8–39].

2. EPA's failure to identify the PFAS listed in the complaint violated the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Second Am. Compl. ¶¶ 77–79 (Third Cause of Action) [JA31–32].
3. By failing to identify and regulate the PFAS listed in the complaint, EPA unlawfully withheld or unreasonably delayed action in violation of 5 U.S.C. § 706(1). Second Am. Compl. ¶¶ 74–76, 88–90 (Second and Fifth Causes of Action) [JA31, 37–38].

To remedy these alleged violations, Plaintiffs demanded that the court, among other things, "[o]rder EPA to … regulate the PFAS listed" in the complaint under deadlines set by the court. *Id.* at Request for Relief ¶ C [JA38]. In effect, this demand for relief would transfer EPA's responsibility to assess the risks posed by PFAS in sewage sludge to a district judge, and the court—rather than an expert agency accountable to the public—would determine whether the named pollutants pose risks to human health and the environment sufficient to require EPA to promulgate regulations that would apply to clean water utilities nationwide.

Recognizing the need for clean water utilities to be represented in such consequential litigation, NACWA successfully intervened in the district court under Rule of Civil Procedure 24(a)(1), over the strenuous objections of Plaintiffs. Intervention Mem. Op. 8–10.

EPA, joined by NACWA, moved to dismiss the Second Amended

Complaint,[28] and Judge Friedrich issued a Memorandum Opinion and Order (Mem. Op.) dismissing the entire lawsuit last fall. The court agreed that EPA has no clear-cut nondiscretionary duty to identify or regulate additional pollutants during its biennial reviews. Specifically, the district court held that it lacked subject matter jurisdiction over Plaintiffs' Clean Water Act claims because section 33 U.S.C. § 1345(d)(2)(C)'s plain language requires EPA only "to *review* its regulations on a biennial basis." Mem. Op. 4 [JA43] (emphasis in original). EPA, Judge Friedrich explained, had no duty to regulate pollutants on the same schedule as its biennial reviews. *See id.* at 4–7 [JA43–46].

The court also found that Plaintiffs failed to state claims under the Administrative Procedure Act, concluding that (a) EPA's most recent biennial report on biosolids was not a final agency action and (b) Plaintiffs had not identified any inaction that would serve as "the functional equivalent of final agency action." *Id.* at 8–9 [JA47–48] (citation modified). Plaintiffs also conceded that the Clean Water Act precluded their unreasonable delay claims under 5 U.S.C. § 706(1), and the court dismissed these claims as well. *Id.* at 9–10 [JA48–49].

---

[28] Defs.' Mot. to Dismiss [JA50]; Mot. to Join Mot. to Dismiss.

Plaintiffs filed a notice of appeal on November 25, 2025. Notice of Appeal. Plaintiffs, however, declined in their opening brief to "address the District Court's conclusion that the biennial reports do not constitute a final agency action," thereby abandoning their APA claims. Plaintiffs' Br. 20. They also represented that they now seek only to compel EPA to regulate a "single list of six [unidentified] PFAS" they allege meet the Clean Water Act's criteria for regulation. *Id.*

## SUMMARY OF ARGUMENT

**I.** The Clean Water Act does not authorize private litigants to dictate whether and when EPA regulates pollutants in sewage sludge. The Act places the agency under no deadline to issue regulations for PFAS or any other additional pollutants in sewage sludge. Congress required EPA only to review its existing regulations every two years, while leaving the timing and substance of the agency's regulatory decisions to its discretion. Thus, EPA has no nondiscretionary duty to issue regulations for PFAS in sewage sludge, and the district court correctly held it lacked subject matter jurisdiction over Plaintiffs' citizen suit.

**A.** Congress did not impose recurring two-year deadlines for

EPA to determine which pollutants in sewage sludge pose risks sufficient to warrant regulation. Instead, 33 U.S.C. § 1345(d)(2)(C) instructs EPA to "review" its regulations biennially "for the purpose of" identifying and regulating additional pollutants. The statute's plain meaning requires EPA simply to assess its regulations *to advance the objective* of identifying additional pollutants for regulation. But Congress did not dictate the manner or timing of the agency's decisions about which pollutants must be regulated. Concluding otherwise would disregard the statute's text and clash with how Congress used the phrase "for the purpose of" elsewhere in the Clean Water Act.

**B.** Congress knows how to set deadlines for EPA's regulatory determinations but declined to impose one in § 1345(d)(2)(C). As it has elsewhere in the Act, Congress used clear, mandatory language in § 1345(d)(2)'s other subparagraphs to require EPA to issue sewage sludge regulations by dates certain. The omission of similar language from § 1345(d)(2)(C) confirms that Congress did not put EPA on a strict schedule for regulating additional pollutants in sewage sludge.

**C.** Plaintiffs' reading of § 1345(d)(C)(2) would make it an aberration—the only instance where EPA lacks discretion over the

timing of revisions to its Clean Water Act rules. Consistent with background principles of administrative law, the Act generally affords the agency discretion to determine which rules it revises and the timing of those revisions. Plaintiffs suggest that Congress somehow sought to depart from this basic rule by defining the objectives of a periodic *review*. Congress does not use vague language to make substantial changes to how statutes function, and § 1345(d)(2)(C) is no exception.

**II.** In the alternative, this Court may affirm because the district court lacked jurisdiction to determine whether PFAS meet the Clean Water Act's standard for regulating pollutants in sewage sludge. Determining whether PFAS—or any other pollutants—pose risks sufficient to warrant regulation requires the exercise of scientific and policy judgment and cannot be adjudicated in a citizen suit.

**A.** The Clean Water Act's citizen suit provision does not give district courts jurisdiction to resolve questions Congress assigned to EPA. This Court has long recognized that EPA's scientific judgments are discretionary, and its sister circuits have consistently rejected citizen suits seeking to enforce duties conditioned on EPA making a scientific determination. These technical questions are textbook exercises of

agency discretion and cannot be the subject of a citizen suit.

**B.** Determining which pollutants in sewage sludge need to be regulated and when regulation is warranted poses complex scientific and policy questions that EPA has discretion to resolve. The Clean Water Act sets a risk-based standard for regulating pollutants in sewage sludge that requires EPA to assess and weigh different scientific evidence and models. Making these judgments demands an exercise of agency discretion and stakeholder participation rather than the types of "clear-cut" factual questions courts have jurisdiction to resolve in citizen suits.

**III.** This case is not a vehicle for the Court to review the adequacy of EPA's biennial reports on biosolids. Plaintiffs cannot seek review under the Administrative Procedure Act because the district court held that the biennial reports are not final agency action, and Plaintiffs forfeited any challenge to this holding. Nor can Plaintiffs challenge the sufficiency of the reports—or any other EPA action—in a Clean Water Act citizen suit. The district court also never had any occasion to review the reports' adequacy below, and Plaintiffs may not litigate this issue for the first time on appeal.

## STANDARD OF REVIEW

NACWA agrees with the standard of review articulated by the Federal Appellees (at 13–14).

## ARGUMENT

The district court correctly held that the Clean Water Act does not empower private parties to use courts to dictate which pollutants EPA must regulate under 33 U.S.C. § 1345 and when the agency must do so. The Act's citizen suit provision waives sovereign immunity only to compel EPA "to perform any act or duty . . . which is not discretionary." 33 U.S.C. § 1365(a)(2). A nondiscretionary duty must be "clear-cut," such that the statute "categorically mandat[es] that all specified action be taken by a date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (citation modified) (interpreting near-identical language in the Clean Air Act).[29] Conversely, a plaintiff cannot maintain a citizen suit if the putative duty to act by a certain time "exists only by reason of an

[29] *Accord Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) ("failure to act" claims under the Administrative Procedure Act can be brought "only where a plaintiff asserts that an agency failed to take a *discrete* agency action" (emphasis in original)).

inference drawn from" the Clean Water Act's structure. *Sierra Club*, 828 F.2d at 791.

Plaintiffs' attempt to compel EPA to regulate certain PFAS fails under 33 U.S.C. § 1345 under this standard. The Act's biennial review provision, 33 U.S.C. § 1345(d)(2)(C), requires EPA only to *review* its regulations every two years, not revise them. Nor is determining which constituents in sewage sludge present risks sufficient to warrant regulation the type of "clear-cut factual determination" that district courts may make in citizen suits. *Sierra Club*, 828 F.2d at 791. It is a scientific and policy question that Congress gave "the Administrator" of EPA discretion to answer. 33 U.S.C. § 1345(d)(2)(A)(i).

## I. The Clean Water Act does not set deadlines for EPA to regulate additional pollutants in sewage sludge.

Congress did not give EPA arbitrary two-year windows to complete the complex task of determining which pollutants in sewage sludge pose risks sufficient to warrant regulation. Yet the Plaintiffs read the Clean Water Act to do just that and even claim that a mere "sixteen months" could be sufficient to weigh risks and make critical regulatory decisions. Plaintiffs' Br. 25. The district court correctly rejected this reading, concluding that the plain meaning of Congress's directive to "review" the

sewage sludge regulations every two years only required EPA to do precisely that—a review. Mem. Op. 7 [JA46]. Identifying additional pollutants that could meet the statutory threshold for regulation must motivate EPA's review, but Congress did not force the agency to shoehorn its risk assessment and rulemaking decisions into biennial cycles.

Recognizing that Congress did not direct EPA to reach scientific conclusions on an arbitrary timeline would not, as the Plaintiffs and their amici contend, "render[] the provision meaningless." Plaintiffs' Br. 24; Bierschenck, et al. Amicus Br. 23 (district court's reading "would rob these provisions of their true meaning"). To the contrary, § 1345(d)(2)(C) requires EPA to conduct reviews with the aim of evaluating whether current science indicates that additional pollutants show risks sufficient to warrant regulation. Section 1345(d)(2)(C) does not, however, go so far as to mandate that final decisions be made on an unrelenting biennial schedule. The district court's decision gives effect to the words Congress chose, rather than the meaning Plaintiffs strain to wring from them.

### A. The statute's ordinary meaning does not force EPA to decide every two years which pollutants need to be regulated.

The district court correctly read § 1345(d)(2)(C) to require EPA's biennial reviews to advance the identification and regulation of additional pollutants while leaving the timing and substance of regulatory decisions to the agency's discretion. *See* Mem. Op. 7 [JA46]. "[S]tatutory interpretation must begin with, and ultimately heed, what a statute actually says." *Groff v. DeJoy*, 600 U.S. 447, 468 (2023) (citation modified). Here, the statute says:

> [N]ot less often than every 2 years, the Administrator *shall review* the regulations promulgated under this paragraph *for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants* consistent with the requirements of this paragraph.

33 U.S.C. § 1345(d)(2)(C) (emphases added). In determining this provision's meaning, the Court "afford[s] the law's terms their ordinary meaning at the time Congress adopted them." *iTech U.S., Inc. v. Renaud*, 5 F.4th 59, 63 (D.C. Cir. 2021) (citation modified).

In § 1345(d)(2)(C), Congress chose words directing EPA to conduct a review every two years but did not impose this timetable on the agency's regulatory decisions. The statute gives EPA the task to "review" its regulations biennially and made identifying and regulating

additional pollutants the review's "purpose"—*i.e.*, "the objective and aim of the reviews," rather than a task EPA must complete. Fed. Appellees' Br. 16 (synthesizing dictionary definitions). Consistent with this ordinary meaning, the Supreme Court has long recognized that whether one acted for a particular "purpose" specified by Congress "turns on the purpose which motivates the [action], not on its [*i.e.*, the purpose's] accomplishment." *Cleveland v. United States*, 329 U.S. 14, 20 (1946) (determining whether conduct fell within scope of criminal statute prohibiting transportation for an "immoral purpose"); *see also CIC Servs., LLC v. I.R.S.*, 593 U.S. 209, 217 (2021) ("purpose of a measure is 'the end or aim to which [it] is directed.'") (quoting N. Webster, An American Dictionary of the English Language (rev. ed. 1844)). Thus, EPA must biennially review its regulations but need not reach decisions about regulating additional pollutants on this schedule.

Everyday speech confirms that a directive periodically to perform an act "for the purpose of" some objective does not require the achievement of that objective every time one takes the action. *See, e.g.*, *Groff*, 600 U.S. at 468 (using "common parlance" to interpret statute). To add to the Federal Appellees' example (at 18), one could schedule a series

of weekly doctor's appointments "for the purpose of" diagnosing a mysterious illness. One would not say the first several appointments were a failure if the doctor ordered tests and ruled out certain conditions but did not reach a final diagnosis. Similarly, someone declaring they will start going to the gym daily "for the purpose of" becoming an accomplished weightlifter has misled no one if they cannot bench press their body weight during their first, third, or even eighth sessions in the gym.

Contrary to *amici's* arguments, Bierschenk et al. Amicus Br. 23–24, this commonsense reading of § 1345(d)(2)(C) also *ensures* the phrase "for the purpose of" maintains consistent meaning throughout the Clean Water Act. *See, e.g., IBP, Inc. v. Alvarez*, 546 U.S. 21, 22 (2005) ("[I]dentical words used in different parts of the same statute are generally presumed to have the same meaning."). As the Federal Appellees note (at 18), Congress' use of language to define an activity's purpose "does not dictate when its 'purpose' is accomplished." For instance, Congress did not intend its instruction to publish guidelines "[f]or the purpose of adopting or revising effluent limitations" also to require EPA to revise those effluent limitations. 33 U.S.C. § 1314(b). The

Act instead requires EPA to set effluent limitations through a different process under a different part of the Act. *See* 33 U.S.C. § 1311 (titled "Effluent limitations"); *see also E. I. du Pont de Nemours & Co. v. Train*, 430 U.S. 112, 131 (1977) (EPA's "guidelines are then to describe the methodology EPA intends to use . . . to determine the effluent limitations for particular plants."). Plaintiffs' reading of the phrase "for the purpose of" to identify tasks that EPA "must accomplish" should thus be rejected because it would make § 1345(d)(2)(C) an outlier rather than ensure consistency. *See U.S. Postal Serv. v. Konan*, 146 S. Ct. 736, 745 (2026) (rejecting interpretation that would have given a term inconsistent meaning).

In the face of this textual evidence, Plaintiffs offer no authority that would warrant giving the phrase "for the purpose of" in § 1345(d)(2)(C) anything other than its ordinary meaning.[30] Moreover, broad objectives like "the importance of modifying" environmental regulations, Plaintiffs' Br. 28, are no reason to disregard the Clean Water Act's plain meaning. *See Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 462 (2002) (regardless

[30] *See, e.g., Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566, (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

of a statute's purpose, judicial inquiry is complete when "the words of a statute are unambiguous"). The Court should thus reject Plaintiffs' invitation to adopt an intent-driven approach for determining whether EPA has an obligation to update its rules. Plaintiffs' Br. 28 (citing *In re A Cmty. Voice*, 878 F. 3d 779, 784 (9th Cir. 2017)). As the dissent in *In re a Community Voice* correctly noted, the panel majority erred by invoking a statute's goals "to alter the apparent meaning of a specific provision." 878 F.3d 779, 790 (9th Cir. 2017) (quoting *United States v. Plaza Health Lab'ys, Inc.*, 3 F.3d 643, 647 (2d Cir. 1993)); *see* Fed. Appellees' Br. 25.

**B. The statute's structure confirms that EPA has no biennial rulemaking obligation.**

Plaintiffs' rhetoric (at 27) that Congress "meant business" when it amended § 1345(d) is no reason to conjure up a requirement for EPA to biennially update its sewage sludge regulations. Plaintiffs (at 25) ask the Court to infer a "two-year timeline to identify and regulate" in § 1345(d)(2)(C) because it would be "consonant with the timelines Congress imposed in Section [1345](d)(1) . . . and in Section [1345](d)(2)(A) and (B)." This Court, however, has cautioned against creating nondiscretionary duties "by reason of an inference drawn from

the overall statutory framework." *Sierra Club*, 828 F.2d at 791. In any event, these other deadlines demonstrate "that where Congress wanted EPA to act by a date certain, it said so unequivocally," Fed. Appellees' Br. 19, by pairing "shall" with the tasks—"propose regulations" and "promulgate the regulations"—EPA needed to timely accomplish. 33 U.S.C. § 1345(d)(2)(A), (B).[31] In drafting § 1345(d)(2), Congress thus used the same formulation it deployed throughout the Act to give EPA deadlines to complete regulatory tasks. *See, e.g.*, 33 U.S.C. § 1314(b) (EPA "shall . . . publish within one year of October 18, regulations"); *id.* § 1311(d) (effluent limitations "*shall* be reviewed at least every five years").

Section 1345(d)(2)(C) lacks this commonsense formulation for imposing deadlines for regulatory action. The statute provides that EPA "shall" do only one thing: "review the regulations." *Id.* § 1345(d)(2)(C). By leaving out verb forms of "identify" and "promulgate," Congress made

[31] Plaintiffs' observation (at 27) that § 1345(d)(2)(D) also requires "quick compliance" with EPA's regulations has no bearing on *when* EPA must promulgate those rules. This provision clearly speaks to regulated entities' compliance with the rules' content rather than EPA's procedures for issuing them. *See* 33 U.S.C. § 1345(d)(2)(D) (imposing deadlines for "[t]he management practices and numeric criteria established" by EPA).

identifying and regulating additional pollutants the *goal* of EPA's biennial reviews, not the *action* EPA must take.[32] *See supra* Section I.A.; Fed. Appellees' Br. 15–16. As the district court concluded, Mem. Op. 6 [JA45], inferring otherwise would disregard Congress' choice to omit duty-creating language it clearly knew how to use.[33]

Section 1345(d)(1) offers yet more support for the conclusion that EPA is under no obligation to confine its regulatory decisions to two-year cycles. In that provision, Congress gave EPA a deadline to issue an initial set of rules and then revise them "from time to time thereafter." 33 U.S.C.

---

[32] To the extent the headings in § 1345(d)(2) "supply cues" about its meaning, *Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (citation modified), they do not support *amici's* claim that Congress meant to demand biennial updates to EPA's rules. *See* Plainfield Twp. Amicus Br. 25. The headings for each of § 1345(d)(2)(A) and (B)'s subparts are "Proposed regulations" and "Final regulations"—a clear indication that Congress wanted rules published. 33 U.S.C. § 1345(d)(2)(A)(i)–(ii), (B)(i)–(ii). Subparagraph (C)'s heading is simply "Review," the only task that its plain language directs EPA to undertake. *Id.* § 1345(d)(2)(C).

[33] *See, e.g.*, *City & Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation modified)). Plaintiffs (at 30) are thus wrong to assert "no rule of statutory interpretation . . . establishes that 'for the purpose of' has a different effect than 'and'" followed by relevant verbs. The district court, in fact, based its conclusion on a canon courts have invoked "time and time again." *San Francisco*, 604 U.S. at 344.

§ 1345(d)(1). Those rules must "identify uses for sludge, including disposal," *id.* § 1345(d)(1)(A), and those uses define the scope of EPA's rules for toxic pollutants under § 1345(d)(2). *Id.* § 1345(d)(2)(A)(i) (regulations must "establish numerical limitations . . . for *each use identified under paragraph (1)(A)*" (emphasis added)). Plaintiffs' reading of § 1345(d)(2)(C) would thus put two intertwined rulemaking provisions on different cycles, an implausible outcome that Congress could not have intended. *See U.S. Sugar Corp. v. EPA,* 113 F.4th 984, 994 (D.C. Cir. 2024) (rejecting EPA interpretation of the Clean Air Act that would not "allow[] all parts of Section 112 to function as a harmonious whole" (citation modified)).

### C. Plaintiffs' interpretation is inconsistent with the Clean Water Act's approach to rulemaking.

Finally, the Court should reject Plaintiffs' implausible reading of § 1345(d)(2)(C) because it would transform the provision into the only instance where EPA has no discretion over whether to revise Clean Water Act rules. In general, the agency "has discretion to determine the timing and priorities of its regulatory agenda." *New York v. EPA*, 921 F.3d 257, 298 (D.C. Cir. 2019) (quoting *WildEarth Guardians v. EPA*, 751 F.3d 649, 651 (D.C. Cir. 2014)). Congress had no need to use additional

qualifiers (*e.g.* “if appropriate”) to preserve EPA’s discretion, as Plainfield Township *et al.* argue (at 27), because § 1345(d)(2)(C) imposes no obligation to take any specific regulatory action. *See supra* Section I.A., B.

Plaintiffs nonetheless infer from language defining a review’s “purpose” that Congress meant to depart from its normal practice of giving EPA control of its rulemaking schedule. Congress, however, “does not . . . hide elephants in mouseholes” by using “vague terms” to make major changes in how statutes function. *Whitman v. Am. Trucking Ass’ns*, 531 U.S. 457, 468 (2000). Here, Congress did not use language defining the scope of a review to strip EPA of the ability to identify regulatory priorities and ensure that sound regulatory decisions on issues of nationwide importance are based on a well-developed public record.

## II. EPA has discretion to determine whether PFAS in sewage sludge must be regulated.

Even if § 1345(d)(2)(C) somehow required EPA to do anything other than review its regulations, the district court would still lack jurisdiction to compel the agency to regulate PFAS in sewage sludge. EPA is in the middle of assessing the risks PFAS in sewage sludge may pose and has

yet to find that any PFAS meet the Clean Water Act's threshold for regulation. Making such a determination is inherently discretionary, but Plaintiffs' position would reassign this task to a district court and call on a judge to make an assessment.[34] This Court should reject such an interpretation.[35]

### A. Scientific and policy determinations about the need to regulate are discretionary.

Citizen suits do not provide a forum for private actors to compel courts to resolve the scientific and policy matters Congress assigned to EPA. Citizens can compel the agency to undertake only an "act or duty . . . which is not discretionary." 33 U.S.C. § 1365(a)(2). Thus, a plaintiff can only "compel the Administrator to perform purely ministerial acts,"

---

[34] *See, e.g.*, Plaintiffs' Br. 2 (plaintiffs "have the right to present the factual evidence . . . that certain PFAS meet the statutory criteria requiring regulation"); Second Am. Compl. ¶¶ 81–87 and Prayer for Relief ¶ C [JA32–38] (identifying scientific studies and demanding relief requiring EPA "to regulate the PFAS" identified in the complaint).

[35] The Court may affirm the judgment below on these grounds even though the district court did not address this issue. Whether Plaintiffs seek to enforce is a nondiscretionary implicates the district court's subject matter jurisdiction, *Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020) (interpreting the Clean Air Act's identical citizen suit provision), that may be raised for the first time on appeal. *See Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 571 (2004) (A challenge to subject matter jurisdiction can be made "even for the first time on appeal.").

*Env't Def. Fund v. Thomas (EDF)*, 870 F.2d 892, 899 (2d Cir. 1989) (interpreting identical language in the Clean Air Act),[36] and cannot ask "a court to exercise judgment that is properly vested in the executive branch." *Sanitary Bd. of City of Charleston v. Wheeler*, 918 F.3d 324, 331 (4th Cir. 2019). Citizen suits thus call on district courts to do no more than make a "clear-cut factual determination of whether a violation did or did not occur," *Sierra Club*, 828 F.2d at 791, not make scientific judgments.

The Court should join its sister circuits by holding that private litigants may not conscript courts to make the very judgment calls that this Court has long recognized as discretionary and worthy of deference. This Court has repeatedly affirmed that resolving scientific and policy questions is a matter of agency discretion that courts ordinarily should not resolve on their own. *See, e.g.*, *Cboe Global Markets, Inc. v. SEC*, 155 F.4th 704, 722 (D.C. Cir. 2025) ("Congress vested agencies—not courts—with the authority to make discretionary policy judgments."); *U.S. Sugar*

[36] *See also Citizens for Const. Integrity v. United States*, 70 F.4th 1289, 1298 (10th Cir. 2023) ("[C]itizen suit provisions serve a more limited, mandamus-like role of ensuring that agencies perform required tasks." (synthesizing case law from multiple circuits)).

*Corp. v. EPA*, 113 F.4th 984, 999 (D.C. Cir. 2024) ("[T]his Court has generally acknowledged that EPA may exercise discretion and utilize its expertise" when determining how to use scientific data.).[37] For this reason, EPA's "evaluation of scientific data within [the agency's] technical expertise" receives "an extreme degree of deference." *Ctr. for Biological Diversity v. EPA*, 141 F.4th 153, 175 (D.C. Cir. 2025) (citation modified).

Consistent with this principle, other courts of appeals have rejected citizen suits attempting to enforce duties that are contingent on EPA making a scientific judgment. The Second Circuit rejected a Clean Air Act citizen suit seeking a judicial determination that certain air pollution standards were inadequate so that EPA would have a duty to revise them, explaining that the demand for relief would have required a court to exercise "the sort of scientific judgment that is the hallmark of agency

---

[37] *Accord Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 182 (2025) (reviewing court "must be at its 'most deferential'" when assessing a decision based on an agency's "speculative assessments or predictive or scientific judgments"); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024) ("[J]udicial review of agency policymaking and factfinding [must] be deferential.").

discretion." *EDF*, 870 F.2d 892 (citation modified).[38] The Fourth Circuit similarly affirmed dismissal of a citizen suit where EPA's duty to act was contingent on the agency first "bring[ing] its own understanding of the most recent science to bear," explaining that this undertaking was "a paradigmatic example of agency discretion." *Charleston*, 918 F.3d at 332. Allowing the suit to proceed, the court explained, "would erode the discretion inherent in the agency's authority" under the Clean Water Act. *Id.* at 333. Similarly, the Ninth Circuit rejected an attempt to compel EPA to act under the Clean Air Act where EPA's duty turned on determining whether certain emission controls were feasible. *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978). That determination, the court explained, "requires the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary." *Id.*

District judges in this Circuit have similarly dismissed citizen suits that would have required courts to make scientific determinations

---

[38] *See also NRDC v. Thomas*, 885 F.2d 1067, 1074–75 (2d Cir. 1989) (affirming dismissal of citizen suit seeking to compel EPA to list hexavalent chromium as a hazardous air pollutant while the agency's assessment was ongoing).

Congress assigned to EPA. In *Zook v. McCarthy*, the court dismissed a suit seeking to compel EPA to list and regulate certain pollutants under a provision of the Clean Air Act requiring EPA to regulate substances that "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare," 42 U.S.C. § 7408(a)(1)(A). 52 F. Supp. 3d 69, 75 (D.D.C. 2014). The court cautioned that "granting plaintiffs' requested relief would improperly usurp EPA's exclusive authority to make the substantive judgment" whether a pollutant meets this risk-based standard. *Id.* In *Gunpowder Riverkeeper v. Regan*, the court also dismissed a suit attempting to compel EPA to reject a proposed water quality measure, concluding that the Clean Water Act "leaves that decision to the scientific judgment of the agency." 2021 WL 3722714, at *3 (D.D.C. Aug. 23, 2021). In short, no plaintiff may sue EPA to take an action contingent on a scientific determination the agency has not yet made.

### B. Determining whether to regulate PFAS is a scientific and policy question Congress assigned to EPA, not courts.

Decisions about regulation of pollutants—including PFAS—that may be present in sewage sludge require the resolution of complicated

scientific questions—a "paradigmatic example of agency discretion." *Charleston*, 918 F.3d at 332. Even if Plaintiffs (at 25) are correct that the Clean Water Act sets "a low evidentiary bar" for regulation, Congress charged only "the Administrator" with making this call based on "available information on [the pollutant's] toxicity, persistence, concentration, mobility, or potential for exposure." 33 U.S.C. § 1345(d)(2)(A)(i).

Experience shows that assessing this evidence demands an exercise of scientific judgment and expertise that "warrant[s] significant discretion on the part of the agency." *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 406 (D.C. Cir. 1994) (reviewing the Part 503 biosolids rules).[39] EPA's 1993 determination that ten pollutants met the Act's standard for regulation was the product of a robust assessment of "the pollutants' general toxicity and persistence, as well as the particular pathways by which they might cause harm to human health or the environment." *Id.* at 395. This last task proved particularly complex, requiring EPA to select from "[h]undreds of models for fate, transport,

---

[39] To be sure, that discretion is not limitless, and it is the courts' role to "ensure that agencies exercise their discretion consistent" with the limits Congress prescribes by statute. *Loper Bright*, 603 U.S. at 404.

and dispersion" of pollutants in the environment. 58 Fed. Reg. 9248, 9273 (Feb. 19, 1993), *see also id.* at 9274 (describing agency's assumptions for assessing exposure from food consumption). The agency's assessment also made a variety of assumptions to estimate risks, many of which were "based on longstanding Agency policy and reflect risk management choices." *Id.* at 9273.

The Plaintiffs seek relief that would short-circuit EPA's similarly complex evaluation of the risks that PFAS may pose. As noted above (at 15–16), EPA's risk assessment for PFOA and PFOS is ongoing, and such a scientific evaluation is not the type of "clear-cut factual determination[]" courts may resolve in this or any other citizen suit. *Sierra Club*, 828 F.2d at 791.

## III. The adequacy of EPA's biennial reviews is not at issue in this case.

Despite abandoning all claims other than the cause of action to compel EPA to promulgate PFAS regulations, Plaintiffs nonetheless ask the Court to find that EPA's biennial reports "do not fulfill EPA's biennial review duty." Plaintiffs' Br. 32. Plaintiffs effectively attack the adequacy

of these reports, an issue that is not properly before this Court for two reasons:

*First*, the biennial reports are not subject to review through the causes of action Plaintiffs pled.[40] The Clean Water Act's citizen suit provision only allows claims for EPA's failure to perform a nondiscretionary duty, 33 U.S.C. § 1365(a)(2); it "cannot be employed to challenge the substance or content of an agency action." *Scott v. City of Hammond*, 741 F.2d 992, 996 (7th Cir. 1984). Thus, Plaintiffs cannot use a citizen suit to secure judicial review of whether EPA's biennial reports were "adequate in the first instance." *Charleston*, 918 F.3d at 333.

Nor can the Plaintiffs obtain review under the Administrative Procedure Act, which allows review of only "final agency action," 5 U.S.C. § 704. *See Soundboard Ass'n v. Fed. Trade Comm'n*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) ("[W]ithout final agency action, there is no doubt that appellant would lack a cause of action under the APA." (citation modified)). The district court held below that EPA's biennial reports do

[40] Second Am. Compl. ¶¶ 68–90 [JA29–38] (asserting claims under 33 U.S.C. § 1365(a)(2) and 5 U.S.C. § 706(2)(A)).

*not* constitute final agency action,[41] and Plaintiffs declined to challenge this holding. Plaintiffs' Br. at 20 ("[T]his brief does not address the District Court's conclusion that the biennial reports do not constitute a final agency action . . . ."). Having forfeited this argument, the reports remain unreviewable under the Administrative Procedure Act. *See, e.g.*, *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1341 (D.C. Cir. 2023) (party forfeited argument omitted from its opening brief).

*Second*, this Court cannot assess the biennial reviews' adequacy because the district court never decided this question. As the Federal Appellees explain (at 26–27), Plaintiffs never asserted a claim that EPA failed to fulfill its review obligation in the district court. Even if they had, the district court had no occasion to address this question because it dismissed Plaintiffs' claims on other grounds. *See* Mem. Op. 5–7 [JA44–46] (dismissal for lack of subject matter jurisdiction (Clean Water Act) and lack of final agency action (Administrative Procedure Act); Fed. Appellees' Br. 27.

This Court "does not consider an issue not passed upon below," except in circumstances not found here. *Kingman Park Civic Ass'n v.*

[41] *See* Mem. Op. 8–9 [JA47–48].

*Williams*, 348 F.3d 1033, 1039 (D.C. Cir. 2003) (quoting *Singleton v. Wulff,* 428 U.S. 106, 120 (1976)). Assessing the adequacy of EPA's reviews would require the Court to scrutinize the biennial reports, as well as an administrative record that has not been compiled. *See* Def's Mem. Supp. Mot. to Dismiss 1 n.1 [JA52] (noting that an administrative record has not been prepared). Such a fact-intensive analysis does not present the type of purely legal issue that this Court may consider absent a decision from a district court. *See Liff v. Off. of Inspector Gen. for U.S. Dep't of Lab.*, 881 F.3d 912, 919 (D.C. Cir. 2018) (noting exceptions for a "recurring question of federal law," "the clear inapplicability of a statute," or a "straightforward legal question." (citation modified)).

## CONCLUSION

Decisions concerning whether, when, and how to regulate pollutants under 33 U.S.C. § 1345 are weighty ones that affect critical infrastructure and the provision of vital public health and environmental services in every U.S. city and town. Recognizing these stakes, Congress tasked EPA with making these determinations, thereby ensuring they would be the product of the agency's expertise, public input, and a robust scientific record. Plaintiffs' attempt to re-write the Clean Water Act would reassign this function to courts, which possess neither the expertise nor the ability to engage stakeholders to make these decisions based on the best science and factual record. The district court correctly dismissed Plaintiffs' lawsuit because the Act's plain language unambiguously gives this task only to EPA.

The Court should affirm that judgment.

Date: August 26, 2026

Respectfully submitted,

*/s/ Andrew C. Silton*

Andrew C. Silton
James B. Slaughter
Allyn L. Stern
BEVERIDGE & DIAMOND, P.C.
1900 N Street, N.W., Suite 100
Washington, DC 20036

(202) 789-6000
asilton@bdlaw.com
*Counsel for Intervenor for Defendant-Appellee National Association of Clean Water Agencies*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the word limit of Fed. R. App. P. 32 (a)(7)(B), because it contains 8948 words, excluding the parts of the filing exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) as it was prepared using Microsoft Word in Century Schoolbook 14-point font and is double-spaced, with the exception of headings, footnotes, and block quotations.

*/s/ Andrew C. Silton*
Andrew C. Silton
*Counsel for Intervenor for Defendant-Appellee National Association of Clean Water Agencies*