**ORAL ARGUMENT NOT YET SCHEDULED**
No. 25-5431

---

# United States Court of Appeals for the D.C. Circuit

---

JAMES FARMER, et al.
*Plaintiffs-Appellants,*

*v.*
ENVIRONMENTAL PROTECTION AGENCY, et al.
*Defendant-Appellees*

NATIONAL ASSOCIATION OF CLEAN WATER AGENCIES
*Intervenor below*

---

Appeal from the United States District Court for the District of Columbia
No. 24-cv-01654-DLF (Hon. Dabney L. Friedrich)

---

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS**

---

LAURA DUMAIS
PAULA DINERSTEIN
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337
ldumais@peer.org / pdinerstein@peer.org

*Counsel for Plaintiffs-Appellants James Farmer, Robin Alessi, Tony Coleman, Karen Coleman, Patsy Schultz, Johnson County (TX), Maine Organic Farmers and Gardeners Association, Potomac Riverkeeper Network*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

**A. Parties, Intervenors, and Amici:**

**Plaintiffs-Appellants** are (1) James Farmer, (2) Robin Alessi, (3) Patsy Schultz, (4) Karen Coleman, (5) Tony Coleman, (6) Johnson County, Texas, (7) the Maine Organic Farmers and Gardeners Association, and (8) Potomac Riverkeeper, Inc. d/b/a Potomac Riverkeeper Network.

The individual Appellants are farmers and ranchers in Johnson County, Texas negatively affected by the land application of sewage sludge on neighboring property. Appellant Johnson County, Texas is the county in which they live. It has a large agricultural presence and has diverted significant financial resources in recent years to investigating environmental contamination due to the land application of biosolids, helping its residents deal with such contamination, and protecting its residents from future contamination.

The Maine Organic Farmers and Gardeners Association (MOFGA) and the Potomac Riverkeeper Network (PRKN) are nonprofit organizations, and neither has any parent corporation or any publicly held corporation that owns 10% or more of its stock. *See* Fed. R. App. P. 26; D.C. Cir. R. 26.1(a). MOFGA serves over 15,000 dues-paying members and its mission is to educate about and advocate for organic agriculture. In recent years, it has been heavily involved in assisting farmers whose land has been contaminated by PFAS from land-applied sewage sludge. PRKN has approximately 2,000 members who reside throughout the

Potomac River watershed, and is dedicated to protecting, conserving, and restoring the Potomac River and its watershed and resources.

**Defendants-Appellees** are (1) the United States Environmental Protection Agency, and (2) Lee Zeldin, in his capacity as Administrator of the U.S. Environmental Protection Agency. Pursuant to Fed. R. App. P. 43(c)(2), Mr. Zeldin automatically substituted for former EPA Administrator Michael S. Regan, the named official at the time Plaintiffs filed the case below.

**Intervenor Defendant:** The U.S. District Court allowed the National Association of Clean Water Agencies to intervene and to submit briefing in support of EPA's motion to dismiss.

**Amici:** The identity of any amici is unknown at this time.

**B. Rulings Under Review**

The decision at issue on appeal is the United States District Court for the District of Columbia's September 29, 2025 Memorandum Opinion and Order granting defendants' Motion to Dismiss Plaintiffs' Complaint. JA 40-49.

**C. Related Cases**

Undersigned counsel are not aware of any related cases.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF CONTENTS ........................................................................ iii

TABLE OF AUTHORITIES ......................................................................v

INTRODUCTION ........................................................................................1

JURISDICTIONAL STATEMENT ..........................................................3

ISSUE PRESENTED..................................................................................3

STANDING ...............................................................................................4

STATUTES AND REGULATIONS ..........................................................6

STATEMENT OF THE CASE....................................................................6

I. The Treatment of Wastewater Concentrates Toxic Substances in Sewage Sludge, Most of Which is Disposed of by Spreading on Land. ...........................................................................6

II. PFAS are Highly Toxic and Persistent Chemicals..............................8

III. EPA has Long Ignored the Clean Water Act Mandate to Keep America Safe from Toxics in Sewage Sludge.....................................11

A. Congress's repeated attempts to get EPA to regulate sludge ...........................................................................11

B. EPA's Part 503 sewage sludge regulations...............................15

C. EPA's "biennial reports"..........................................................18

IV. Procedural History and Anticipated Narrowing Upon Remand .........20

SUMMARY OF THE ARGUMENT ........................................................20

STANDARD OF REVIEW ......................................................................21

ARGUMENT ...........................................................................................22

I. The District Court Erred in Dismissing Plaintiffs-Appellants' Case Due to an Incorrect Conclusion that the Biennial Review Provision, 33 U.S.C. § 1345(d)(2), Lacked Deadlines. ......................22

A. The statute's plain language requires EPA, every two years, to identify additional toxic pollutants in sludge that meet the statutory criteria and regulate them. ........................................22

B. The statute's history and purpose further demonstrate that EPA's duties of "identifying" and "regulating" are biennial. ..........................................................................25

C. Courts have recognized the importance of updating standards to protect public health. ...........................................28

D. The District Court's reasoning was flawed..............................29

1. The phrase "for the purpose of" is not limited to future conduct. ..............................................................29

2. Congress's use of "for the purpose of" rather than "and" is not dispositive. .................................................30

II. EPA's Biennial Reports, which merely gather preliminary information, do not fulfill EPA's biennial review duty. .....................32

CONCLUSION .........................................................................................33

CERTIFICATE OF COMPLIANCE .......................................................35

CERTIFICATIE OF SERVICE ...............................................................36

## TABLE OF AUTHORITIES

**Cases**

*Am. Water Works Ass'n, et al., v. EPA, et al.*,
D.C. Cir. Case No. 24-1188, (March 6, 2026) .............................................. 9, 10

*Banneker Ventures, LLC v. Graham*,
798 F.3d 1119, (D.C. Cir. 2015) ......................................................................21

*Boyce v. Augusta-Richmond County*,
111 F. Supp. 2d 1363 (S.D. Ga. 2000) ...............................................................17

*Center for Biological Diversity v. EPA*,
794 F. Supp. 2d 151, (D.D.C. 2011) ...................................................................31

*City of Olmsted Falls, OH v. FAA*,
292 F.3d 261, (D.C. Cir. 2002) ...........................................................................5

*Cmty. Voice v. EPA,*
878 F.3d 779, (9th Cir. 2017) ............................................................................28

*Cnty. Sanitation Dist. No. 2 v. Cnty. of Kern*,
127 Cal. App. 4th 1544, (2005)...........................................................................17

*Davis v. Mich. Dept. of Treasury*,
489 U.S. 803, (D.C. Cir. 1989)...........................................................................26

**Del. Dep't of Natural Res. & Envtl. Control v. EPA*,
895 F.3d 90, (D.C. Cir. 2018) ............................................................................22

*Dep't of Commerce v. U.S. H.R.*,
525 U.S. 316, (D.C. Cir. 1999)...........................................................................26

*Earth Island v. Regan*,
553 F. Supp. 3d 737, (N.D. Cal. 2021) ..............................................................28

* Authorities upon which we chiefly rely are marked with asterisks.

*Ecological Rights Found. v. Pacific Lumber Co.*,
230 F.3d 1141, (9th Cir. 2000)....................................................................11

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120, (D.C. Cir. 2000)....................................................................25

*Friends of the Earth v. EPA*,
934 F. Supp. 2d 40, (D.D.C. 2013) .............................................................. 30, 31

*Gearhart v. Whitman,*
Civ. No. 89–6266–HO (D. Ore.) ....................................................................15

INS v. Cardoza-Fonseca,
480 U.S. 421, (D.C. Cir. 1987)....................................................................27

*K Mart Corp. v. Cartier, Inc.*,
486 U.S. 281, (D.C. Cir. 1988)....................................................................23

*Leather Indus. of Am. v. EPA*,
40 F.3d 392, (D.C. Cir. 1994) ......................................................................16

*Muscogee (Creek) Nation v. Hodel*,
851 F.2d 1439, (D.C. Cir. 1988) ....................................................................27

*Nat. Res. Def. Council v. Env't Protection Agency,*
464 F.3d 1, (D.C. Cir. 2006) ..........................................................................4

*NRDC v. EPA*,
790 F.2d 289, (3d Cir. 1986) ...................................................................... 7, 12

*People for the Ethical Treatment of Animals v. USDA*,
797 F.3d 1087, (D.C. Cir. 2015) ......................................................................5

*Robinson v. Shell Oil Co.,*
519 U.S. 337, (D.C. Cir. 1997)................................................................. 22, 25

*Sierra Club v. EPA*,
292 F.3d 895, (D.C. Cir. 2002) ........................................................................5

*U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*,
508 U.S. 439, (D.C. Cir. 1993)....................23

*United States* v. *Am. Trucking Ass'ns., Inc.*,
310 U. S. 534, (D.C. Cir. 1940)....................23

**Statutes**

28 U.S.C. § 1291....................3

28 U.S.C. § 1331....................3

28 U.S.C. § 1346(a)(2)....................3

28 U.S.C. § 1361....................3

28 U.S.C. § 2107 (b)(2)....................3

28 U.S.C. § 2201(a)....................3

28 U.S.C. § 2202....................3

33 U.S.C. § 1345....................7

33 U.S.C. § 1345 (1972)....................14

*33 U.S.C. § 1345(d).................... 16, 31

33 U.S.C. § 1345(d) (1977).................... 14, 18, 35

33 U.S.C. § 1345(d)(1).................... 16, 31, 35

33 U.S.C. § 1345(d)(2).................... 17, 35

33 U.S.C. § 1345(d)(2)(A).................... 17, 31, 34

*33 U.S.C. § 1345(d)(2)(A)(i).................... 17, 30, 31, 41

*33 U.S.C. § 1345(d)(2)(B) .......................................................... 17, 31, 34

*33 U.S.C. § 1345(d)(2)(C) ........................................... 1, 4, 17, 26, 30, 31, 34, 35

33 U.S.C. § 1345(d)(2)(C) (1977) ........................................................................18

33 U.S.C. § 1345(d)(2)(D) .................................................................................17

33 U.S.C. § 1365(a)(2) ................................................................................. 3, 28

33 U.S.C. § 1414b ............................................................................................16

42 U.S.C. § 7571(a)(2)(A) .................................................................................38

**Regulations**

40 C.F.R. § 141.5 ..............................................................................................10

40 C.F.R. § 141.61, Table 2 (c)(2) ......................................................................10

40 C.F.R. § 503 ....................................................................................................8

40 C.F.R. § 503.9(w) ..............................................................................................6

**Federal Register Notices**

46 Fed. Reg. 9408 (Jan. 28, 1981) ........................................................................8

58 Fed. Reg. 9248 (Feb. 19, 1993) ......................................................................19

68 Fed. Reg. 61083 (Oct. 24, 2003) .....................................................................18

68 Fed. Reg. 75531 (Dec. 31, 2003) .....................................................................22

89 Fed. Reg. 39124 (May 8, 2024) .......................................................................13

90 Fed. Reg. 16128 (April 17, 2025) ....................................................................12

90 Fed. Reg. 3864 (Jan. 15, 2025) .......................................................................11

**Legislative History**

Rep. Stangeland, 134 Cong Rec H 10473 (Oct. 19, 1988) .................................... 13

**Other Authorities**

Christopher J. Conrad, *Sewage Sludge and Land Application Practices: Do the Section 503 Standards Guarantee Safe Fertilization Usage*, 9 Penn St. Envtl. L. Rev. 147 (2000) ............................................................................................ 16

E. Harrison et al., *The Case for Caution: Recommendations for Land Application of Sewage Sludge and an Appraisal of the US EPA's Part 503 Sludge Rules*. Cornell Waste Management Inst., Working Paper (Aug. 1997, revised Feb. 1999) ............................................................................................ 16

EPA IG Report No. 2000-P-10 (March 20, 2000) .................................................. 16

EPA IG Report No. 2000-P-10 (March 28, 2002) ........................................... 16, 17

EPA IG Report No. 14-P-0363 (Sept. 2014) ........................................................ 19

*EPA IG Report: No. 19-P-0002 (Nov. 15, 2018) .......................................... 19, 33

EPA, *1988 National Sewage Sludge Survey*, www.epa.gov/biosolids/1988-national-sewage-sludge-survey, last accessed March 13, 2026 .......................... 15

EPA, *2001 National Sewage Sludge Survey,* available at: https://www.epa.gov/biosolids/2001-national-sewage-sludge-survey, last accessed March 11, 2026 ......................................................................... 17

EPA, *Basic Information about Sewage Sludge and Biosolids*, www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids .... ........................................................................................................... 7, 8

NRC, *Biosolids Applied to Land: Advancing Standards and Practices* (July 2002), 3, available at *www.nationalacademies.org/read/10426* .................................... 17

Ruckelshaus Letter to Sen. Stafford, June 28, 1983 ............................................... 13

Ruckelshaus Letter to Sen. Stafford, May 22, 1984 ............................................... 13

See EPA, *Biennial Reviews of Sewage Sludge Standard,* including links to each of the nine reports, available at www.epa.gov/biosolids/biennial-reviews-sewage-sludge-standards, last accessed March 16, 2026 .......................................... 18, 32

U.S. Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls*, U.S. Dep't of Health & Human Serv., 5–6 (May 2021) ............9

William Goldfarb et al., *Unsafe Sewage Sludge or Beneficial Biosolids?: Liability, Planning, and Management Issues Regarding the Land Application of Sewage Treatment Residuals,* 26 B.C. Envtl. Aff. L. Rev. 687 (1999).............................16

*Authorities upon which we chiefly rely are marked with asterisks.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| CWA | Clean Water Act |
| EPA | Environmental Protection Agency |
| IG | Inspector General |
| PFAS | Per- and polyfluoroalkyl substances |
| PFOA | Perfluorooctanoic Acid |
| PFOS | Perfluorooctane Sulfonic Acid |
| ppb | Parts per billion |
| FTE | Full time equivalent position |

## INTRODUCTION

The Clean Water Act (CWA) requires the Environmental Protection Agency (EPA) to review its sewage sludge regulations every two years "for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants" consistent with the statute's other mandates. 33 U.S.C. § 1345(d)(2)(C) ("the biennial review provision"). The District Court erred in interpreting the words "for the purpose of" as divorcing the actions of "identifying" and "regulating" from the provision's two-year timeline. Based on this interpretation, the District Court dismissed the case, finding that even assuming that the CWA requires EPA to identify and regulate additional pollutants, it does not specify a date-certain deadline for doing so, meaning there is no cause of action under the CWA's citizen suit provision. This flawed interpretation contravenes the statute's plain language, structure, purpose, and historical context. The decision has dangerous real-world consequences for public health, and it blocks the public's right to seek redress through the CWA citizen suit provision when evidence exists that a toxic pollutant in sewage sludge meets the criteria under which the statute requires EPA to regulate it.

EPA has not identified any new toxic substances for regulation (through its biennial review process or otherwise) since its initial and sole round of regulation in 1993. This is *not* because EPA has concluded, through its biennial reviews, that

no substances in sludge meet the statutory criteria requiring regulation and thus the regulations are adequate to ensure that America's sewage disposal methods are safe. Rather, it is because EPA has never used its biennial review process for the purpose of identifying toxic pollutants requiring regulation and regulating them, as the statute requires. Instead, every two years EPA simply gathers information about pollutants in sludge. It treats the question of whether the regulations should be updated as a future step it can take at an undefined and unenforceable time – a time that has never come in the thirty-three years since promulgating them.

This lawsuit focuses on per- and polyfluoroalkyl substances (PFAS), known as "forever chemicals" due to their exceptional persistence in the environment and in living things. A well-established body of scientific evidence has long shown that PFAS pose significant health risks at miniscule amounts and are present at dangerous levels in the sewage sludge spread on American land as fertilizer and in the soil, water, crops, and animals where sludge spreading occurs. The Texas ranchers, their county, and the nonprofits that brought this case have the right to present the factual evidence supporting their claims that certain PFAS meet the statutory criteria requiring regulation. Congress made EPA's biennial duty to identify and regulate toxic pollutants in sewage sludge mandatory in the CWA and enforceable through its citizen suit provision.

This Court should find that EPA's biennial mandatory duty is to identify all

substances that, at the time of the review, meet the statutory criteria for regulation and regulate them. It should reverse the dismissal and remand.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction over the action pursuant to 28 U.S.C. §§ 1331 (federal question), § 1346(a)(2) (federal defendant), § 1361 (action to compel federal employee), as well as pursuant to the Clean Water Act, 33 U.S.C. § 1365 (a)(2) (citizen suit provision). The District Court had jurisdiction to issue a declaratory judgment under 28 U.S.C. § 2201(a) and grant further relief under 28 U.S.C. § 2202.

This Court has jurisdiction over appeals from final decisions of the District Court. 28 U.S.C. § 1291. Plaintiffs-appellants timely filed this appeal on November 25, 2025, within 60 days of the September 29, 2025 entry of decision on appeal, JA 40-49. *See id*. § 2107 (b)(2)-(3) (where a party is a United States agency or officer sued in an official capacity, requiring filing within 60 days from the entry of decision). The judgment on appeal disposed of all parties' claims.

## ISSUE PRESENTED

Whether the District Court erred in dismissing the case for lack of jurisdiction due to the purported lack of a clear deadline to identify and regulate toxic pollutants in sewage sludge in the CWA's biennial review provision, 33 U.S.C. § 1345(d)(2)(C).

## STANDING

Pursuant to D.C. Circuit Rule 28(a)(7), a standing analysis is required only for cases coming before this Court on direct review. No party challenged Plaintiffs-Appellants' standing below, nor did the District Court address it. However, in an abundance of caution, we briefly address it.

Plaintiffs-Appellants James Farmer, Robin Alessi, Tony and Karen Coleman, and Patsy Schultz are landowners and ranchers in Grandview, Texas. Their injuries in fact include the spreading of sludge on adjacent land that resulted in extremely high levels of PFAS contamination (with no other plausible source) on their property and in the tissues of farm animals that suddenly died after the application, while they themselves experienced various health problems potentially linked to PFAS exposure. JA 16-18 (Compl. ¶¶ 21-33). Sludge is available and actively marketed in their community and they fear future contamination from additional spreading. JA 19 (Compl. ¶¶ 34-35). This Court has recognized that increased risk of injury from an agency's failure to properly regulate can constitute injury redressable by proper regulation. *Nat. Res. Def. Council v. EPA,* 464 F.3d 1, 6-7 (D.C. Cir. 2006).

Plaintiff-Appellant Johnson County, Texas is the county in which the ranching plaintiffs live and where PFAS contamination from sludge occurred. JA 19-20 (Compl. ¶ 36). The County has expended significant resources investigating

the contamination and assisting the ranching family plaintiffs and other residents affected. *Id.* A local government can sue the federal government when unregulated environmental hazards result in economic impacts in the government's jurisdiction. *City of Olmsted Falls, OH v. FAA*, 292 F.3d 261, 268 (D.C. Cir. 2002).

Organizations can establish organizational standing based on direct injury to the organization (as in *People for the Ethical Treatment of Animals v. USDA*, 797 F.3d 1087, 1094 (D.C. Cir. 2015)) or associational standing when at least one of its members has standing to sue in his own right and the interests it seeks to protect are germane to its purpose (as in *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)). Plaintiff-Appellant Maine Organic Farmers and Gardeners Association is a nonprofit that has expended substantial personnel time and money testing for PFAS pollution from land-applied sludge impacting its members' property and assisting impacted farmers, including seven operations that had to pause sales due to the severity of PFAS contamination and two that had to close entirely. JA 20-21 (Compl. ¶ 37). It had to install a filtration system on its own wells, which were also impacted by PFAS contamination. *Id*. It has both organizational and associational standing. Plaintiff-Appellant Potomac Riverkeeper Network is a nonprofit dedicated to protecting clean water and enhancing the use and enjoyment of the Potomac and Shenandoah watersheds. JA 21-22 (Compl. ¶ 38). It has associational standing as several of its members have ceased recreational activities they used to

enjoy, such as fishing and boating, within certain water bodies in the Potomac River watershed due to concerns about PFAS contamination from land-applied biosolids in adjacent and upstream farm fields. *Id*.

## STATUTES AND REGULATIONS

The Addendum (ADD) contains relevant statutes and regulations. The most important is the provision of the Clean Water Act governing "Disposal or use of sewage sludge," 33 U.S.C. § 1345 (CWA Section 405). The ADD includes the current version (enacted in 1987), along with its two predecessor versions from 1977 and 1972.

## STATEMENT OF THE CASE

### I. The Treatment of Wastewater Concentrates Toxic Substances in Sewage Sludge, Most of Which is Disposed of by Spreading on Land.

All the waste sent down the sewer, including industrial, hospital, military, commercial, and human waste, landfill leachate, and storm water runoff, ends up at wastewater treatment plants. JA 10-11 (Compl. ¶ 5). The treatment process results in (1) a liquid effluent that, provided it meets CWA discharge standards, is expelled into surface waters and (2) sewage sludge, the "solid, semi-solid, or liquid residue generated during the treatment of domestic sewage in a treatment works." 40 C.F.R. § 503.9(w).

During the process of treating the wastewater to make it clean enough to release into surface waters, many toxic substances, including heavy metals, PFAS,

and other synthetic chemicals bind to particles or microbial biomass and become concentrated in the leftover sludge. *See NRDC v. EPA*, 790 F.2d 289, 311-312 (3d Cir. 1986) (*citing* 46 Fed. Reg. 9408 (Jan. 28, 1981) (explaining how such concentration can cause serious problems including contaminating food and ground water).

The following EPA chart shows how America disposes of its sewage sludge:




*See* EPA, *Basic Information about Sewage Sludge and Biosolids*, available at www.epa.gov/biosolids/basic-information-about-sewage-sludge-and-biosolids, last accessed March 16, 2026.

As the chart shows, almost sixty percent of the nation's sewage sludge is

disposed of by being spread on land. *Id*. At some point, EPA began using the term "biosolids" to refer to sewage sludge approved for land application, *id*., but the Clean Water Act does not use this term, nor do EPA's sludge regulations, at 40 C.F.R. Part 503. Of the millions of dry metric tons of sewage sludge land-applied per year, 53% is on agricultural land, although EPA admits that figure could be much higher.[1] Overall, it is not known how many acres of food-producing land (farmland, rangeland, and home gardens combined) receive sludge per year, much less the food-related acreage where sludge has *ever* been spread, which is the relevant number for this lawsuit, as it concerns "forever chemicals" that contaminate the land for generations and have a cumulative impact with each additional application on the same land.

## II. PFAS are Highly Toxic and Persistent Chemicals.

PFAS are a class of thousands of dangerous chemicals known as "forever chemicals" due to the strong carbon-fluorine bonds that make them exceptionally persistent in the environment and in living things. JA 11 (Compl. ¶7) In a brief filed ten days ago in a different case, EPA acknowledged to this Court that PFAS

---

[1] See *id*., (showing a second pie chart entitled *Distribution of the reported end use of land applied sewage sludge from Biosolids Annual Reports covering 2024*.) The chart depicts the end use of land-applied sludge, with 53% categorized as "agricultural." In the text, EPA notes that sludge categorized as "distribution and marketing" (34.5% of land-applied sludge) can be applied to agricultural lands, as can the "reclamation" category (1.5% of land-applied sludge). *Id.*

"are known to be dangerous to humans (including children and fetuses); do not break down to become less dangerous over human lifespans" and "persist and accumulate in the environment, meaning that once released, they will remain for decades or even millennia." *Am. Water Works Ass'n, et al., v. EPA, et al.*, D.C. Cir. Case No. 24-1188, Final Br. of Respondent EPA at 1 (March 6, 2026). EPA further stated that "[a] large and robust body of scientific evidence indicates PFAS exposure can result in cancer and a broad range of other adverse health effects, including developmental, cardiovascular, liver, kidney, immune, endocrine, metabolic, reproductive, and musculoskeletal effects." *Id*. *See also* JA 11 (Compl. ¶ 7).[2] EPA has identified serious problems with PFAS exposure in at least three contexts relevant here.

First, in January 2025, EPA released a Draft Risk Assessment for two types of PFAS in biosolids. 90 Fed. Reg. 3859-3864 (Jan. 15, 2025): Draft Sewage Sludge Risk Assessment for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonic Acid (PFOS), ADD- 165-171. The assessment found "recent, well-documented examples of significantly elevated PFOA and PFOS concentrations in U.S. sewage sludge," *id*. at iv, and determined that biosolids containing just *1 part*

---

[2] *See also* U.S. Agency for Toxic Substances and Disease Registry, *Toxicological Profile for Perfluoroalkyls*, U.S. Dep't of Health & Human Serv., 5–6 (May 2021) (listing risks health risks including cancer, hormone disruption, liver and kidney damage, birth defects, developmental and reproductive harm, increased cholesterol, and immune system toxicity).

*per billion (ppb)* of PFOS or PFOA can pose human health risks exceeding EPA's acceptable risk thresholds by several orders of magnitude, *id*., Section 4 (Human Health Risk Characterization) and 5 (Land Application Scenarios).[3] Plaintiffs-Appellants should have the opportunity to present evidence that biosolids routinely contain PFOS and PFOA at concentrations much higher than 1 ppb.

Second, under the Safe Drinking Water Act, EPA determined that, for PFOS and PFOA in public drinking water systems, there is *no level below which they are considered safe*. 40 C.F.R. § 141.5. Given the practical obstacles to completely eliminating PFOS and PFOA, EPA set the maximum concentration level allowed at 4 parts per *trillion* each.[4] 40 C.F.R. § 141.61, Table 2 (c)(2). Evidence showing that sludge spreading contaminates well water with PFOS or PFOA levels over four parts per trillion should alone be sufficient to require EPA to regulate these substances in sludge pursuant to the biennial review provision. Plaintiffs-Appellants should have the opportunity to present evidence that biosolid spreading results in elevated PFAS levels in the well water and in blood serum levels of those

---

[3] EPA extended the comment deadline on the draft risk assessment twice (the last time through August, 2025, 90 Fed. Reg. 16128-16129 (April 17, 2025)), and has taken no further action; however, EPA's findings remain highly relevant.

[4] EPA also set a maximum contaminant level of 10 parts per trillion of other PFAS at issue in this lawsuit: PFHxS, PFNA, HFPO-DA (Gen X). *Id*. EPA is currently defending these regulations from a challenge by industry groups before this Circuit in the *American Water Works Association* case mentioned *supra* at 9.

living near areas spread with sewage sludge.

Third, EPA designated PFOS and PFOA as hazardous substances under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA). Final rule: Designation of PFOA and PFOS as CERCLA Hazardous Substances, 89 Fed. Reg. 39124 (May 8, 2024). EPA determined that these are "linked to a broad range of adverse health effects" including low birth weight, accelerated puberty, skeletal variations, liver tissue damage, immune system effects, and cancer. *Id*.

## III. EPA has Long Ignored the Clean Water Act Mandate to Keep America Safe from Toxics in Sewage Sludge

The CWA "not only regulates actual water pollution, but embodies a range of prophylactic, procedural rules designed to reduce the risk of pollution." *Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1152 n.12 (9th Cir. 2000). The provision at issue is one such prophylactic measure, designed to keep Americans safe from emerging threats in sewage sludge.

### A. Congress's repeated attempts to get EPA to regulate sludge

Congress's first mandate for EPA to regulate sewage sludge was in 1972, when it required EPA to "issue regulations governing the issuance of permits for the disposal of sewage sludge" using requirements applicable to Section 402 National Pollutant Discharge Elimination System permits. 33 U.S.C. § 1345 (1972), Pub. Law 92-500 (Oct. 1, 1972) (CWA Section 405), ADD- 007-008.

EPA having failed to do this, Congress amended the law in 1977 to require EPA to:

> *…develop and publish, within one year* after December 27, 1977, *and from time to time thereafter*, regulations providing guidelines for the disposal of sludge and the utilization of sludge for various purposes. Such regulations shall -- (1) identify uses for sludge, including disposal; (2) specify factors to be taken into account in determining the measures and practices applicable to each such use or disposal (including publication of information on costs); (3) identify concentrations of pollutants which interfere with such use or disposal.

33 U.S.C. § 1345(d) (1977) (emphasis added), Pub. Law 95-217 (Dec. 27, 1977), ADD- 005-006.

Almost a decade later, EPA had issued some regulations under other statutes, but not "the comprehensive standards for sludge disposal intended by section 405(d)." *NRDC v. EPA*, 790 F.2d 289, 313 (3d Cir. 1986) (cataloguing EPA's failures), *cert. denied*, 479 U.S. 1084 (1987). This, despite a promise from the Administrator, in response to a Senate Oversight Committee, that EPA could:

> commit at this time to promulgating within two years a basic regulation which will establish the programmatic framework for sludge management, list the significant pollutants found in sludge, list sludge uses, and specify factors to be taken into account in determining measures and practices to be applied to the various sludge uses and disposal practices, and issue concentration criteria for those key pollutants for which we now have adequate scientific information to develop regulatory standards.

*Id*. (citing Ruckelshaus Letter to Sen. Stafford, June 28, 1983). A year later, he assured Congress that work on sludge regulations was "well underway." *Id*. (Citing

Ruckelshaus Letter to Sen. Stafford, May 22, 1984).

At this time, Congress was working to ban America's former primary method of disposing of sewage sludge: ocean dumping.[5] The ban's secondary impact was of particular concern to Congress,[6] because shifting America's communal sewer, containing toxic concentrations of industrial, domestic, biological, and pharmaceutical hazards, from the ocean to (largely) farmland would require serious, ongoing regulation by EPA.

In 1987, Congress completely revamped the prior formulation of subsection 405(d) to add more stringent timelines and detailed criteria to identify toxic pollutants that, if met, *require* regulation. *See* Water Quality Act of 1987, Pub. L. No. 100-4, 101 Stat. 7 (Feb. 4, 1987), ADD- 001-004. In broad strokes: the updated regulation required EPA to start with two phases of regulation, then review the regulations biennially to identify and regulate additional substances. Subsection § 1345(d) is best read in its entirety, but the following is a breakdown of the portions most relevant for this appeal:

---

[5] The Ocean Dumping Ban Act, signed into law by President Ronald Regan, amended the Marine Protection, Research, and Sanctuaries Act of 1972 to prohibit the ocean disposal of sewage sludge. P.L. 100-688 (1988), 33 U.S.C. § 1414b

[6] *See, e.g.*, comments of Rep. Stangeland on the bill's conference report. Rep. Stangeland, 134 Cong Rec H 10473 (Oct. 19, 1988) (asking, "Where are we going to put all of this sewage sludge?" and emphasizing the need for ensuring the safety of alternative disposal methods.).

| | |
|---|---|
| § 1345(d)(1): Regulations | Retains some of the language of the prior version setting out what the sludge regulations must generally do, including the requirement to "develop and publish" regulations from time to time. |
| § 1345(d)(2): Identification and regulation of toxic pollutants | (A) Requires EPA to identify toxic pollutants that meet specified criteria[7] and propose regulations for them virtually immediately,[8] with finalization about **seven months** after the provision's enactment.<br>(B) Requires a second round of identification and proposed regulations within **six months** of the provision's enactment, with finalization **less than one year later**.<br>(C) Requires EPA to review the regulations **every two years** to identify and regulate additional pollutants "consistent with the requirements of this paragraph."<br>(D) Reminds EPA that the regulations EPA establishes through (A), (B), and (C) must be adequate to protect public health and the environment and must require quick compliance. |

The full version of § 1345(d)(2)(C), the biennial review provision, is:

> From time to time, but not less often than every 2 years, the Administrator shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph.

---

[7] EPA "shall identify those toxic pollutants which, on the basis of available information on their toxicity, persistence, concentration, mobility, or potential for exposure, may be present in sewage sludge in concentrations which may adversely affect public health or the environment…." 33 U.S.C. § 1345(d)(2)(A)(i).

[8] By November 30, 1986. The amendment was enacted in February 1987, so this compliance date was in the past, an oddity for which we have found no explanation. Perhaps it highlights Congress' understanding that EPA's sewage sludge regulations – as EPA had represented to Congress – were almost complete.

### B. EPA's Part 503 sewage sludge regulations

Having missed its deadline to finalize the first set of regulations by August 31, 1987, EPA faced a citizen suit, *Gearhart v. Whitman* [later *Reilly,* the new Administrator], Civ. No. 89–6266–HO (D. Ore.), resulting in a consent decree requiring EPA to act. *See* 68 Fed. Reg. 61083, 61085 (Oct. 24, 2003) (explaining *Gearhart*).[9] In 1988, EPA conducted a National Sewage Sludge Survey to gather data from wastewater processors.[10] Based primarily on this data, in 1993, EPA finally promulgated sewage sludge regulations, which govern not only land application, but disposal in landfills and through incineration. 58 Fed. Reg. 9248-9404 (Feb. 19, 1993) (40 C.F.R. § 503, eleven heavy metals and total hydrocarbons) (Part 503 regulations), ADD- 009-165. EPA has not regulated a single substance in sludge since. The regulations we rely on to protect us *today*, which Congress required EPA to review for sufficiency *biennially*, are based on data collected the year the Soviet Union collapsed, the film "Rain Man" came out, and Microsoft Office was introduced.

Industry immediately challenged the regulations, and in 1994 this Court

---

[9] The consent decree was later amended to give EPA additional time for the second round (required by 405(d)(2)(B)), through which EPA considered but decided not to regulate certain dioxins. 68 Fed. Reg. 61083- 61096 (Oct. 24, 2003).

[10] EPA, *1988 National Sewage Sludge Survey*, www.epa.gov/biosolids/1988-national-sewage-sludge-survey, last accessed March 13, 2026.

rejected some portions and upheld others in *Leather Indus. of Am. v. EPA*, 40 F.3d 392, 395 (D.C. Cir. 1994). Scientists and legal scholars questioned whether the regulations were protective enough.[11] The controversy led to several closer looks at the sewage sludge program, particularly with relation to land-spreading (biosolids).

In the late 1990s, EPA's Inspector General (IG) reviewed the biosolids program, and faulted EPA for failing to ensure compliance with the regulations. EPA IG Report No. 2000-P-10 (March 20, 2000). Shortly thereafter, EPA's IG again investigated the biosolids program, this time due to whistleblower allegations. EPA IG Report No. 2000-P-10 (March 28, 2002). The report found that "EPA continues to place a low priority on the program, and staff assigned to the biosolids program have been declining." *Id.*, i. EPA's Office of Water, which is responsible for compliance with the biennial review provision, had only four full time equivalent positions (FTEs) working on biosolids. *Id.*, 5. Additionally, the National Academy of Science's National Research Council conducted an

---

[11] *See generally* E. Harrison et al., *The Case for Caution: Recommendations for Land Application of Sewage Sludge and an Appraisal of the US EPA's Part 503 Sludge Rules*. Cornell Waste Management Inst., Working Paper (Aug. 1997, revised Feb. 1999); Christopher J. Conrad, *Sewage Sludge and Land Application Practices: Do the Section 503 Standards Guarantee Safe Fertilization Usage*, 9 Penn St. Envtl. L. Rev. 147 (2000); William Goldfarb et al., *Unsafe Sewage Sludge or Beneficial Biosolids?: Liability, Planning, and Management Issues Regarding the Land Application of Sewage Treatment Residuals,* 26 B.C. Envtl. Aff. L. Rev. 687 (1999).

independent review of the scientific basis of the Part 503 regulations with respect to land application and found that the regulations were based on outdated science.[12]

EPA did not update its regulations upon receiving the 2002 report; it developed a "final action plan" to collect yet more data, 68 Fed. Reg. 75531, 75533 (Dec. 31, 2003), even though EPA had conducted another national sewage sludge survey in 2001.[13] In 2006, it conducted a third national sewage sludge survey and also started issuing what it calls "Biennial Reports."

From the fifth report (reporting period 2012-2013) forward, EPA began calling these "Biosolids Biennial Reports," and they do not appear to address the other disposal methods, even though the Part 503 regulations are not limited to land application. *See* EPA pie chart *supra* at 7 (showing that roughly 40% of sewage sludge is disposed of through other methods).

---

[12] NRC, *Biosolids Applied to Land: Advancing Standards and Practices* (July 2002), 3, available at *www.nationalacademies.org/read/10426*, last accessed March 13, 2026. As one court observed, the anecdotal allegations of injury from sludge spreading to which the report alluded included over 350 examples of adverse effects collected by the Cornell Waste Management Institute and the deaths of 300 cattle in Georgia resulting in a $550,000 jury verdict in state court (*Boyce v. Augusta-Richmond County*,111 F. Supp. 2d 1363 (S.D. Ga. 2000)). *Cnty. Sanitation Dist. No. 2 v. Cnty. of Kern*, 127 Cal. App. 4th 1544, 1565, n. 28 (2005).

[13] EPA, *2001 National Sewage Sludge Survey,* available at: https://www.epa.gov/biosolids/2001-national-sewage-sludge-survey, last accessed March 11, 2026.

### C. EPA's "biennial reports"

Although the law requires that the biennial review process be for the purpose of identifying and regulating additional toxic pollutants in sewage sludge, EPA's biennial reviews and "biennial reports" [14] instead simply collect information on substances present in biosolids.[15] *See, e.g.*, Biosolids Biennial Report No. 9 (link in footnote 15 below), at 1-2. In report after report, EPA postpones deciding which substances may require regulation, even as the number of substances identified as present in sludge continued to balloon. The most recent reports admit that EPA is still developing a prioritization and risk screening process. *See* page 1 of Reports No.s 7, 8, and 9.

In 2014, EPA's IG again identified substantial problems with EPA's sludge program, finding that EPA had not taken actions to address hundreds of hazardous chemicals from sewage treatment plants. EPA IG Report No. 14-P-0363 (Sept.

---

[14] EPA has issued a total of nine reports, starting (belatedly) in 2006. It has issued nothing for Reporting Periods 2022-2023 and 2024-2025. See EPA, *Biennial Reviews of Sewage Sludge Standard,* including links to each of the nine reports, available at www.epa.gov/biosolids/biennial-reviews-sewage-sludge-standards, last accessed March 16, 2026.

[15] As EPA confusingly explains in Biosolids Biennial Report No. 9 at iii, "biosolids" means sewage sludge treated to Part 503 standards and intended to be land-applied, yet for the purpose of the biennial report, EPA appears to intend for "biosolids" to mean the broader category of "sewage sludge" as defined by the Part 503 regulations. Available at https://www.epa.gov/system/files/documents/2022-12/2020-2021-biennial-report.pdf.

2014). In 2018, the IG issued a report entitled, "*EPA Unable to Assess the Impact of Hundreds of Unregulated Pollutants in Land-Applied Biosolids on Human Health and the Environment*," finding that among the pollutants in land-applied sewage sludge that EPA had not analyzed for regulation are "61 designated as acutely hazardous, hazardous, or priority pollutants in other programs." EPA IG Report: No. 19-P-0002 (Nov. 15, 2018).[16] This report emphasized EPA's deprioritization of its biosolids program and staff. In the department responsible for compliance with the biennial review mandate, *id*. 9, "there are less than the equivalent of *one-and-a half full-time staff working on biosolids*," *id*., 17 (emphasis added). The report faults EPA for failing to disclose to the public the fact that "because it cannot assess the safety of the 352 pollutants found in biosolids, it cannot inform the public as to whether the biosolids are safe." *Id*., 19.

Meanwhile, scientific studies and real-life examples of the devastating effects of sludge spreading – including on the property of Plaintiffs-Appellants James Farmer, Robin Alessi, Tony and Karen Coleman, and Patsy Schultz and the property of farmers who are members of Plaintiff-Appellant Maine Organic Farmers and Gardeners Association – have continued to pile up.

---

[16] Available at https://www.epa.gov/sites/default/files/2018-11/documents/_epaoig_20181115-19-p-0002.pdf.

## IV. Procedural History and Anticipated Narrowing Upon Remand

The decision at issue on appeal is the United States District Court for the District of Columbia's September 29, 2025 Memorandum Opinion and Order granting defendants' Motion to Dismiss Plaintiffs' Complaint, JA 40-49. The aspect of the ruling we are appealing is the District Court's dismissal the CWA counts on the basis that while there was a duty to "review" the regulations every two years, there was no date certain timeline to "identify" and "regulate" and therefore no non-discretionary duty supporting a claim under the CWA citizen suit provision.

If this case is remanded, Appellants will focus solely on a <u>single list of six PFAS</u> claimed to meet the statutory criteria requiring identification and regulation under the CWA, regardless of their presence on prior biennial reports. For this reason, this brief does not address the District Court's conclusion that the biennial reports do not constitute a final agency action, as that determination was only relevant to the Administrative Procedure Act claim of arbitrary and capricious action for failure to list substances in a biennial report, a claim that Plaintiffs-Appellants are no longer pursuing.

## SUMMARY OF THE ARGUMENT

Congress required EPA to review sewage sludge regulations biennially "for the purpose of identifying additional toxic pollutants and promulgating regulations

for such pollutants consistent with the requirements of this paragraph." 33 U.S.C. § 1345(d)(2)(C). There is no basis in statutory interpretation, legislative history, or common sense for the District Court's conclusion that the words "for the purpose of" divorce the actions of identifying and regulating from the two-year deadline.

A two-year deadline for those actions not only gives effect to the plain language of the statute, but it is consistent with the coherent statutory scheme for sludge regulation, evident from the wording choices Congress made in rejecting the provision's prior version, and in harmony with the historical context in which Congress drafted the provision. It is also in keeping with other courts' interpretations of similar duties in other laws.

This Court should overturn the dismissal and find that in each two-year period, EPA must identify any substances meeting the statutory criteria for regulation, and regulate them.

## STANDARD OF REVIEW

This Court reviews *de novo* the dismissal of a complaint under Rule 12(b)(6), accepting plaintiffs' factual allegations as true and drawing all reasonable inferences in their favor. *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, (D.C. Cir. 2015). When reviewing a dismissal under Rule 12(b)(1) for which the District Court did not purport to resolve disputed facts, this Court reviews the dismissal *de novo*, taking plaintiffs' allegations as true. *Id.*, 1129.

## ARGUMENT

### V. The District Court Erred in Dismissing Plaintiffs-Appellants' Case Due to an Incorrect Conclusion that the Biennial Review Provision, 33 U.S.C. § 1345(d)(2), Lacked Deadlines.

The CWA's citizen suit provision enables a lawsuit in the district courts "where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). The District Court held that there was no cause of action under this provision because there was no time certain for the EPA to perform the duty of "identifying and regulating," as opposed to merely "reviewing."

The question on review is whether the biennial review provision requires EPA to act within each two-year period to identify and regulate substances in sewage sludge that meet the statutory criteria requiring regulation. If so, there is a mandatory duty with a date certain, and therefore there is a cause of action under the CWA citizen suit provision and the District Court erred in dismissing the case on jurisdictional grounds.

#### A. The statute's plain language requires EPA, every two years, to identify additional toxic pollutants in sludge that meet the statutory criteria and regulate them.

To establish what Congress intended, the Court begins by determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case," closing the inquiry "if the statutory language

is unambiguous and 'the statutory scheme is coherent and consistent.'" *United States v. Wilson,* 290 F.3d 347, 352-353 (D.C. Cir. 2002) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997)). The Court looks not only to "the particular statutory language at issue," but also "the language and design of the statute as a whole." *Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 895 F.3d 90, 97 (D.C. Cir. 2018) (quoting *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)) "The Supreme Court has stressed time and time again that '[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law.'" *Id*. (citing *U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc.*, 508 U.S. 439, 455 (1993))." Furthermore, "when one statutory provision informs the meaning of another at issue, we must apply interpretive tools to *both.*" *Id.* (emphasis original).

The language at issue here is:

> From time to time, but not less often than *every 2 years*, the Administrator shall review the regulations promulgated under this paragraph for the purpose of identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph.

*Id*. § 1345(d)(2)(C) (emphasis added).

Under the statute's plain language, the words "for the purpose of" set out what the review must accomplish. EPA must, *every two years*, update the regulations by identifying and regulating any toxic pollutants in biosolids that meet

the criteria requiring regulation (which Congress set out in "this paragraph" in Section 405(d)(2)(A)(i)).

Statutory interpretation must "give effect to the intent of Congress." *United States* v. *Am. Trucking Ass'ns., Inc.*, 310 U. S. 534, 542 (1940). Identifying and regulating additional pollutants is the *explicit* purpose of the review. To divorce the actions of identifying and regulating pollutants from the two-year timeline, as the District Court has done, renders the provision meaningless, as whatever EPA considers to be its biennial "review" need not reach any conclusions about whether the regulation sufficiently protects public health.

In addition to this unambiguous language, "the statutory scheme is coherent and consistent." *Wilson*, 290 F.3d at 352. This portion of the CWA is about ensuring the safety of sewage sludge disposal methods through two initial rounds of regulations, followed by reviews to ensure that EPA would catch and remedy any additional threats in two-year intervals. The fact that the statute requires EPA to identify and regulate "additional" toxic pollutants every two years reinforces that the biennial review provision contains the same basic requirements as those for the first two rounds of regulation. It is a coherent statutory scheme.

The consistency of the timeframes in Section 405(d)("Regulations") suggests that when it drafted this provision, Congress regarded the identification and regulation of additional pollutants in sewage sludge to be achievable in a two-

year period. The two-year timeline to identify and regulate is consonant with the timelines Congress imposed in Section 405(d)(1) (retaining language from the 1977 version of the law requiring EPA to "develop and publish" regulations within one year of the 1977 version's enactment) and in Section 405(d)(2)(A) and (B) for the first two rounds of regulation, explained supra at 14. Indeed, two years is longer than the total time frame in Round Two of roughly sixteen months for EPA to both identify pollutants and promulgate regulations for them.

Finally, the plain meaning of the words "*may* be present in sewage sludge in concentrations which *may* adversely affect public health or the environment" in the criteria for mandatory regulation as set out in Section 405(d)(2)(A)(i) present a low evidentiary bar for the determination EPA needs to make for "identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph," Section 405(d)(2)(C). This low bar should not require decades of information-gathering. The language further demonstrates the consistency of the statutory scheme and the reasonableness of reading the biennial deadline to apply to the actions of identifying and regulating substances meeting the statutory criteria requiring regulation.

### B. The statute's history and purpose further demonstrate that EPA's duties of "identifying" and "regulating" are biennial.

Should this Court find the words "for the purpose of" unclear, it looks to "the specific context in which that language is used, and the broader context of the

statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) (citing prior Supreme Court cases)). "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Davis v. Mich. Dept. of Treasury*, 489 U.S. 803, 809 (1989)). Context includes related provisions in historically antecedent statutes. *Dep't of Commerce v. U.S. H.R.*, 525 U.S. 316, 339-40 (1999), (exploring historical events surrounding the legislation at issue).

Congress's attempts to get EPA to regulate pollutants in sludge in 1972 and again with stronger language in 1977 had failed. *Supra* at 11-12. It enacted the current wording in 1987 after the Third Circuit found that EPA failed to comply with its Section 405 mandate. *Supra* at 12. Congress made this amendment contemporaneously with the total ban on ocean dumping, *supra* at 13, making it extremely urgent to ensure regulations that would protect public health and safety from the harms of alternate disposal methods (land application, incineration, and landfilling) going forward. Congress even added subparagraph (D), which reminded EPA that the regulations established through the first, second, and

biennial review rounds must be adequate to protect public health and the environment and must require quick compliance.[17]

In short, Congress meant business. It left no question that the biennial review mandate in (C), just like the requirements in (A) and (B), required EPA not to merely gather data, but to identify toxic pollutants requiring regulation and regulate them to protect public health. Courts must reject "constructions which are contrary to clear congressional intent," *INS v. Cardoza-Fonseca*, 480 U.S. 421, 447-448 (1987), as is the District Court's construction here.

Furthermore, EPA's flawed interpretation runs counter to Congress' revision of the historical antecedent of this provision. "Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988). The prior (1977) iteration required EPA to "develop and publish" regulations within one year of the 1977 enactment date "and from time to time thereafter," Section 405(d) (1977). In the 1987

[17] In full: "The management practices and numerical criteria established under subparagraphs (A), (B), and (C) shall be adequate to protect public health and the environment from any reasonably anticipated adverse effects of each pollutant. Such regulations shall require compliance as expeditiously as practicable but in no case later than 12 months after their publication, unless such regulations require the construction of new pollution control facilities, in which case the regulations shall require compliance as expeditiously as practicable but in no case later than two years from the date of their publication." 33 U.S.C. § 1345(d)(2)(D)

revisions, Congress retained this language at Section 405(d)(1), and in the biennial review provision at Section 405(d)(2)(C) defined what "from time to time" meant: "not less often than every 2 years." Although it framed the duty as a "review" of the regulations, Congress was crystal clear that the review was to be "*for the purpose of* identifying additional toxic pollutants and promulgating regulations for such pollutants consistent with the requirements of this paragraph." Section 405(d)(2)(C) (emphasis added).

It is thus clear that Congress did not intend to create a serial two-year data gathering requirement but instead intended to force EPA to at least biennially identify any new threats and promulgate regulations to address those threats.

### C. Courts have recognized the importance of updating standards to protect public health.

Even where there is no date certain to act as there is in this case, courts have stressed the importance of modifying standards meant to protect public and environmental health when new information warrants such modification. See, e.g., *In re A Cmty. Voice v. EPA,* 878 F.3d 779, 784 (9th Cir. 2017) (Looking to the purpose of the Toxics Substances Control Act and its requirement to create and update regulations when necessary to hold that the "statutory framework clearly indicates that Congress did not want EPA to set initial standards and then walk away, but to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress's intent…" See also

*Earth Island v. Regan*, 553 F. Supp. 3d 737, 742-43 (N.D. Cal. 2021) (explaining that if EPA were allowed "to fail to review, update, or amend the [National Contingency Plan] for decades despite scientific advances, the occurrence of incidences involving discharge of oil and hazardous substances, and an internal report concluding that the [plan] was outdated and inadequate" it would frustrate the purpose of the plan.)

**D. The District Court's reasoning was flawed.**

**1. The phrase "for the purpose of" is not limited to future conduct.**

The District Court summarily concluded that "for the purpose of" imposes "at most a prospective duty" based on the 1968 Black's Law Dictionary definition of the phrase as meaning, "with the intention of," and its definition of the word "purpose" as meaning "[t]hat which one sets before him to accomplish; an end, intention or aim, object, plan, project." JA 45. Even if Congress in 1987 consulted the 1968 edition of Black's, nothing about these definitions is *inherently* future-oriented as opposed to contemporaneous.

Take the phrase, "I visit the grocery store weekly for the purpose of selecting and purchasing food." No one expects the speaker to return empty-handed from each weekly grocery run for months on end. Similarly, it would be quite alarming to hear a doctor say, at every annual physical exam, "I've reviewed your health information for the purpose of identifying and resolving any issues.

Someday I might diagnose and treat any problems you might have, but I'm too busy now. See you next year." The words "for the purpose of" *can* be future-oriented, but they can also be descriptive and contemporaneous, and nothing in the Black's Law definitions suggest otherwise.

#### 2. Congress's use of "for the purpose of" rather than "and" is not dispositive.

The other reasoning the District Court provides is that Congress ordered EPA to review the regulations "for the purpose of identifying additional toxic pollutants and promulgating regulations" rather than "'<u>and</u>' identify and regulate additional pollutants." JA 45 (emphasis added). That logic, too, comes up short.

No rule of statutory interpretation (in 1987 when the language was drafted or today) establishes that "for the purpose of" has a different effect than "and" in this circumstance. The case upon which the District Court relied, *Friends of the Earth v. EPA*, 934 F. Supp. 2d 40, (D.D.C. 2013) (Amy Berman Jackson, J.) postdates the drafting of the 1987 language by sixteen years. It involved the following Clean Air Act provision:

> The Administrator shall, from time to time, issue proposed emission standards applicable to the emission of any air pollutant from any class or classes of aircraft engines which in his judgment causes, or contributes to, air pollution which may reasonably be anticipated to endanger public health or welfare.

42 U.S.C. § 7571(a)(2)(A). At issue was whether EPA had a duty to make the *predicate* finding of endangerment. Judge Jackson concluded that it did not, noting

in passing that the statute did not instruct EPA to make an endangerment finding "and" take some action based upon that finding. *Friends*, 934 F. Supp. 2d 40, 49. This hardly establishes that Congress's use of "for the purpose of" rather than "and" in the biennial review provision relieves EPA of the two-year time requirement. In fact, two years earlier, a different DC District Court judge, apparently not overly concerned with the omission of the word "and," interpreted the very same provision to mandate endangerment findings. See *Ctr. for Biological Diversity v. EPA*, 794 F. Supp. 2d 151, 152-62 (D.D.C. 2011) (Henry H. Kennedy, Jr., J.) (examining the overall statutory scheme and history, and concluding that Congress did require EPA to make endangerment findings and, if necessary, promulgate regulatory standards because EPA's "discretion does not extend to eschewing a required component of the regulatory process.").

It is also worth nothing that Judge Jackson did emphasize that "EPA must periodically issue standards" to protect public health and that there is no question that a plaintiff could, through the Clean Air Act's citizen suit provision, seek an order to do so. *Friends* at 48. In any case, the provision at issue in those cases does not – as the biennial review provision here at issue does – incorporate by reference specific criteria *requiring* the promulgation of regulations, nor did it include the phrase "for the purpose of." In short, the District Court erred in concluding that the

choice of "for the purpose of" rather than "and" excuses EPA from the clear two-year timeline for identifying and regulating toxic substances.

## VI. EPA's biennial reports, which merely gather preliminary information, do not fulfill EPA's biennial review duty.

The District Court found that EPA's purely informational biennial reports meet its statutory obligations under the biennial review provision because, in the Court's view, they "facilitate the *subsequent* identification and regulation of pollutants that may adversely affect public health or the environment." JA 45. The District Court made this finding even though in the thirty-nine years since Congress put the requirement in place, EPA has never identified a single substance for regulation through the biennial review process, and even though its running tally of new substances is now up to 739. Biosolids Biennial Report No. 9 at iv.[18]

The statute requires a review of the regulations for the purpose of identifying and regulating additional toxic pollutants, not a review of scientific articles for the purpose of collecting information. What is, at best, an optional preliminary step toward a duty does not itself fulfill the duty. EPA effectively acknowledges this, explaining in Biennial Report No. 9 that its review process "is intended to *help* fulfill [the biennial review requirement]. The data gleaned from the process may be used to assess risk from chemicals found in biosolids." Biennial Report No. 9 at 1.

[18] Available at https://www.epa.gov/sites/default/files/2018-11/documents/_epaoig_20181115-19-p-0002.pdf.

It also states: "Section 405(d) of the Clean Water Act (CWA) requires [EPA] to review sewage sludge regulations every two years to identify any additional pollutants that might occur in biosolids and to set regulations for those pollutants if sufficient scientific evidence shows they could harm, or present a risk to, human health or the environment." *Id*., 1. While this statement misreads the statute (which requires EPA to identify substances in sewage sludge requiring regulation, not to identify "*any additional pollutants that might occur in biosolids*") it does recognize that the law requires it to regulate when there is scientific evidence of potential harm – not just to issue informational reports.

The nation relies on EPA to follow the mandate of the biennial review provision to ensure that all sludge disposal methods – including by spreading on land where food is grown – are safe. Instead, EPA's biennial reports have merely kept a running list of pollutants in biosolids; "it cannot inform the public as to whether the biosolids are safe." EPA IG Report No. 19-P-0002 (Nov. 15, 2018), 19. The biennial reports have never met the biennial review mandate.

## CONCLUSION

To divorce the word "biennial" from the actions of identifying and regulating toxic pollutants continues to expose farmers, gardeners, consumers of American-grown food, and the environment to unacceptable risks, particularly from the PFAS at issue in this case. The District Court's interpretation robs the

public of its right to seek redress through the citizen suit provision of the Clean Water Act and impermissibly transfers EPA's burden to citizens to gather information themselves and petition for rulemaking on a substance-by-substance basis.

This Court should find that the biennial review provision imposes on EPA a clear statutory duty, every two years, to identify any pollutants in sewage sludge meeting the criteria in 33 U.S.C. § 1345(d)(2)(A)(i) and regulate them. It should remand this matter to the District Court to make a factual determination as to whether that duty remains unmet for the six specific PFAS Appellants will advance on remand.

Respectfully submitted March 17, 2026,

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337
ldumais@peer.org

/s/ Paula Dinerstein
PAULA DINERSTEIN
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337
pdinerstein@peer.org

*Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

I certify that this final brief complies with the word limit of Fed. R. App. P. 32 (a)(7)(B), because it contains 7,878 words, excluding the parts of the filing exempted by Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). This brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because it was prepared in a proportionately spaced typeface using Microsoft Word in Times New Roman 14- point font.

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337
ldumais@peer.org

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2026, I electronically filed the foregoing final version of Plaintiffs-Appellants' Opening Brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Laura Dumais
LAURA DUMAIS
Public Employees for Environmental Responsibility
962 Wayne Ave., Suite 610
Silver Spring, MD 20910
(202) 265-7337
ldumais@peer.org